UNITED STATES of America, Plaintiff,

v.

CONSERVATION CHEMICAL
COMPANY, et al.,
Defendants.

No. 82–0983–CV–W–5.

United States District Court,
W.D. Missouri, W.D.

Sept. 2, 1986.

On Request for Clarification
Sept. 17, 1986.

Special Master's Recommendations
June 27, 1986.

See also, D.C.Mo., 628 F.Supp. 391.

Niewald, Waldeck, Norris & Brown, Michael E. Waldeck, John L. Hayob, Terry L. Karnaze, Kansas City, Mo., for Conservation Chemical, CCC of Ill. and Norman Hjersted.

Thos. F. Fisher, John M. Kilroy, Jr., Shughart, Thomson & Kilroy, Kansas City, Mo., Edmund B. Frost, John A. Zackrison, Kirkland & Ellis, Washington, D.C., Robert F. St. Aubin, FMC Corp., Philadelphia, Pa., for FMC Corp.

Neil D. Williams, Overland Park, Kan., James F. Duncan, Watson, Ess, Marshall & Enggas, Kansas City, Mo., Allan J. Topol, Patricia A. Barald, David F. Williams, Covington & Burling, Washington, D.C., for IBM Corp.

Richard F. Adams, Ben R. Swank, Jr., John J. Williams, III, Slagle & Bernard, Kansas City, Mo., for third party plaintiffs.

Linde Thomson Fairchild Langworthy Kohn & Van Dyke, P.C., John R. Cleary, Darwin Johnson, Wm. Session and Robert J. Bjerg, Kansas City, Mo., for Norman Hjersted.

J. Jeffrey McNealey, Porter, Wright, Morris & Arthur, Columbus, Ohio, Martin J. Purcell, Robert M. Kroenert, Stanley A. Reigel, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Daniel W. Kemp, Legal Dept., Armco, Inc., Middleton, Ohio, for Armco, Inc.

Jerome T. Wolf, Carl H. Helmstetter, Spencer, Fane, Britt & Browne, Kansas City, Mo., John A. McKinney, Morton I. Zeidman, Alan R. Chesler, New York City, for AT & T Tech. Inc.

Stephen Jacobson, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for Mobay.

Kenneth Josephson, Asst. U.S. Atty., Kansas City, Mo., John R. Barker, Environmental Enforcement Section, Land Natural Resource Div., U.S. Dept. of Justice, Washington, D.C., Ken Weinfurt, Asst. U.S. Atty., Kansas City, Mo., John Wittenborn, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

On June 27, 1985, the Special Master filed a report issuing recommendations concerning the appropriate disposition of twenty-two motions and cross-motions for summary judgment and partial summary judgment. As required, the Court has independently reviewed the record regarding the issues relating to the Master's report, including the relevant motions and responses thereto, and the objections filed to the report. *See United States v. Louisiana,* 470 U.S. 93, 105 S.Ct. 1074, 1080, 84 L.Ed.2d 73 (1985). Accordingly, the Court vacates its Order of July 10, 1986 and enters the following rulings *nunc pro tunc* * in summary form and, with respect to those recommendations approved by the Court, the Court adopts the reasoning stated in the Master's report in support of those recommendations. Recommendations of the Master not adopted by the Court will be so designated.

1. CHOICE OF LAW—

a. Contracts—substantive law of Missouri will apply to all questions involving formation, construction or interpretation of the insurance policies, except for those policies which contain a choice of law provision. There the law of the state chosen will control.

b. Torts—substantive law of Missouri will apply to any claims sounding in tort.

c. Generally—where Missouri has not established, by statute or decision, a particular issue, general principles of insurance law will be applied.

* The third-party plaintiffs' claims against Commercial Union, Great American, Maryland Casualty and Great Southwest have been settled, and those insurers are excluded from these summary judgment rulings.

## 2. AFTER LITIGATION INSURANCE—

As a matter of law, no "occurrence" took place after September 29, 1980—the date the government instituted suit.

Accordingly, summary judgment is

(a) Granted in favor of Centaur Insurance Co. on the claims of CCC, CCCI, Hjersted, Armco, AT & T–TI, FMC, IBM, Sperry and Murray-Ohio[1] on each of the three policies issued by Centaur after September 29, 1980;

(b) Granted in favor of Central National on the claims of CCC, CCCI, Hjersted, Armco, AT & T–TI, FMC, and IBM;

(c) Granted in favor of each third-party defendant insurer issuing a policy to CCC, CCCI and/or Hjersted after September 29, 1980.[2]

## 3. CLAIMS MADE POLICIES—

As a matter of law, claim must be made within the policy period of the relevant "claims-made" policy for coverage to be afforded.

Accordingly, summary judgment is

(a) Denied as to Lincoln Insurance Co.'s motion on the basis of the "claims-made" policy provision;

(b) Granted as to Evanston's 1985 policy, but denied on the basis of the claims-made policy provision;

(c) Denied as to Mutual Fire's motion on the basis of the claims-made policy provision.

## 4. FAILURE TO SETTLE—

There is no issue as to any material fact existing with respect to the claim for bad faith refusal to settle pleaded in Count III of the OGD's third-amended third-party complaint.

Accordingly, summary judgment is granted in favor of each of the 16 Third-party Defendant Insurers on Count III of the OGD's Third Amended Third-Party Complaint.

## 5. ISSUANCE DELIVERY AND PAYMENT—

■ (a) As to the Original Generator Defendants, partial summary judgment is

(i) Granted on the issues of issuance, delivery and payment of insurance policies against Central National, Home, American Fidelity, and Continental;

(ii) Granted on the single issue of issuance of insurance policies against Centaur, Evanston, Mutual Fire, Foremost, and Lincoln.

(iii) Over the recommendation of the Special Master, summary judgment is additionally granted on issues of delivery and payment regarding the policies against the same companies as listed in (ii) above.

■ (b) As to the Site Operator Defendants, partial summary judgment is

(i) Granted on the issues of issuance, delivery and payment as to CCCI and Hjersted over the recommendation of the Special Master;

(ii) Granted on the issues of issuance, delivery and payment by CCC with respect to Central National, Home, American Fidelity, and Continental;

(iii) Over the recommendation of the Special Master, summary judgment is additionally granted as to the issues of delivery and payment by CCC regarding Centaur, Evanston, Mutual Fire, Foremost, and Lincoln.

## 6. "PROPERTY DAMAGE" UNDER CGL POLICIES—

As to the Original Generator Defendants, partial summary judgment is granted on the specific issues that:

(a) Environmental harm associated with the CCC site constitutes "property damage" as such term is used and defined in

---

1. Sperry and Murray-Ohio were inadvertently omitted from the Special Master's Recommendations.

2. The Master's Recommendations incorrectly stated this date as December 28, 1980.

the CGL insurance policies issued and delivered to CCC;

(b) Cleanup costs arising out of the environmental harm caused by the discharge, dispersal, release or escape of toxic chemicals and waste material constitutes "damage" as that term is used in the CGL policies issued and delivered to CCC;

(c) Alleged economic losses in the form of response and cleanup costs sought by the United States constitute damage caused by or arising out of the environmental harm for purposes of the CGL insurance policies issued and delivered to CCC.

### 7. OCCURRENCES—

A question of fact remains as to when disposal of waste materials first commenced, when leaking first occurred, or when damage to the environment was first discovered. A further question remains as to the Site Operators' objective or subjective knowledge[3] that there was a substantial probability that environmental harm would result from their activities.

Accordingly, summary judgment is denied as to the various insurers' motions on the issue that CCC expected and intended harm to result from its operations.

### 8. OWNED PROPERTY EXCLUSION—

While the "owned property exclusion" cannot apply to percolating ground water under the CCC site, there remains a question of fact as to what portion of the remedy relates solely to damage to the CCC site itself.

Accordingly, summary judgment is denied as to the motion of Armco, AT & T-TI and FMC on the issue that the owned property defenses are inadequate as a matter of law to bar coverage for remedial measures being undertaken at the CCC site.

### 9. THE POLLUTION EXCLUSION—

Questions of fact remain concerning the ambiguity of this exclusion clause. Further questions remain as to whether the pollution was sudden and accidental, and whether Hjersted had intent to cause harm.

Accordingly, summary judgment is denied on the basis of the pollution exclusion clause.

However, the exception is for damage occurring *after* the initiation of this action. Therefore, as pertains to Central National's January 1983 policy, summary judgment is granted.

### 10. DUTY TO DEFEND—

 Both the Original Generator Defendants and the Site Operator Defendants move for summary judgment on the issue of the Insurance Companies' obligation to defend CCC, CCCI and Hjersted against all claims asserted by the United States and "other parties." There is no issue as to material facts with respect to the duty to defend CCC. Over the recommendation of the Special Master, the Court additionally finds there is no question of fact as to the duty to defend Hjersted and as to the duty of two companies to defend CCCI.

Accordingly, summary judgment is

(a) Granted against those primary insurance carriers who issued and delivered standard-form CGL policies ("accident" or "occurrence") prior to September 29, 1980 to CCC, and for which CCC paid the applicable premium;

(b) Granted against Foremost and Mutual Fire as to their duty to defend CCCI;[4]

(c) Granted against the same insurance carriers as in (a) above, as to Hjersted;

---

**3.** The Special Master recommended that an objective test of "knew or should have known" should be applied to determine whether an act falls within the definition of "occurrence" or "accident." The OGDs argue a subjective test, that is a showing of specific intent, be applied. For the purposes of trial, the Court will admit evidence under both standards. At this time, the Court defers a ruling on which test shall govern.

**4.** Objections to the Special Master's recommendations indicate a question of fact remains as to whether CCCI was a named insured under Lincoln's policies.

(d) Denied as to any "excess" insurer on the duty to defend.

## 11. THIRD–PARTY BENEFICIARIES—

Questions of fact remain with respect to the intention and motive of the parties to confer a benefit on a third party.

Accordingly, summary judgment is denied on the motions filed by Foremost, ACIC and Centaur on the issue of third-party beneficiaries.

## 12. INDIVIDUAL INSURER'S MOTIONS FOR SUMMARY JUDGMENT

The conclusions and recommendations of the Special Master concerning the following nine Insurance Companies' motions for summary judgment are adopted in their entirety:

(a) Evanston
(b) Mutual Fire
(c) Lincoln
(d) Centaur
(e) Foremost
(f) Continental Casualty
(g) Home
(h) Central National
(i) American Centennial

## 13. MOTIONS OF MURRAY OHIO AND SPERRY CORPORATION—

As there are questions of fact regarding the identical motions of Murray Ohio Manufacturing Company and the Sperry Corporation for judgments on their cross-claims against CCC for indemnification for all obligations imposed on them as a result of the present litigation, summary judgment is denied.

At this time no action will be taken on the motion of Sperry and Murray Ohio against Illinois Employers Insurance of Wausau.

## 14. CONTRACTUAL INDEMNITY—

The Original Generator Defendants' separate motions for summary judgment against CCC on the issue of indemnification must be denied pending development of those factors which would enable a determination of the state possessing the most significant relationship to the parties and indemnity.

Accordingly, subject only to the expressed exceptions contained above, it is

ORDERED that the Special Master's Report of June 27, 1986 is adopted. It is further

ORDERED that, subject to the exceptions contained above, the pending motions for summary judgment are ruled in accordance with the Master's Report.

## ON REQUEST FOR CLARIFICATION

Upon the request of Illinois Employers Insurance Company of Wausau for clarification of this Court's September 2, 1986, Summary Judgment Order, it is hereby ordered:

1. Claims brought by Murray Ohio and Sperry against Illinois Employers of Wausau were dismissed by this Court's Order of July 18, 1986. Accordingly, no motions between Sperry and Murray Ohio and Illinois Employers Insurance of Wausau remain before the Court for consideration.

2. This Court's Summary Judgment Order of September 2, 1986, does not apply to Illinois Employers Insurance of Wausau because Illinois Employers Insurance of Wausau, having settled with third-party plaintiffs, was not a party to the summary judgment motions addressed in the Court's ruling.

## SPECIAL MASTER'S RECOMMENDATIONS ON MOTIONS FOR SUMMARY JUDGMENT REGARDING INSURANCE AND INDEMNIFICATION

### TABLE OF CONTENTS

Page

A. INTRODUCTION AND BACKGROUND .... 162
B. SUMMARY JUDGMENT STANDARDS ..... 170
C. UNCONTROVERTED FACTS ............. 172
D. CHOICE OF LAW ........................ 176
E. PRELIMINARY MATTERS ............... 178
 1. After Litigation Insurance ............ 178

Page

2. Claims Made Policies .................. 181
3. Failure to Settle ...................... 184
F. ISSUANCE, DELIVERY AND PAYMENT ... 185
G. "PROPERTY DAMAGE" UNDER CGL POLI-
 CIES ................................... 187
H. OCCURRENCES ........................... 194
I. OWNED PROPERTY EXCLUSION ........ 199
J. THE POLLUTION EXCLUSION ........... 201
K. DUTY TO DEFEND ...................... 204
L. THIRD–PARTY BENEFICIARIES ......... 208
M. INDIVIDUAL INSURER'S MOTIONS FOR
 SUMMARY JUDGMENT ................. 213
 1. Maryland Casualty .................... 213
 2. Commercial Union ..................... 216
 3. Evanston ............................. 219
 4. Mutual Fire........................... 220
 5. Lincoln .............................. 220
 6. Centaur.............................. 222
 7. Foremost ............................. 225
 8. Continental Casualty ................. 226
 9. Home................................. 227
 10. Central National ..................... 227
 11. American Centennial .................. 227
 12. Great American ....................... 228
N. MOTIONS OF MURRAY OHIO AND SPER-
 RY CORPORATION ..................... 231
 1. Sperry ............................... 231
 2. Murray Ohio .......................... 234
O. CONTRACTUAL INDEMNITY ............. 235

## A. INTRODUCTION AND BACKGROUND

From 1960 until the present, defendant Conservation Chemical Company ("CCC") has owned and operated an industrial chemical waste disposal facility located at 8900 Front Street, Kansas City, Missouri (the "Site," the "CCC Site" or the "K.C. Site"). The approximately six-acre site is located on the Missouri River floodplain, between East Bottoms Levy and the Missouri River, just upstream of the confluence of the Missouri and Blue Rivers. *See, United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 182–84 (W.D.Mo.1985).

On September 29, 1980, the United States of America ("United States" or "Plaintiff") filed suit, pursuant to 42 U.S.C. § 6973, Section 7003 of the Resource Conservation and Recovery Act ("RCRA") in the United States District Court for the Western District of Missouri against CCC, Kansas City Power & Light Company (KCP & L) and Mobay Chemical Company ("Mobay"). The Complaint alleged that hazard-

ous wastes which had been disposed of and which were stored at the CCC Site were migrating from the site and posed a danger to public health and the environment. The United States sought reimbursement of expenses and injunctive relief to compel cleanup of the site.

On September 3, 1981, an Amended Complaint was filed by the United States against CCC, KCP & L and Mobay. Pursuant to Section 7003 of RCRA, the United States sought injunctive relief to compel implementation of plans to clean-up the Site and for recovery of costs and expenses expended to determine the nature and extent of contamination.

On November 22, 1982, the United States filed the present action, Civil Action No. 82–0983–CV–W–5, against CCC, Conservation Chemical Company of Illinois ("CCCI"), Norman B. Hjersted ("Hjersted"), FMC Corporation ("FMC"), International Business Machines Corporation ("IBM"), Armco, Inc. ("Armco") and AT & T Technologies, Inc. ("AT & T–TI"). CCCI is a domestic corporation which owned a similar site in Gary, Indiana. Both CCC and CCCI were owned by Norman Hjersted who also acted as President and Chief Executive Officer of the two corporations. The four other defendants were "deep pockets" selected by the Government out of over 150 waste generators who supplied waste to CCC and/or CCCI for disposal at the site. The other generators were subsequently brought into the suit by impleader by the four generator defendants.

The factual averments contained in the 1980 and 1981 suits were essentially realleged. The Complaint asserts claims pursuant to 42 U.S.C. § 6973, Section 7003 of RCRA and 42 U.S.C. §§ 9604, 9606, and 9607(a), of the Comprehensive Environmental Response Compensation and Liability Act of 1980 (hereinafter "CERCLA"). (On December 9, 1982, the Court issued an Order requiring the United States "to show cause ... why Case Number 80–0883–CV–W–5 should not be dismissed with prejudice and why Case Number 82–0983–CV–W–5 should not be the only case to proceed."

On March 31, 1983, a Stipulation for Dismissal was filed with respect to Case No. 80–0883–CV–W–5). In very general terms, the United States seeks reimbursement for response costs incurred by the Government in connection with the CCC Site as well as an injunction requiring defendants to remedy environmental endangerment at the Site due to the handling, disposal and discharge of various industrial waste materials. It is alleged that from the early 1960's until 1979, large quantities of solid or hazardous waste, hazardous substances and/or pollutants or contaminants were deposited at the Site which present an imminent and substantial danger to the public health or welfare. It is further alleged that as a consequence of the activities of defendants at the CCC Site that such hazardous wastes were and are being released into the environment and/or have seeped or migrated from the site as leachate.

In letters dated October 13, 1983 and December 13, 1983, CCC, CCCI and Hjersted requested that nine (9) insurance companies which had issued primary liability insurance policies to CCC assume the defense of CCC, CCCI and Hjersted against the claims asserted by the United States. The letter requests were made to the following primary insurers: (1) American Fidelity Fire Insurance Company (policy period 3/22/71 to 3/22/72); (2) Centaur Insurance Company (policy period 12/14/81 to 12/14/83); (3) Commercial Union Insurance Company (policy period 9/7/60 to 9/7/66); (4) Evanston Insurance Company (policy period 12/14/80 to 12/14/81); (5) Foremost Insurance Company (policy period 3/22/72 to 12/1/76); (6) Great American Insurance Company (policy period 9/7/66 to 9/7/68); (7) Lincoln Insurance Company (policy period 12/14/78 to 12/14/79); (8) Maryland Casualty Company (policy period 9/7/68 to 2/26/71); and (9) Mutual Fire, Marine and Inland Insurance Company (policy period 12/14/79 to 12/14/80). Each of the companies had issued one or more primary liability insurance policies to CCC, CCCI and/or Norman Hjersted during the period of 1960 through 1983. (Commercial Union Insurance Company, Centaur Insurance Company, Evanston Insurance Company, Foremost Insurance Company, Great American Insurance Company, Lincoln Insurance Company, Maryland Casualty Company, and Mutual, Fire, Marine and Inland Insurance Company issued more than one policy).

Each of the insurance companies refused to defend CCC, CCCI and Hjersted, except for Commercial Union Insurance Co., Foremost Insurance Co. and Great American Insurance Co. which agreed to assume the defense of CCC and Hjersted subject to a full reservation of rights. The remainder of the primary insurers disclaimed any obligation to defend or indemnify CCC, CCCI and/or Hjersted against the claims asserted by the United States or claims made by other parties to the action.

The primary insurers relied upon a number of exclusions and conditions in their respective policies in refusing to defend CCC, CCCI and Hjersted. Their contentions can be summarized as follows: (1) the Government's Complaint fails to allege the happening of an "occurrence" or "accident" as those terms are defined in the policies; (2) the Government's Complaint contains no allegation of "property damage" within the meaning of the policies; (3) the "pollution exclusion" clause precludes coverage for claims asserted by the United States; and (4) the policies do not provide coverage for claims seeking injunctive or other equitable relief.

In a letter dated April 13, 1984, CCC, CCCI and Hjersted renewed their demand for defense and indemnification. The primary carriers once again declined to defend CCC, CCCI and Hjersted.

Thereafter, on June 19, 1984, CCC, CCCI and Hjersted filed a Third-Party Complaint against eleven (11) primary insurance carriers (American Fidelity Fire Insurance Co., Centaur Insurance Co., Commercial Union Insurance Co., Evanston Insurance Co., Foremost Insurance Co., Great American Insurance Co., Lincoln Insurance Co., Maryland Casualty Co., Mutual Fire, Marine and Inland Insurance Co., Hartford

Accident & Indemnity Co., and Illinois Employers Insurance Co. of Wausau) and five (5) excess carriers (Continental Casualty Co., American Centennial Insurance Co., The Home Insurance Co., Great Southwest Fire Insurance Co., and Central National Insurance Co. of Omaha) seeking a declaration of the insurers' obligation to defend and indemnify CCC, CCCI and Hjersted against and for the claims asserted by the United States as well as the claims made by other parties on the numerous cross-claims and counterclaims seeking contribution and indemnity from CCC, CCCI and Hjersted.

At issue in this case are a total of twenty-six (26) primary policies underwritten by nine (9) insurance companies. The primary policies include:

(1) Six of the policies were written by Commercial Union Insurance Co. ("Commercial Union") and its predecessor in interest, Central Surety and Insurance Corp. ("Central Surety"), with successive yearly policies covering the period September 7, 1960 through September 7, 1966.

(2) Two policies were issued by Great American Insurance Company ("Great American") with policy periods from September 7, 1966 through September 7, 1968.

(3) Three policies were written by The Maryland Casualty Company ("Maryland Casualty") with annual policy periods from September 7, 1968 through September 7, 1971.

(4) One policy with a policy period from March 22, 1971 through March 22, 1972 was issued by American Fidelity Fire Insurance Co. ("American Fire").

(5) Five policies were written by Foremost Insurance Company ("Foremost") with annual policy periods from March 22, 1972 through March 22, 1976.

(6) Two policies were issued by Lincoln Insurance Company ("Lincoln") with policy periods from December 14, 1977 through December 14, 1979.

(7) Two policies were written by Mutual Fire, Marine and Inland Insurance Company ("Mutual Fire") covering the period of December 14, 1979 through December 14, 1980.

(8) Two policies were issued by Evanston Insurance Company ("Evanston") for the period December 14, 1980 through December 14, 1981. (One of the Evanston policies was a "Products and Completed Operations" policy while the other was a Comprehensive General Liability policy).

(9) Three policies were issued by Centaur Insurance Company ("Centaur") with policy periods from December 14, 1981 until January 1, 1985.

Also at issue are 13 excess policies underwritten by five (5) insurance companies:

(1) Three excess policies written by Continental Casualty Co. ("Continental Casualty") for the period September 19, 1960 to September 7, 1963.

(2) Seven excess policies issued by The Home Insurance Company ("Home") with effective dates from March 3, 1966 through March 22, 1977.

(3) One excess policy written by Great Southwest Fire Insurance Company ("Great Southwest") with a policy period of December 14, 1976 to December 14, 1977.

(4) One excess policy issued by American Centennial Insurance Co. ("ACIC") with a policy period of December 14, 1981 to January 1, 1983.

(5) One excess policy with a policy period of January 1, 1983 to January 1, 1984 issued by Central National Insurance Co. of Omaha ("Central National").

On or about December 26, 1985, CCC, CCCI and Hjersted ("the Site Operator Defendants" or "Third-Party Plaintiff Operators") filed a First Amended Third-Party Complaint naming seventeen insurance companies as third-party defendants. In fifty numbered paragraphs, the Third-Party Complaint alleges that each of the seventeen insurers is liable for the claims asserted by the United States because each issued one or more policies to CCC, with Hjersted being a "Person Insured" by definition under each of the policies issued by the third-party defendant insurers by vir-

tue of his capacity as an officer, director, stockholder and/or employee of CCC, acting within the scope of his duties as such. CCCI is a named insured under the policies issued by third-party defendants Great American, Home, Foremost, Illinois Employers Insurance of Wausau ("Wausau"), Great Southwest, Lincoln, Mutual Fire, Evanston, Centaur, ACIC, and Central National. The policies of insurance referred to have individual policy periods, as set forth in each policy, covering a total aggregate period of time from 1960 through and including 1983. It is alleged that Third-Party Plaintiff Operators have complied with all conditions under the policies, including payment of the policy premiums. The Third-Party Complaint states that under the terms and provisions of the policies enumerated, which are incorporated by reference, the respective third-party defendants are obligated to defend and pay any judgments recovered by the United States, or by any cross-claiming or counterclaiming party, against CCC and Hjersted in this action. The named insurers of CCCI are alleged to have similar obligations to defend and pay any judgments recovered by the United States or by any cross-claiming or counterclaiming party, against CCCI. The First Amended Third-Party Complaint further alleges that the third-party defendant insurers, although requested to do so, have refused to defend the action and have declared that they would not pay any judgment rendered against defendants CCC, CCCI and Hjersted in the action or have reserved the right to do so. The Third-Party Plaintiff Operators pray for judgment against the insurance companies in such sums, if any, as may be awarded as a judgment against CCC, CCCI and Hjersted under the Complaint filed by the United States, or any other claim, counterclaim or cross-claim asserted; for reasonable fees and expenses of defendants, and for interest and costs of this action.

On January 3, 1986, FMC, IBM, Armco and AT & T–TI (collectively referred to as "Original Generator Defendants," "OGDs" or "Third-Party Plaintiff Generators") filed a Third Amended Third-Party Complaint against sixteen insurance companies (Commercial Union was alleged to be successor in interest to Central Surety, named in CCC, CCCI and Hjersted's Third-Party Complaint).

Briefly, the Third Amended Third-Party Complaint alleges that each of the insurance companies issued one or more policies of insurance to CCC for its operations at the Kansas City Site. Under the terms of various contracts, purchase orders, or service agreements, CCC was obligated to acquire insurance that would indemnify and hold harmless the Third-Party Plaintiff Generators. It is alleged that CCC entered into insurance contracts issued by the Third-Party Defendant Insurers in order to satisfy obligations to the Third-Party Plaintiff Generators. The Third-Party Plaintiff Generators allege that they are intended and/or creditor beneficiaries of the contracts between CCC and Third-Party Defendant Insurers and/or are additional insureds under certain of the insurance contracts. Based upon the finding of the Court that CCC is liable as a matter of law under § 7003 of RCRA and § 106 and § 107 of CERCLA, and based upon the policies issued by Third-Party Defendant Insurers, the course of dealing and the respective contracts and agreements between CCC and Third-Party Plaintiff Generators referred to in the Third Amended Third-Party Complaint, it is alleged that Third-Party Defendant Insurers are obligated to indemnify and hold harmless Third-Party Plaintiff Generators for all damages, costs and fees incurred, or to be incurred. It is further alleged that the refusal to pay defense costs constitutes a continuing violation of contractual obligations, and that the Third-Party Defendant Insurers have raised numerous unsupported defenses to contractual liability and that they have acted in concert to frustrate and reject any and all efforts to achieve a comprehensive settlement in conscious disregard of the Third-Party Plaintiff Generators' financial interests. This failure is also alleged to be a breach of the implied covenant to deal fairly and in good faith.

The relief requested in the Third Amended Third-Party Complaint is a declaration that each Third-Party Defendant Insurer has a duty to pay and is jointly and severally liable for all damages, costs, and fees incurred by third-party defendant insurers, including without limitation, response costs, attorney's fees and legal expenses, and sums expended pursuant to the preliminary agreement of settlement reached by defendant generators with the U.S. Government for the remediation of the site.

During a hearing before the Special Master on August 12, 1985, a number of the Third-Party Defendant Insurers requested the opportunity to file motions seeking dismissal or judgment on the pleadings with regard to the Third-Party Complaints of the Site Operator Defendants (CCC, CCCI and Hjersted) and Original Generator Defendants (Armco, AT & T–TI, FMC and IBM) primarily on the grounds that the decision of Judge Russell Clark in *Continental Ins. Cos. v. Northeastern Pharm. & Chem. Co.*, No. 84–5034–CV–S–4 (W.D.Mo. June 25, 1985), [Available on WESTLAW, DCTU database], *appeal pending sub. nom, Continental Ins. Cos. v. State of Missouri*, No. 85–1940WM (8th Cir.), (hereinafter *"NEPPACO"*), had enunciated a rule of law limiting liability of insurance carriers only to those periods after the United States had incurred response costs. The request was opposed by the Original Generator Defendants primarily on the grounds that the motions under Rule 12, Fed.R.Civ.P., would be inappropriate in light of the complex legal and factual issues existing with respect to insurance coverage. In an effort to resolve matters of a purely legal nature and to consider and take under advisement the *NEPACCO* decision (albeit on appeal), the Special Master agreed to the request.

Thereafter all of the insurers filed motions for dismissal or for judgment on the pleadings under Rules 12(b)(6) and 12(c), Fed.R.Civ.P.

With a few exceptions, the Special Master recommended that the motions be denied, primarily for lack of an appropriate factual basis. (Special Master's Report and Recommendation Regarding Rule 12 Motions on Insurance Issues, Nov. 1, 1985, approved by Order, December 18, 1985). The parties were invited to provide certain facts and to submit motions under Rule 56.

Now pending before the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, are twenty-two (22) motions and cross-motions for summary judgment and partial summary judgment. The motions, briefs in support and opposition, and exhibits comprise over 3,000 pages and well over 500 cases are cited.

1. Both CCC and the OGDs have filed motions for partial summary judgment against each Third-Party Defendant Insurer on the issues of issuance, delivery and payment of premium, the three prerequisites of an insurance coverage claim. The OGDs contend that the insurers have either admitted these issues or admitted they have no evidence with which to contest these issues.

2. Both CCC and the OGDs have filed motions for partial summary judgment against certain defendant insurance companies on the issue of the duty to defend. CCC seeks a partial summary judgment declaring that the third-party American Fidelity, Centaur, Evanston, Lincoln, Maryland, and Mutual Fire have a joint and several obligation to defend CCC, CCCI and Hjersted against all claims asserted by the United States and the other parties to this action. The OGDs seek a similar declaration establishing that each of the insurance companies which issued primary liability insurance policies to defendant and third-party plaintiff Conservation Chemical Company between 1960 and 1984 are jointly and severally obligated under the terms of their respective policies to defend CCC, CCCI and Hjersted against all claims asserted by the United States. It is asserted that American Fidelity, Evanston, Foremost, Great American, Lincoln, Maryland, and Mutual Fire issued primary liability policies to CCC and Hjersted during that period. It is further alleged that Centaur, Evanston, Foremost, Great American and Mutual Fire

issued policies to CCCI during the identified 24–year period.

3. The OGDs also have filed a motion for partial summary judgment against the Third-Party Defendant Insurers on the issue that the escape of environmental contaminants from the CCC site constitutes "property damage" under the insurance policies and that the site investigation and cleanup costs are the proper measure of damage. This motion includes the assertion that the "owned property" exclusion does not preclude coverage since percolating waters permeating a site are subject to the reasonable use doctrine, and cannot be owned absolutely. It is also contended that remediation work performed on the site is within the coverage because it is designed to prevent damage to off-site third parties, particularly to prevent further damage and cost.

4. Armco, AT & T–TI and FMC (but not IBM) have moved for partial summary judgment on the issue of the inapplicability of the "owned property" defense raised by the Third-Party Defendant Insurers. The identified generators assert that the owned property/care, custody or control exclusion does not preclude coverage from remedial actions being taken in this case for contamination that has occurred or will occur because CCC does not control ground water beneath its site or the Missouri River into which the ground water flows. It is argued that the measure of damages includes abatement costs and that the remedy here is to prevent further contamination and migration. It is stated that neither the property damage nor the remedial activities are confined to property owned by CCC, and that a substantial number of activities to remedy migration will be undertaken beyond the property lines of the CCC site.

5. The Third-Party Defendant Insurers have filed individual motions for summary judgment. All of the individual motions refer to the applicable portions of the "Insurers' Memorandum in Support of Individual Insurers' Motion for Summary Judgment." The individual motions use various theories to assert that the policies issued do not provide coverage to CCC, CCCI and Hjersted or to the third-party plaintiff generators.

6. Great American and Continental assert as grounds for the denial of coverage: the failure by CCC to provide the notice required under the policies; that the statute under which liability was found was passed twelve to fourteen years after the effective policy period which precludes a finding of exposure during the policy period; that the Complaint does not allege property damage as defined in the policies; that no insurance coverage exists for equitable relief; that the environmental effects at the site resulting in environmental harm were expected or intended by the site operators, and thus do not constitute an occurrence under the policies; and that coverage under the policies is excluded for damage to CCC's premises or property in its control.

7. Maryland Casualty seeks summary judgment on theories that: no property damage is alleged; that equitable relief is sought; that no occurrence can be established; and finally non-compliance with the notice provision. In addition, Maryland Casualty asserts that *if* property damage exists, it occurred after their last policy period; that no major generators or third-party defendant generators are named or constitute additional insureds under Maryland Casualty's policies with CCC; that contractual liability insurance existed for designated contracts only; and that no insurance coverage theory exists that would hold Maryland liable to the generators having no relationship to the CCC site prior to the expiration of the Maryland Casualty policies.

8. Commercial Union has filed two separate motions for summary judgment. One is against CCC and Hjersted, and one is against the Third-Party Plaintiff Generators/Original Generator Defendants. Against CCC and Hjersted, Commercial Union asserts that there is no allegation of property damage during the policy period, that there is no coverage for CERCLA cost recovery, that the results were intended or

expected, that non-compliance with notice provisions forecloses coverage, and that a policy term provides for no action being maintained by the insured against the insurer on the policy until the insured's obligation to pay has been finally determined by judgment or settlement. Against the OGDS, Commercial Union contends that since the claims are based on the parties being insureds or third-party beneficiaries under CCC's policies, the same defenses and exclusions are available to Commercial Union. Commercial Union also asserts that the Third-Party Plaintiff Generators are not named insureds under the policy definition, that the action is premature since no insured has become obligated to pay damages for property destruction, and that to be a third-party beneficiary on the insurance contract, the party must be listed in accord with the policy. Commercial Union raises RSMo § 379.200, which entitles judgment creditors to bring a direct action for insurance proceeds only after a final judgment against the insured has been entered. Commercial Union points out that although written agreements and contracts existed between the Original Generator Defendants and CCC, there is evidence that only FMC deposited waste material at the site during the policy period.

9. Foremost's motion for summary judgment is against CCC, CCCI, Hjersted, the OGDS as well as cross-claimants, Sperry Corporation ("Sperry") and Murray Ohio Manufacturing Company ("Murray"). Foremost contends that there is no occurrence under the policy since the government incurred no response costs until two years after the last Foremost policy was cancelled, that the claim of the United States is not for property damage but for a new statutory liability. Foremost argues that coverage is precluded by the "pollution exclusion" clause since leaching contaminants cannot be considered sudden or unexpected and the leaching was a direct result of Hjersted's intent, design and expectation. Foremost argues in the alternative that remedial costs are barred by the clause excluding damages to insured's property. Foremost asserts that any liability obligation is precluded by CCC's failure to mitigate damages or minimize avoidable consequences by accepting materials after the site reached capacity in 1971 and after warnings of leaching in 1972. CCC is stated to have breached the insurance contract by failing to provide notice of investigations, claims and lawsuits by state and federal agencies. It is asserted that retroactive RCRA and CERCLA liability should not be imposed on Foremost because there was no contractual intent to provide coverage for such liability and because it would frustrate the statutory policy of having the chemical industry pay for cleanup. Alleging that actions for breach arising from a contractual duty to indemnify are only for the named insured, Foremost states that the Third-Party Plaintiff Generators do not have standing to bring the action, and that the included contractual liability does not cover the generators.

10. Lincoln asserts that no compensable property damage is alleged, that the "Pollution Exclusion" would exclude coverage, and that they did not receive timely notice. Lincoln also contends that material misrepresentations in procuring its coverage preclude application of its coverage. Lincoln notes that under its "claims-made" policies, claims must be made during the policy period, and that there is no evidence that any claim was made during that period. It is also stated that Lincoln's policies contain exclusions for mishandled materials and design deficiencies.

11. Home asserts that its excess liability policies do not provide coverage because the harm was expected or intended; there was not an occurrence under the policies; coverage is excluded by the pollution exclusion clause; and that response costs constitute equitable relief, and not property damage, and were incurred after the expiration of Home's last policy. Alternatively, Home seeks an order pursuant to 56(d), Fed.R. Civ.P., deeming the material facts forming the bases for their motion to be material facts without substantial controversy.

12. Evanston and Mutual Fire argue that no claims were made within the policy

periods of its claims-made policies, and that therefore, there is no duty to defend or to indemnify, and that all of their policies incorporate a pollution exclusion which precludes claims when claims arise from gradual and intended pollution. Evanston and Mutual Fire also assert that they did not contract to bear the cost of a known and present danger at the time the policy was issued.

13. Central National seeks summary judgment because their policy cannot provide coverage for relief sought before the policy was purchased and the effective date of coverage. Central National contends that to meet the "occurrence" requirement, the "property damage" for which liability is asserted must occur unexpectedly during the policy period, and that continuing damages cannot act as the basis for coverage under a policy taking effect after litigation is commenced. Central National argues that releases after January, 1983 could not be considered sudden and accidental under the exception to the pollution exclusion clause. Central National asserts that CCC did not reference the K.C. Site, CCC's waste disposal activities, or the present lawsuit in the application form, and furthermore that CCC's application affirmatively represents that CCC knows of no other facts that would significantly affect underwriting judgment. These items are alleged to constitute misrepresentations which void coverage.

14. ACIC's motion for summary judgment contends that as an excess carrier, no duty to defend arises until notice is received that either no defense is being provided by the underlying insurers or that the underlying insurance is exhausted, neither of which has occurred here. ACIC argues that the Government's Complaint does not allege "property damage," that the acts alleged were not an "occurrence" under the policy because they were intended or the result of reckless indifference; that if an "occurrence" is found, it is a repeated exposure of the same general conditions existing prior to the ACIC policy; and that the pollution exclusion precludes coverage of a discharge in the regular course of business. ACIC asserts that if there was an intent to procure coverage against the allegations of the Complaint, the insureds intentionally withheld material information which would have prevented the issuance of coverage or limited the risk, and that therefore, the policy is void *ab initio*. ACIC is the only insurer to raise the doctrine of *uberrimae fidei*, or absolute and perfect candor, a violation of which is alleged to make an insurance contract voidable. Other arguments raised by ACIC are that there is no contractual liability to the Third-Party Plaintiff Generators either as insureds or third-party beneficiaries since no claim was made, the policy excludes it, and there is no evidence of an intent to procure such coverage. It is also noted that coverage is vitiated by the failure of CCC or Hjersted to provide notice.

15. Centaur's motion raises the issue that there is a public policy against coverage of pre-existing claims. They assert that contractual coverage is excluded under their first policy, and exists only for designated contracts under the second and third policies. Centaur contends that to find third-party creditor beneficiary status requires the intent of both CCC and Centaur. They also contend that under Missouri law, one cannot act against another party's insurer until there is a recovery of a final judgment against the insured. Centaur notes that their policies contain a total pollution exclusion and that the policies are void *ab initio* for either false warranties or material misrepresentations in applying for the insurance.

16. Great Southwest adopts the Insurer's Joint Memorandum in Support Of the Individual Motions and seeks summary judgment on those grounds.

17. Sperry and Murray (third-party defendant generators) have filed motions for summary judgment on their cross-claims against CCC and two of CCC's insurers, Foremost and Home, on the issues of their right to indemnification by CCC for all obligations imposed as a result of this litigation, and their right to reimbursement by

CCC's insurers. These two movants contend that as an inducement to enter into business with CCC that CCC explicitly indemnified them against all loss, cost, expense or liability occasioned by CCC's disposition of their waste, and that their liability in this litigation arises solely out of its dealings with CCC and CCC's disposal activities. They contend further that CCC's insurers are responsible for CCC's liability based on contractual liability insurance covering such contracts; Foremost's policy is the underlying insurance for Home's excess coverage. Sperry and Murray also argue that they have an implied right of indemnity even absent an explicit contract based on Missouri law which allows non-contractual indemnity where one party creates a condition which causes injury and another party does not join therein, but is exposed to liability on account of it. Sperry and Murray assert that they are creditor beneficiaries under Missouri law, a party for whom the performance of a contract will satisfy an actual, supposed, or asserted duty of the promise of the contract to the beneficiary, and as such may maintain a direct action against Foremost and Home to obtain reimbursement. The movants also contend that since CCC's liability has been determined by the Court upon summary judgment, they have become judgment creditors of CCC and have an immediate and direct action against CCC's liability insurers pursuant to RSMo § 379.200 for all damages, expenses and other costs of the litigation.

18. Third-party defendant insurer Wausau has filed a separate motion for summary judgment against the third-party defendants and cross-claimants Sperry and Murray. In its motion, Wausau points out that they have settled with CCC, and CCCI, and with other third-party plaintiffs (FMC, IBM, Armco, and AT & T–TI). Checks have been issued to the Settlement Fund for Wausau's total aggregate policy limit for property damage. Wausau asserts that there is no basis for the claims of Sperry or Murray; they are neither named insureds nor do they fit within the definition of insureds, the policy's contractual liability exclusion is not modified by any endorsement, and there is no evidence that Wausau, CCC or CCCI intended that Murray or Sperry would be beneficiaries under the Wausau policy.

It should be noted that application of the rules for summary judgment precludes approval of a sizeable number of the motions that have been filed. Of the motions that should be denied on that basis, most present a straightforward question of fact or mixed fact and law. Time and space prevent a discussion of the facts of all the motions. Therefore, motions which cannot be granted because there are material facts in dispute are, for the most part, dealt with in a summary manner unless an important or novel question of law is also raised. However, the fact that a particular party's motion is dealt with without full discussion does not mean that the motion was not given full and careful consideration. On the contrary, every motion was reviewed very carefully. Moreover, the fact that a particular motion is dealt with without full discussion or in a footnote is not a reflection of its relative merit.

## B. SUMMARY JUDGMENT STANDARDS

Summary Judgment, pursuant to the Federal Rules of Civil Procedure, Rule 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utilization of the summary judgment procedure is encouraged to promote judicial economy. *Butler v. MFA Life Ins.*, 591 F.2d 448, 451 (8th Cir.1979). An essential purpose of summary judgment is to determine "whether the parties can provide evidentiary support for their version of the facts." *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 573 (2nd Cir.1969).

As the Special Master has previously noted, summary judgment is a drastic and extreme remedy, not to be granted if there

is even the slightest doubt as to a factual dispute on any genuine issue of material fact. *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 395 F.2d 388, 389 (8th Cir.1968). Judicial reluctance to grant summary judgment is common, and prompted one court to comment:

> Summary judgment, with ever-lerking issues of fact, is always a treacherous shortcut and, in cases like these, too fragile a foundation for so heavy a load. Such relief is always discretionary, and in cases posing complex issues of fact and unsettled questions of law, sound judicial administration dictates that the court withhold judgment until the whole factual structure stands upon a solid foundation of a plenary trial where the proof can be fully developed, questions answered, issues clearly focused and facts definitively found.

*Petition of Bloomfield Steamship Co.*, 298 F.Supp. 1239, 1242 (S.D.N.Y.1969).

Summary judgment is authorized under the rule only "where it is quite clear what the truth is, * * * [and where] no genuine issue remains for trial * * * [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Nat. Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944)).

In assessing the propriety of a motion under Rule 56, Fed.R.Civ.P., the court must scrutinize the evidence to determine whether the movant has met the heavy burden of proving an absence of any material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The evidence is viewed in the light most favorable to the non-moving party, *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir.1980), and the non-moving party is to be accorded the benefit of every reasonable factual inference. *Buller v. Buechler*, 706 F.2d 844 (8th Cir. 1983). All doubts as to the facts or the existence of any material fact are resolved against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

The party seeking judgment has the burden of establishing the right to a judgment with such clarity as to leave no room for any doubt or controversy, *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 693 F.2d 733, 737 (8th Cir.1982), *cert. denied sub nom. Drury v. Westborough Mall, Inc.*, 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983); *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982); *Snell v. United States*, 680 F.2d 545, 547 (8th Cir.), *cert. denied*, 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982), and to prove that the non-moving party is not entitled to recover under any discernable circumstances. *McGee v. Hester*, 724 F.2d 89, 91 (8th Cir.1983); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363–64 (8th Cir.1983).

Factual allegations underlying a motion for summary judgment must be established by sworn testimony of a competent witness, and only admissible evidence may be considered by the trial court. Fed.R.Civ.P. 56(e); *Security Nat'l Bk. v. Belleville Livestock Comm'n Co., Inc.*, 619 F.2d 840 (10th Cir.1980); *Hollingsworth Solderless Term. Co. v. Turley*, 622 F.2d 1324 (9th Cir.1980). Evidence that is presented to support or oppose the motion that is subject to conflicting interpretations, or is such that reasonable men might differ as to its significance, makes summary judgment improper. *Snyder v. United States*, 717 F.2d 1193, 1195 (8th Cir.1983). This is also true where the affidavits or other sworn statements require an evaluative judgment between rationally possible conclusions. *Minnis v. U.A.W.*, 531 F.2d 850, 854 (8th Cir.1975).

In considering specific evidence submitted to support motions for summary judgment, courts have held that statements of counsel made at oral argument or in legal memoranda may not be used to establish facts. *See, Transurface Carriers, Inc. v. Ford Motor Co.*, 738 F.2d 42, 46 (1st Cir.1984); *Watts v. United States*, 703 F.2d

346, 353 (9th Cir.1983); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Statements of opinion, belief and hearsay which would be inadmissible in evidence and which are contained in affidavits must similarly be disregarded. *Neff v. World Publishing Co.*, 349 F.2d 235, 253 (8th Cir. 1965). Furthermore, the affiant must be qualified to render opinions on the issues or subjects, *National Souvenir Center v. Historic Figures, Inc.*, 728 F.2d 503, 512 n. 5 (D.C.Cir.) *cert. denied*, 469 U.S. 825, 105 S.Ct. 103, 83 L.Ed.2d 48 (1984); *Union Ins. Society of Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946, 952 (2d Cir.1965), and speculative assertions which involve issues of subjective knowledge, intent and state of mind are particularly unsuited for summary disposition by affidavit. *Hanke v. Global Van Lines, Inc.*, 533 F.2d 396, 398 (8th Cir.1976); *McSpadden v. Mullins*, 456 F.2d 428, 430 (8th Cir.1972). Issues of corporate knowledge or understanding are similarly unsuited for resolution by affidavit. *Hanke, supra.*

Documents offered in support of motions for summary judgment must be authenticated through sworn testimony as to their connection, authenticity, and completeness before they will be considered. *E.g., Havoco of America, Ltd. v. Hollobow*, 702 F.2d 643, 646 n. 2 (7th Cir.1983); *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir.1970); *Goldman v. Summerfield*, 214 F.2d 858, 859 (D.C.Cir.1954); *Midland Engineering Co. v. John A. Hall Const. Co.*, 398 F.Supp. 981, 990 (N.D.Ind. 1975).

The same rules apply to testimony given at deposition which is offered in support of a motion for summary judgment. Deposition testimony must be based on personal knowledge, must not contain hearsay, may contain only conclusions the deponent/witness is qualified to make, and must be otherwise unobjectionable under the Federal Rules of Evidence to support a motion for summary judgment. *Nadler v. Baybank Merrimack Valley*, 733 F.2d 182, 184 (1st Cir.1984); *Sires v. Luke*, 544 F.Supp.

1155, 1160 (S.D.Ga.1982); *Liberty Leasing Co., Inc. v. Hillsum Sales Corp.*, 380 F.2d 1013, 1015 (5th Cir.1967); *Standard Rolling Mills, Inc. v. National Mineral Co.*, 2 F.R.D. 236, 237 (E.D.N.Y.1942).

A party opposing summary judgment need not respond or file counter-affidavits or other evidentiary materials under Rule 56 if the affidavits and other evidence of the moving party are intrinsically insufficient to establish its entitlement to summary judgment. *Securities & Exchange Comm'n v. Spence & Green Chem. Co.*, 612 F.2d 896 (5th Cir.) *cert. denied*, 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981); *Sheet Metal Workers' Int'l Ass'n Local No. 355 v. NLRB*, 716 F.2d 1249, 1254 (9th Cir.1983); *Security National Bank v. Belleville Livestock Comm'n Co.*, 619 F.2d 840, 848 (10th Cir.1980); *John v. Louisiana Bd. of Trustees for State Colleges and Univs.*, 757 F.2d 698 (5th Cir. 1985); *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir.1976).

## C. UNCONTROVERTED FACTS

During the course of this litigation, the Court has issued several Memorandum Opinions and Orders containing specific findings of fact and conclusions of law which relate to a number of the allegations in the United States' Complaint.

From the Order of the Court adopting the Special Master's Recommendation on summary judgment concerning statutory liability, *United States v. Conservation Chem. Co.*, 619 F.Supp. 162 (W.D.Mo.1985), are the following uncontroverted facts:

From 1960 until the present, defendant CCC has owned and operated an industrial chemicals waste disposal facility located at 8900 Front Street, Kansas City, Missouri. The approximately six (6) acre site is located on the Missouri River floodplain, between the East Bottoms Levy and the Missouri River, just upstream of the confluence of the Missouri and Blue Rivers.

CCC purchased the KC Site in 1959. By early 1963, CCC had constructed a shop and office building, installed various stor-

age tanks and reaction vessels, and constructed six basins at the Site. Basins 1 through 5 were constructed by excavating soils. Basin 6 was constructed by excavating soil and constructing walls.

CCC stored, treated and disposed of various chemical wastes in Basins 1 through 6. In addition, CCC operated one or more incinerators at the Site for the destruction of chemical waste from the early 1960s until approximately 1971. CCC also buried various chemical wastes on the Site.

Over 50 million gallons of waste materials were transported to the Site during its period of operations. The type of waste which CCC treated, stored or disposed of at the KC Site included: (1) liquid acidic metal finishing wastes, such as spent steel pickling solutions containing sulfuric acid or hydrochloric acid, spent electroplating solutions, and bright dipping solutions; (2) liquid alkaline metal finishing wastes, including wastes containing cyanide; (3) solid cyanide wastes; (4) laboratory wastes; (5) non-pourable organic chemicals; (6) sludge containing arsenic sulfide and elemental phosphorous; (7) filter cake containing arsenic sulfide; and (8) solid cyanides.

As a consequence of CCC's activities, each of the waste disposal basins at the KC Site contains at least the following hazardous substances: methylene chloride; tetrachloroethylene; trichloroethylene; toluene; 1,1,1–trichloroethane; phenol; 2,3,7,8–tetrachlorodibenzo-P-dioxin; arsenic; beryllium; cadmium; chromium; copper; lead; mercury; nickel; selenium; zinc; and cyanides.

The surface soil at the CCC Site contains at least the following hazardous substances: methylene chloride; tetrachloroethyene; tricholoreothylene; bis (2–ethylhexyl) phthalate; PCB–1254; arsenic; beryllium; cadmium; chromium; copper; lead; nickel; selenium; zinc; and cyanides.

The groundwater beneath the CCC Site contains at least the following hazardous substances: benzene; chloroform; ethylbenzene; methylene chloride; tetrachloroethylene; toluene; 1,1,1–trichloroethane; trichloroethylene; vinyl chloride; phenol;

arsenic; cadmium; chromium; copper; nickel; selenium; zinc; and cyanides.

The subsurface soil at the CCC Site contains at least the following hazardous substances: methylene chloride; tetrachloroethylene; toluene; trichloroethylene; phenol; bis (2–ethylhexyl); phthalate; arsenic; beryllium; cadmium; chromium; copper; lead; nickel; selenium; zinc; and cyanides.

Some of these hazardous substances are being released into the environment into areas likely to be directly encountered by humans or other living organisms. The "Remedial Investigation Report" states that hazardous substances are being and may be released from the CCC Site in several ways:

Waste materials from the site have the potential for migration via groundwater, surface water or air. Migration to groundwater can occur through leaching or by direct infiltration. These materials can also enter the atmosphere through volatilization or particulate transport while migration to surface water can occur by way of overland flow and flood inundation. Wastes which enter the aquifer beneath the site can be transported by groundwater flow to discharge points along the Blue River and Missouri River. The surface water flow can, in turn, transport these materials to receptors along the Missouri River.

By defendants' own estimates, more than 22,000 pounds of hazardous substances are being discharged into the Missouri River and Blue River each year. Such discharges include the following hazardous substances: benzene; carbon tetrachloride; chloroform; 1,1–dichloroethane; 1,2–dichloroethane; 1,1–dichloroethane; ethylbenzene; methylene chloride; tetrachloroethyelene; toluene; 1,2–trans-dichloroethylene; 1,1,1–trichloroethane; 1,1,2–tricholoroethane; tricholoroethylene; trichlorofluoromethane; vinyl chloride; 2,3–dichlorophenol; 2,4–dimethylphenol; phenol; 2,4,6–trichlorophenol; arsenic; cadmium; chromium; copper; nickel, selenium; thallium; zinc; and cyanides. These substances ab-

sent remediation will continue to be discharged for many years.

Of the substances listed in the preceding paragraphs, at least the following are known or suspected carcinogens for which the recommended exposure level is zero: benzene; carbon tetrachloride; chloroform; 1,2–dichloroethane; 1,1–dichloroethylene; tetrachloroethylene; 1,1,2–trichloroethane; trichloroethylene; polychlorinated biphenyls (PCBs); vinyl chloride; trichlorophenol; arsenic; and beryllium. There is potential for exposure of humans to these substances. The site is surrounded by Kansas City, Missouri and its suburbs. A farmer cultivates soybeans on the land immediately adjacent to the Site on the southeast side. Mobay Chemical Corporation ("Mobay") operates a manufacturing facility which is located one-quarter mile south of the site. A Kansas City Power & Light Company ("KCP & L") plant is located approximately one-quarter mile west-northwest of the site. Residential and other industrial areas are as close as 1.3 miles from the site.

Mobay operates several wells on its property that may draw groundwater from beneath the CCC Site. The Missouri Water Company draws water for public water supplies from several wells located on the same side of the river as the site about five miles downstream of the site. Those wells are recharged, at least in part, by water from the river. The City of Lexington, located 40 miles downstream from the CCC Site, draws water directly from the Missouri River for public use. In addition, other living organisms, including frogs, toads, turtles, lizards, snakes, birds, mammals and fish, are likely to inhabit the area of the CCC Site. *United States v. Conservation Chem. Co.,* 619 F.Supp. 162 at 182–186.

In the same Order approving the Special Master's Recommendation, the Court further found:

CCC is a corporation organized under the laws of the State of Missouri. CCC owned the KC Site since 1959, and operated the site as a disposal facility from 1960 until CCC stopped accepting waste in late 1979 or early 1980. During that period, CCC stored, treated and disposed of various chemical wastes in Basins 1 through 6. CCC also operated one or more incinerators at the site to destroy chemical waste. Among the wastes that were being disposed at the site while it was being operated by CCC were: (1) sludges containing arsenic sulfide and elemental phosphorous; (2) filter cake containing arsenic sulfide; and (3) solid cyanides. All of these substances are "hazardous substances" within the meaning of CERCLA.

As indicated previously, among the "covered persons" who are liable for response costs under Section 107 are the owner and operator of the facility, Section 107(a)(1), and any person who at the time of disposal of any hazardous substance owned or operated the facility at which such hazardous substance was disposed of, Section 107(a)(2). 42 U.S.C. § 9607(a)(1)–(2). Clearly, CCC is liable under both subsections (a)(1) and (a)(2) of Section 107 since it is both the current owner of the CCC Site and was the owner and operator of the site when hazardous substances were disposed of at the site.

Norman Hjersted founded CCC in 1960, and has been its President since its inception. He has also owned at least 93% of CCC's stock since 1960.

Initially, Hjersted was CCC's sole technical person. "Plant Managers" were subsequently hired, but they reported directly to Hjersted. He controlled the company's fiscal matters and made decisions about the types of projects and business ventures CCC would undertake. He was primarily responsible for environmental controls at CCC and also acted as a chemical engineer. Even when he resided in Gary, Indiana, (from approximately 1968 to 1974), Hjersted personally visited the KC Site several times a month. After he returned to Kansas City in 1975, he was much more closely involved with the day-to-day operations of the KC Site. In short, Hjersted "[is] the boss of CCC operations and ha[s] been all along." *United States v. Conservation*

*Chem. Co.*, 619 F.Supp. at 186–187. With respect to CCCI, the Court found:

CCCI is a corporation organized under the laws of the State of Illinois. By contract, agreement or otherwise, CCCI arranged with CCC for the disposal of waste containing cyanide possessed by CCCI at the KC Site. By contract, agreement or otherwise, CCCI also arranged with a transporter to transport for disposal or treatment of cyanide-bearing waste owned or possessed by CCCI at the KC Site. In addition, CCCI accepted cyanide-bearing waste for transport to CCC–KC for treatment and disposal with CCCI selecting the KC Site as the disposal site. At least some of the cyanide-bearing wastes actually were disposed of at the KC Site.

CCCI is liable as a waste generator under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3). *United States v. Conservation Chem. Co.*, 619 F.Supp. at 190.

The Court has already found that "as a consequence" of the treatment, storage, handling and disposal of waste materials at the CCC Site, the surface and sub-surface soil at the site and groundwater beneath the site contained large quantities of hazardous substances. *United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 182–183 (W.D.Mo.1985). The Court has also determined that at least some of the hazardous chemical constituents are being released into the surrounding environment, and has specifically found that more than 22,000 pounds of hazardous materials continue to be discharged from the site into the groundwater and the Missouri and Blue Rivers each year. *Id.* at 183.

In its recent Order approving the proposed remedial action plan for the CCC Site, the Court made the following specific findings and conclusions:

The evidence establishes the existence of hazardous substances in the soil at the CCC site and in the groundwater and aquifer underlying the CCC site, and the hazardous substances were being released and discharged into the Missouri River. Furthermore, the Focus Feasibility Study suggests that the possibility exists that aqueous or non-aqueous contaminants are being passed under the Missouri River and possibly contaminating the aquifer on the north side of the river. The certainty of that risk is unknown due to the fact that hydrogrologic modeling is incomplete at this time. In any event, it is clear that there is a serious environmental risk posed by the CCC site.

*United States v. Conservation Chem. Co.*, 628 F.Supp. 391, 402 (W.D.Mo.1985).

Finally, this Court has previously concluded as a matter of law that the ongoing releases of hazardous substances from the CCC Site constitute an "imminent and substantial endangerment to the public or welfare of the environment," within the meaning of Section 106 of CERCLA, *United States v. Conservation Chem. Co.*, 619 F.Supp. at 191–197. Moreover, the Court has found that CCC and CCCI are liable under Sections 106 and 107 of CERCLA and has concluded that Norman Hjersted is a liable party under Section 107. *Id.* at 175, 184–187, 190–191, 202; *see also, United States v. Conservation Chem. Co.*, 628 F.Supp. at 416–420. CCC, CCCI and Hjersted are therefore legally obligated to reimburse the United States for its recoverable response costs. In addition, both CCC and CCCI have been held legally obligated to remedy environmental damage in the vicinity of the CCC Site.

With respect to the insurance policies at issue and for purposes of the motions for summary judgment, the identity, validity and authenticity of the policies is not at issue. There is, likewise, no dispute that the policies were issued by Central National, Home, American Fidelity, Continental Casualty, Great American, Great Southwest, Centaur, Evanston, Mutual Fire, Commercial Union, Foremost, Lincoln and Maryland and delivered to CCC by Central National, Home, American Fidelity, Continental Casualty, Great American and Great Southwest, and that all applicable premiums were paid by CCC for such policies with respect to policies issued and delivered by Central National, Home, American Fi-

delity, Continental Casualty, Great American and Great Southwest. There is a dispute regarding issues of delivery and payment with respect to the policies issued by Centaur, Evanston, Mutual Fire, Commercial Union, Foremost, Lincoln and Maryland.

It is undisputed that CCC is the named insured under each of the twenty-six policies at issue, and that CCCI is a named insured under certain primary policies issued by Centaur, Evanston, Foremost, Great American and Mutual Fire. Finally, it is beyond dispute that the insurers, and not CCC, CCCI or Hjersted, drafted the policies and the operative language of the policies consist of standard-form provisions commonly utilized in comprehensive general liability ("CGL") and other primary policies throughout the insurance industry.

## D. CHOICE OF LAW

As the Special Master previously recognized, and as all parties now apparently agree, federal courts must apply the choice of law rule of the forum state to resolve conflict of law questions. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Manchester Premium v. Manchester Ins. & Indem. Co.*, 612 F.2d 389, 391 n. 8 (8th Cir.1980).

### 1. *Contracts.*

With respect to contracts, including insurance liability contracts, Missouri courts follow the Restatement (Second) of Conflict of Laws. *Havenfield Corp. v. H & R Block*, 509 F.2d 1263, 1267 (8th Cir.1975); *Ryder Truck Rental v. Fid. & Guar. Co.*, 527 F.Supp. 666, 670–71 (E.D.Mo.1981); *Young v. Fulton Iron Works Co.*, 709 S.W.2d 927 (Mo.App.1986); *Starch & Chem. Corp. v. Newman*, 577 S.W.2d 99, 102 (Mo.App.1978).

Section 187 of the Restatement provides:

§ 187. Law of the State Chosen by the Parties

(1) The Law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The Law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Missouri follows the general Restatement rule and will apply the law chosen by the parties if there is a logical basis for applying such law. *See, e.g., National Union Fire Ins. Co. of Pittsburgh, Pa. v. D & L Const. Co.*, 353 F.2d 169, 172 (8th Cir.1965); *Zarnecke v. Blue Line Chem. Co.*, 54 S.W.2d 772 (Mo.App.1933). For those insurance policies which contain choice of law provisions, the law of the state chosen by the parties should be applied. The Special Master so recommends.

Insurance policies which do not contain provisions as to applicable law are addressed by § 193 of the Restatement. It states:

§ 193. Contracts of Fire, Surety or Casualty Insurance.

The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local

law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

The principle stated in Restatement, § 6 which may be used to analyze the question of whether some other state has a more significant relationship than the state in which the insured risk is principally located and thus require the application of the law of another state include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6(2).

Missouri was the state of incorporation for CCC and Hjersted's residence. Missouri is the state where CCC maintained its principal place of business at 8900 Front Street, Kansas City, Jackson County, Missouri. It is the place where the risk was located as well as the state from where contacts seeking insurance were made. Missouri has the strongest regulatory interest in the CCC Site and regulatory interest of the activities conducted at the CCC Site. It is the state where the alleged injury and damage took place or is taking place, and the place where the United States filed suit alleging that damages have occurred and/or is injuring the public health, welfare and environment.

No state has been identified with a relationship to, or an interest in the issues that approaches Missouri's. Utilization of Missouri law will ease the determination and application of the law to be applied, and will tend to produce certain, predictable and uniform results.

Even under the more general principles of § 188 of the Restatement, the result is the same as to the question of which state's law to apply. Section 188 states:

§ 188. Law Governing in Absence of Effective Choice by the Parties.

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contracts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil residence, nationality, place of incorporation and place of business of the parties.

These contracts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

The policies were placed through and negotiated by Missouri brokers. Section 188 refers to § 6 of the Restatement. Pursuant to § 6(2)(g), the fact that the insurers are scattered throughout the United States is of diminished significance for the pur-

pose of determining the applicable law. Under these principles, the law of Missouri should be applied.

■ For all the above reasons, the Special Master finds and recommends that except for those policies which contain a choice of law provision, the substantive law of Missouri will be applied to all questions involving formation, construction or interpretation of the insurance policies. Law of the state selected by the parties should control for those policies where a choice was made.

### 2. *Torts.*

The Special Master interprets Count III of the OGDs' Third Amended Third-Party Complaint as attempting to state a claim in tort for the insurers' bad faith refusal to settle. This requires an analysis of choice of laws for tort actions.

In *Kennedy v. Dixon,* 439 S.W.2d 173, 184 (Mo. banc 1969), Missouri adopted the "most significant relationship" test for torts. *Young v. Fulton Iron Works Co.,* 709 S.W.2d 927 (Mo.App.1986). Specifically, Missouri follows the Restatement of Conflict of Laws approach and will apply the law of the state which has the most significant relationship to the parties and events. *See, e.g., Hicks v. Graves Truck Lines, Inc.,* 707 S.W.2d 439 (Mo.App.1986); *Moss v. National Life & Acc. Co.,* 385 F.Supp. 1291, 1297 (W.D.Mo.1974).

Restatement § 145 provides:

§ 145 The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

■ For the reasons stated in the preceding section regarding choice of law for actions sounding in contract, the Special Master finds that Missouri has the most significant relationship to the parties and events, and therefore recommends that the substantive law of Missouri be applied to any claims sounding in tort under the third-party complaints of the Third-Party Plaintiff Operators and Original Generator Defendants.

### 3. *General Principles of Law.*

■ The OGDs invite application of general insurance law to various issues and to several questions. To the extent that Missouri has not established, by statute or decision, a particular issue, the Special Master will apply general principles of insurance law where such do not rely upon principles in conflict with established Missouri law. Where Missouri law is established and settled, it will be followed and applied.

### E. PRELIMINARY MATTERS

### 1. *After Litigation Insurance.*

■ At least two of the insurers (Centaur and Central National) have asked the Court to find as a matter of law that their policies afford no coverage to or for CCC, CCCI, Hjersted or the "other insured(s)" (AT & T-TI, Armco, FMC and IBM) for claims actually and unequivocally asserted by the United States against CCC, CCCI and Hjersted prior to the issuance and delivery of their policies. (Suggs. of Centaur at 4–19; Brief of Central National at Point A).

### a. *Centaur.*

Centaur issued three insurance policies to CCC. Centaur's first policy of insurance (PL 01191) was issued December 14, 1981, and had a policy period of December 14, 1981 through January 1, 1983; the second Centaur policy, PL 04726, was issued January 1, 1983 and was effective until January 1, 1984; and the third Centaur policy, GL 10 02 500, was issued January 1, 1984 with a policy period until January 1, 1985. Thus, all three of Centaur's policies were issued to CCC after the commencement of the action by the United States against CCC (September 29, 1980). Centaur alleges that the present action (No. 82–0983–CV–W–5) is virtually identical and directly connected to the 1980 lawsuit as shown by paragraph numbered 5 of the 1982 Complaint. Under these facts, Centaur claims that it is entitled to judgment on all claims because as a matter of law and public policy, no coverage is afforded for claims asserted prior to the purchase of the policies. "Simply stated, insurance purchased after the litigation is filed cannot and does not cover the claims asserted in the litigation." (Suggs. of Centaur at 2).

In order to support its motion for summary judgment, Centaur says that all factual disputes may be resolved by judicial notice of the pleadings filed to date. Rule 201, Fed.R.Evid., *Pennsylvania v. Brown*, 373 F.2d 771 (3rd Cir.1967); and *Peabody Coal Co. v. Barnes*, 308 F.Supp. 902 (E.D. Mo.1969). The Special Master agrees that the Court may take judicial notice of the pleadings and records in this case.

Thus, by way of judicial notice, having established that the original action by the United States against CCC was filed September 29, 1980, and the present action was commenced on November 22, 1982, Centaur argues that as a matter of public policy, Missouri recognizes that the contract of insurance issued to cover a prior loss is generally invalid. *Presley v. National Flood Insurers Ass'n*, 399 F.Supp. 1242, 1244 (E.D.Mo.1975). These holdings are based upon public policy and the definition of "occurrence"; it being a basic tenet of insurance law that one cannot insure a certainty.

To support its entitlement to judgment as a matter of law, Centaur cites *Bartholomew v. Appalachian Ins. Co.*, 502 F.Supp. 246 (D.R.I.1980), *aff'd*, 655 F.2d 27 (1st Cir.1981). In *Bartholomew*, Robo-Wash sold defective car wash equipment to plaintiffs. Robo received numerous complaints from plaintiffs and sought to remedy the defects, but was unsuccessful. In February, 1984, plaintiffs sued Robo. In June, 1974, Robo purchased primary and excess comprehensive general liability insurance from Appalachian Insurance Co. and Affiliated Insurance Co. respectively. Plaintiffs continued to operate the car wash and suffered damages until September, 1974. An amended complaint was filed after September, 1974, emphasizing different facts, but making the same essential claim.

In February, 1975, Robo notified Appalachian and Affiliated of the lawsuit, and both denied coverage. Robo contested the no coverage determination pointing out that plaintiffs' alleged damages were continuing in nature and would have occurred, at least in part, in the period after June 1, 1974.

Trial commenced on July 21, 1975, and shortly thereafter, plaintiffs reached a settlement with Robo and a consent judgment in the amount of $300,000.00 was entered in favor of plaintiffs. Concurrently, Robo assigned to plaintiffs its rights against its insurance carriers. Plaintiffs settled with Robo's carriers whose policy dates predated and overlapped the filing of the February, 1974 lawsuit and proceeded against Appalachian and Affiliated whose policies were not issued until after the suit was on file.

The Court granted the insurers' motions for summary judgment holding that coverage was not provided under the policies as a matter of law. The grant of summary judgment was affirmed and the First Circuit held:

The concept of insurance is that the parties, in effect, wager against the occurrence or nonoccurrence of a specified

event; the carrier insures against a risk, not a certainty. Thus a homeowner could not insure his house against flood damage when the rising waters were already in his front yard.

655 F.2d at 28–29. (Citations omitted).

In *Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56 (3rd Cir.1982), the Court rejected coverage for an incident occurring prior to the acquisition of the policy.

Liberty Mutual had adopted employment practice policies for its claims department in 1965. Several employees filed discrimination charges against Liberty Mutual with the EEOC in May of 1971. The employment practices were claimed to be discriminatory and continuous until after the Appalachian policy went into effect.

Liberty Mutual settled the case and sought reimbursement from Appalachian under a policy that took effect on August 1, 1971. Some of the employees who participated in the settlement had not begun their employment until after August 1, 1971, and some of the injurious effects of the employment practices were found to have extended into the period of Appalachian coverage. The Court found that this "continuing damage" did not trigger the Appalachian policy:

Since the injuries to Liberty's employees occurred immediately upon the promulgation of Liberty's discriminatory policies, the occurrence took place for purposes of coverage before August 1, 1971. Appalachian need not indemnify Liberty because the occurrence preceded the effective date of the insurance policy.

A contrary result in this case would controvene the rule that an insured cannot insure against something that has already begun. (Case citations omitted). The rule is based on the realization that the purchase of insurance is to protect insureds against unknown risk. When the Appalachian policy became effective, however, the risk of liability was no longer unknown because the injuries resulted immediately upon Liberty's promulgation of its discriminatory policies. Also, the

complaint to the EEOC preceded the effective date of the Appalachian policy. 676 F.2d at 63. In support of the general proposition that no coverage is afforded for claims asserted prior to the purchase of insurance policies, Centaur cites *Presley v. National Flood Insurers Ass'n*, 399 F.Supp 1242 (E.D.Mo.1975); *City of Carter Lake v. Aetna*, 604 F.2d 1052 (8th Cir. 1979); *Summers v. Harris*, 573 F.2d 869 (5th Cir.1978); *Drewett v. Aetna Cas. & Sur. Co.*, 539 F.2d 496 (5th Cir.1976); and *United States Fid. & Guar. v. Bonitz Insulation Co.*, 424 So.2d 569 (Ala.1982).

While the cases cited by Centaur seemingly foreclose coverage under any of its policies because each of the policies was obviously purchased after the institution of the original suit by the United States against CCC, the result urged by Centaur would require a holding as a matter of law that no occurrence took place after the filing of the Government's original suit. Pointed out in *Bartholomew v. Appalachian Ins. Co.*:

Strictly, the act for which a manufacturer is liable is the initial supplying of defective equipment. However, the cause of action is held to arise when the defect takes effect or is discovered ... Thus, when a plaintiff, sometime after having purchased a ladder fell therefrom and was injured, thereby discovering an alleged defect, it was the manufacturer's insurer at that date, if any, that was responsible, and not the insurer at the date of sale. [Citations omitted.] This is not to say, however, that if the plaintiff had continued to use the ladder and was injured again at a later date when there was a third insurer, that company would be liable.

655 F.2d at 28–29. Therefore, it is necessary to establish that no accident causing property damage occurred during the policy periods of the various Centaur policies.

In another section of this Recommendation, the Special Master discusses several possibilities of when an "occurrence" could have taken place under various applicable trigger theories. The Special Master con-

cludes that insufficient facts have been presented to enable a determination in this regard as a matter of law. Thus, although the Special Master believes it is impossible to state with certainty when the first "occurrence" took place or whether the case presents a series of "occurrences" or one continuous "occurrence" starting at some point, this does not necessarily prevent a finding of the last possible date for "an accident, including continuous or repeated exposure to conditions, which resulted in property damage."

The Special Master believes that from 1960 until late 1979 or early 1980, the "property damage" existing at the CCC Site resulted from or was caused by exposure to conditions which were substantially dissimilar from day to day. That is, the environmental injury varied depending upon the quantity and type of the waste materials received by CCC. However, once the site was closed in late 1979 or early 1980, any injury was a continuation of the one which had already begun and represented exposure to substantially the same conditions. The exact date when the CCC Site was closed is not known. It was, however, apparently closed prior to the institution of the Government's suit on September 29, 1980. For purposes of the present motion, the Special Master believes that no "occurrence" took place after September 29, 1980 as a matter of law.

But even in the absence of a determination of the last possible date for an "occurrence," the Special Master believes that public policy should and does bar coverage for litigation already commenced when the policy was acquired and became effective. Thus, in this context, CCC could not insure itself against claims of damage to the environment when those very claims had already been asserted and were already being litigated. And, as a matter of public policy, believes that insurance companies are not obligated to defend or indemnify an insured for pre-existing claims or litigation in the absence of a clear and unequivocal understanding that such claims were being covered.

Therefore, the Special Master finds that as a matter of law and public policy, no coverage is afforded for identical or virtually identical claims asserted prior to the purchase of insurance policies.

The Special Master therefore recommends that *summary judgment be granted* in favor of Centaur Insurance Company on the claims of CCC, CCCI, Hjersted, Armco, AT & T-TI, FMC and IBM on each of the three policies issued by Centaur after September 29, 1980.

b. *Central National.*

For the reasons stated with respect to the motion of Centaur for summary judgment, the Special Master recommends that *summary judgment be granted* in favor of Central National on the Third-Party Complaints of CCC, CCCI, Hjersted, Armco, AT & T-TI, FMC and IBM for the reason that as a matter of law, no insurance coverage is provided for pre-existing claims and the liability is not "on account of" any property damage occurring after September 29, 1980.

c. *Other Insurance Companies*

For the reasons stated with respect to Centaur and Central National, the Special Master believes that each Third-Party Defendant Insurer issuing a policy of insurance to CCC, CCCI and/or Hjersted after December 28, 1980 is entitled to the entry of summary judgment in its favor for the reason that no coverage is afforded for "occurrences" taking place prior to the issuance of the policy, and because no "occurrence" took place after December 28, 1980. In this regard, the Special Master believes that Third-Party Defendant Insurers ACIC, Evanston and Mutual Fire are entitled to summary judgment on the Third-Party Complaints of CCC, CCCI, Hjersted, Armco, AT & T-TI, FMC and IBM.

2. *Claims Made Policies.*

Lincoln Insurance Company argues that a "claims-made" provision of its completed operations policies should result in a find-

ing of no coverage and a granting of summary judgment in its favor. The policies provide that:

> The coverage provided by this form is limited to liability for those CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED WHILE THE POLICY IS IN FORCE except as otherwise provided herein. (Emphasis in original.)

A "claim" is defined as:

> A demand received by the Insured for money, goods, or services, and shall include the service of suit or institution of arbitration proceedings against the Insured.

Lincoln submits that there is no evidence that any claims by the United States or any of the entities asserting third-party claims were made against the insured CCC during the period their policies were in force, December 14, 1977 to December 14, 1979. Lincoln's coverage is averred to be expressly limited to liability claims made against the insured during that period.

The earliest suit initiated by any of the claimants to this action dates from 1980, the year following Lincoln's policy periods, *United States v. Conservation Chemical Co., Kansas City Power & Light, and Mobay Chemical Corp.*, No. 80–0883–CV–W–5.

A number of courts have decided that under a "claims-made" policy, even where the alleged negligence occurred within the policy period, where a claim is not asserted until after expiration of the policy, there is no coverage. *Samuel N. Zarpas, Inc. v. Morrow*, 215 F.Supp. 887, 889 (D.N.J.1963); *Detroit Automobile Inter-Ins. Exchange v. Leonard Underwriters, Inc.*, 117 Mich. App. 300, 323 N.W.2d 679 (1982); *Rotwein v. General Accident Group*, 103 N.J.Super. 406, 247 A.2d 370 (1968); *Brander v. Nabors*, 443 F.Supp. 764 (N.D.Miss.1978), *aff'd per curiam*, 579 F.2d 888 (5th Cir. 1978); *Hoyt v. St. Paul Fire & Marine Ins. Co.*, 607 F.2d 864 (9th Cir.1979); *James J. Brogger & Assoc. v. American Motorist Ins. Co.*, 42 Colo.App. 464, 595 P.2d 1063 (1979); *James & Hackworth v. Continental Cas. Co.*, 522 F.Supp. 785 (N.D.Ala.1980); *Breaux v. St. Paul Fire & Marine Ins. Co.*, 326 So.2d 391 (La.App. 1976); *Gereboff v. Home Indem. Co.*, 119 R.I. 814, 383 A.2d 1024 (1978); *Graman v. Continental Cas. Co.*, 87 Ill.App.3d 896, 42 Ill.Dec. 772, 409 N.E.2d 387 (1980); *Mission Ins. Co. v. Nethers*, 119 Ariz. 405, 581 P.2d 250 (App.1978); *Gulf Ins. Co. v. Dolan, Fertig and Curtis*, 433 So.2d 512 (Fla. 1983).

Lincoln contends that the policy language is unambiguous, and that there is no reason to apply rules of construction favoring the insured. They state further that the "claims-made" provision is clear and unequivocal, and is not rendered ambiguous by the operation of any other policy provisions, including the notice provision. The notice provision and the claims-made provision are said to function independently of each other, each operating as a separate condition to coverage.

Evanston provided Specified Products and Completed Operations coverage on a claims-made basis for the period December 14, 1980 through December 14, 1981, and for the period January 1, 1985 through January 1, 1986 (this policy was cancelled by the insurer as of July 5, 1985). The 1980 policy has a retroactive date of December 14, 1977. Evanston also issued a Commercial Umbrella Liability policy with the excess products and completed operations part of the policy on a claims-made basis for the period December 2, 1980 through December 14, 1981. It also includes the December 14, 1977 retroactive date.

Although the language of the provision differs somewhat from the Lincoln provision, and "claim" is defined as notice received by the insured of an intention to hold the insured responsible, it is similarly argued that there must be a claim made within the policy period, and that has not occurred here. Evanston dates the Government's claim as of December 22, 1982.

Evanston cites *Samuel N. Zarpas, Inc. v. Morrow*, 215 F.Supp. 887, 889, (D.N.J. 1963); *Detroit Automobile Inter-Ins. Ex-*

*change v. Leonard Underwriters, Inc.*, 117 Mich.App. 300, 323 N.W.2d 679 (1982); and *Zuckerman v. National Union Fire Ins. Co.*, 100 N.J. 304, 495 A.2d 395 (1985) for the proposition that where a claim is not asserted against an insured within the period of the policy, there is no coverage.

Mutual Fire provided Specified Products and Completed Operations coverage on a claims-made basis for the period December 14, 1979 through December 14, 1980. In a separate endorsement, the retroactive date is amended to read December 14, 1977. The policy language is the same as that in Evanston's policies, and its argument is the same. Based on a November 22, 1982 date of suit that is identified, Mutual Fire argues that no claim was made during its policy period as was required under the claims-made policy provision.

The OGDs respond that summary judgment is not appropriate for any claims-made policies stating that claims were made during the policy periods or that the policies must be construed as occurrence policies. The OGDs find it significant that the insurers at issue differ as to when a claim occurs.

As to Lincoln's argument that the earliest suit dates from 1980, the OGDs note that the State of Missouri filed suit in July, 1979, and that federal and state authorities began a series of administrative proceedings in 1976 that continued in conjunction with the actual lawsuits.

As to Mutual Fire, the OGDs assert that the (September 29) 1980 suit clearly constitutes a claim within the policy period.

As to Evanston, the OGDs assert that claims were continuing to be made pursuant to the 1979 and 1980 actions. They further assert that the present action constitutes continuing claims under the 1985 policy.

The OGDs' second argument is that the policies must be construed as occurrence policies. For the Lincoln policy, for instance, they contend that a separate endorsement deletes a standard limits of liability provision and in so doing, removes claims-made limitations contained else-

where, and thereby shows Lincoln's intent to provide occurrence coverage. They argue that at the very least, there is sufficient ambiguity to require construction in favor of the insured.

In this regard, the OGDs cite *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 495 A.2d 406 (1985) (companion case to *Zuckerman*, 495 A.2d 395), for the proposition that a claims-made policy that does not conform to the objectively reasonable expectations of the insured with respect to the scope of coverage is violative of public policy. The Special Master agrees that the OGDs have preserved a triable issue of fact with regard to the expectations of the insured.

The Special Master finds that as a matter of law, a claim must be made within the policy period of the relevant "claims-made" policy for coverage to be afforded. The Special Master is not persuaded that the "claims-made" policy of Lincoln Insurance Company cannot be found to provide coverage in the instant case. During the Lincoln policy period, a triable issue exists as to whether a claim as defined in the policy (a demand for money) was received by the insured. The actions filed by the State of Missouri prior to the September, 1980 complaint by the United States while technically did not involve a demand for money, did involve an equitable action for the site. Such a suit necessarily involves a demand upon the site operator insured for a large expenditure of funds for remediation and for investigative response costs. Whether such a suit constituted a claim made under the policy must be resolved at trial. Therefore, the Special Master recommends that Lincoln Insurance Company's motion for summary judgment on the basis of the "claims-made" policy provision be *denied.*

The Special Master finds that there has been no claim against the 1985 policy of Evanston. It is therefore entitled to summary judgment as to that policy. The Special Master found in Section E that there was no coverage afforded by Evanston's policy issued after December 28, 1980 for

the reason that no new occurrence has taken place after that date.

■ The Special Master is not persuaded by Mutual Fire's motion for summary judgment on this basis. Mutual Fire's assertion regarding the action commencing in November, 1982, ignores the action filed in September, 1980. The September, 1980 action clearly constitutes an action within the December, 1979 to December, 1980 claims-made policy period. The Special Master must therefore recommend the *denial* of Mutual Fire's motion for summary judgment on the basis of the claims-made policy provision.

■ Evanston's motion for summary judgment on the basis of the claims-made policy provision is also inappropriate. While Evanston's listed policy period was from December 2, 1980 through December 14, 1981 on the "Commercial Umbrella Liability" policy, and from December 14, 1980 through December 14, 1981 on the Completed Operations Liability policy, both policies include a December 14, 1977 retroactive date. This opens the coverage to a period which includes the September 29, 1980 action by the United States. As such, the Special Master recommends the *denial* of Evanston's motion for summary judgment on the basis of the claims-made policy provision.

### 3. *Failure to Settle.*

Count III of the ODGs' Third-Party Complaint alleges an action in tort for bad faith refusal to settle within applicable coverages allegedly afforded by the separate policies of insurance. In the Report and Recommendation Regarding Rule 12 Motions on Insurance Issues, the Special Master found that Missouri recognizes an insured's recovery in tort for an insurance company's bad faith refusal to settle suits brought against the insured. *Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750 (1950); *Craig v. Iowa Kemper Mut. Ins. Co.*, 565 S.W.2d 716 (Mo.App.1978); *H & S Motor Freight v. Truck Insurance Exchange*, 540 F.Supp. 766 (W.D.Mo.1982).

The rationale for imposing liability for bad-faith refusal to settle is "that the reservation of the exclusive right to contest or negotiate the claim against the insured imposes a fiduciary duty on the carrier." *Young v. United States Fid. & Guar. Co.*, 588 S.W.2d 46, 47 (Mo.App.1979). The tort is only available for bad faith refusal to settle a claim made by a third party against the insured and is not available for first-person coverages. *Rossman v. G.F.C. Corp. of Missouri*, 596 S.W.2d 469, 471 (Mo.App.1980); *Scullin Steel Co. v. National Ry. Utilization Corp.*, 520 F.Supp. 383, 388 (E.D.Mo.1981). Similarly, it has been held that an injured party as a judgment creditor cannot in an equitable garnishment action brought against a defendant's insurer make a claim based on bad faith for any excess of the limits designated in the liability policy. *Linder v. Hawkeye-Security Ins. Co.*, 472 S.W.2d 412 (Mo. banc. 1971).

At Pages 32 and 33 of the Report and Recommendation on Rule 12 motions, the Special Master indicated that application of Missouri law to Count III would require dismissal. The OGDs' objected to the Special Master's statement and requested that the Court not adopt that part of the Special Master's Recommendation. Over the OGDs' objections, the Court did adopt the Special Master's Report and Recommendation, including that part indicating that if Missouri law were applied to Count III, such would require dismissal.

The elements of the tort of bad faith refusal to settle are: (1) assumption by the insured of control over negotiation, settlement and legal proceedings brought against the insured; (2) demand by the insured that the claim be settled; (3) refusal by the insurer to settle the claim within the limits of coverage; and (4) the insurer has acted in bad faith in refusing to settle. *Dyer v. General American Life Ins. Co.*, 541 S.W.2d 702, 704 (Mo.App.1976). It is obvious under Count III and the facts established to date that all sixteen insurance companies, with the exception of Commercial Union, Foremost and Great American, have denied assumption and exercise no

control over negotiation, settlement and legal proceedings brought against CCC, CCCI and/or Hjersted. Similarly, neither Count III nor the uncontroverted facts support a finding that a judgment in excess of policy limits has been entered or exists. Finally, there exists no relationship between the OGDs and the insurance companies which would give rise to a duty by the insurance companies to deal in good faith on behalf of AT & T–TI, FMC and IBM. The insurance companies owe a duty of good faith to their insureds, CCC and/or CCCI and/or Hjersted, none of whom have made a claim for bad faith refusal to settle.

In an effort to avoid summary judgment on Count III, the OGDs contend that the insurers' arguments must fail because they are based upon the erroneous assumption that the OGDs are neither insureds nor third-party beneficiaries of the insurance policies. The OGDs' argument is contrary to the allegations contained in the pleadings where it is alleged that only Armco is an additional insured. No evidence to date has suggested or proven that either AT & T–TI, FMC and/or IBM is an insured under any of the policies. Likewise, even if it is true that the OGDs are third-party beneficiaries to the insurance policies, the Special Master does not believe that such fact is sufficient as a matter of law to establish the necessary fiduciary relationship upon which the tort of bad faith refusal to settle is premised.

The OGDs further argue that the motions "seem premised upon the misapprehension of Missouri law by the suggestion that the good faith duty to settle is somehow dependent upon an insurer's assumption of the third-party plaintiffs' defense." The OGDs go on to argue that the duty to settle is independent of any duty to defend. (OGDs' Response to Insurers' Motions for Summary Judgment at 179–180).

█ The Special Master believes that Missouri law, which must be applied to the present case, clearly and unequivocally requires the assumption by the insurer of control over negotiation, settlement and legal proceedings brought against the insured as a condition precedent to the maintenance of an action for the tort of bad faith refusal to settle. *Young v. United States Fid. & Guar. Co.*, 588 S.W.2d 46 (Mo.App.1979); *Dyer v. General American Life Ins. Co.*, 541 S.W.2d 702 (Mo.App. 1976).

For the above-stated reasons, the Special Master finds that no issue as to any material fact exists with respect to the claim for bad faith refusal to settle pleaded in Count III of the OGDs' Third Amended Third-Party Complaint against the sixteen insurance companies. The Special Master further finds that each of the sixteen insurance companies is entitled to judgment as a matter of law on Count III of the OGDs' Third Amended Third-Party Complaint. Therefore, the Special Master recommends that *summary judgment be granted* in favor of each of the sixteen Third-Party Defendant Insurers on Count III of the Third Amended Third-Party Complaint of the ODGs.

### F. ISSUANCE, DELIVERY AND PAYMENT

#### 1. *Original Generator Defendants.*

The OGDs have moved for partial summary judgment against thirteen (13) insurance companies on three separate but related issues: (1) *Issuance* of insurance policies to CCC or Hjersted; (2) *Delivery* of insurance policies to CCC or Hjersted; and (3) *Payment* of premium for insurance policies. (Motion of OGDs at 1).

To support their motions on these three issues against the thirteen (13) insurance companies, the OGDs claim that Central National, Home, Centaur, American Fidelity, Continental, Great American and Great Southwest have admitted that they issued and delivered policies of insurance to CCC or Hjersted, and that CCC or Hjersted paid the appropriate premiums. (Motion of OGDs at 2). With regard to Evanston, Mutual Fire, Commercial Union, Foremost, Lincoln and Maryland, the OGDs argue that each has admitted issuing policies of insurance to CCC or Hjersted. On the issues of delivery and payment against

such companies, the OGDs offer no proof, but nevertheless claim they are entitled to summary judgment because "none of the ... third-party defendant insurers have any credible evidence to create any genuine issue as to a material fact regarding delivery of their policies to CCC or Norman B. Hjersted, and premium payment by CCC or Hjersted ..." (Motion of OGDs at 2).

The Special Master has carefully examined the pleadings, depositions, answers to interrogatories and admissions on file and believes that they clearly establish that no genuine issue as to any material fact exists with respect to the issues of issuance and delivery of insurance policies to CCC and payment by CCC of premiums applicable to such policies concerning Central National, Home, American Fidelity, Continental, Great American and Great Southwest. That is to say, the Special Master is convinced that the OGDs have established that Central National, Home, American Fidelity, Continental, Great American and Great Southwest issued and delivered policies of insurance to CCC. Furthermore, no genuine issue exists as to *issuance* of insurance policies by Centaur, Evanston, Mutual Fire, Commercial Union, Foremost, Lincoln and Maryland. The OGDs, however, have wholly failed to establish the issues of *delivery* and *payment* regarding Centaur, Mutual Fire, Commercial Union, Foremost, Lincoln and Maryland. Therefore, summary judgment cannot be granted as to such insurers on either delivery or payment or both.

The Special Master therefore recommends that the motion of the OGDs for Partial Summary Judgment be *granted on the issues of issuance, delivery and payment* of insurance policies against Central National, Home, American Fidelity, Continental, Great American and Great Southwest; and should be *granted on the single issue of issuance* of insurance policies against Centaur, Evanston, Mutual Fire, Commercial Union, Foremost, Lincoln and Maryland. The OGDs' Motion for Partial Summary Judgment should *be denied on the issues of delivery and payment* regarding the policies issued by Centaur, Evanston, Mutual Fire, Commercial Union, Foremost, Lincoln and Maryland.

## 2. *Site Operator Defendants.*

CCC, CCCI and Hjersted seek partial summary judgment against each third-party defendant insurer on the issues of issuance and delivery of their policies to CCC and "the other insureds" as well as the appropriate payment of required premium by CCC and "the other insureds" under the policies.

In support of such motion, CCC, CCCI and Hjersted state that there is no genuine issue as to any material fact regarding the issues of issuance, delivery and payment of premium, and that CCC, CCCI and Hjersted are entitled to judgment as a matter of law on these issues. For support of their motion, CCC, CCCI and Hjersted refer the Court to the arguments and authorities cited by the Original Generator Defendants in support of their motion for partial summary judgment on the issues of issuance, delivery and payment. (Motion of CCC, CCCI and Hjersted at 1-2).

The motion of the OGDs referenced by CCC, CCCI and Hjersted does not seek summary judgment regarding CCCI or on the issues of issuance, delivery and payment as such relate to CCCI. The OGDs' motion is confined to CCC or Hjersted, and therefore, the OGDs' motion offers no support for partial summary judgment in favor of CCCI or "the other insureds." There being no proof that CCCI or "the other insureds" is entitled to judgment as a matter of law, or any showing that there are no genuine issues as to any material fact regarding issuance and delivery of any policy to CCCI or "the other insureds" or payment for any such policies of insurance by CCCI or the "other insureds", the motion should be denied as to CCCI. Likewise, for the reasons set forth above, the Special Master believes that no genuine issue as to any material fact exists with respect to the issues of issuance and delivery of insurance policies to CCC and the payment by CCC of premiums applicable to

such policies for Central National, Home, American Fidelity, Continental, Great American and Great Southwest. And, although no issue exists as to the issuance of insurance policies, CCC has failed to establish the issues of delivery and payment regarding Centaur, Evanston, Mutual Fire, Commercial Union, Foremost, Lincoln and Maryland.

On the bases stated above, the Special Master recommends that CCC, CCCI and Hjersted's motion for partial summary judgment on the issues of issuance, delivery and payment be *overruled* in its entirety as to CCCI and Hjersted. The Special Master further recommends that the Court *grant* the motion for summary judgment on the issues of issuance, delivery and payment by CCC with respect to Central National, Home, American Fidelity, Continental, Great American and Great Southwest; but *deny* such as to the issues of delivery and payment regarding Centaur, Evanston, Mutual Fire, Commercial Union, Foremost, Lincoln and Maryland.

## G. "PROPERTY DAMAGE" UNDER CGL POLICIES

The OGDs have moved for an order determining that the escape of environmental contaminants from the CCC site constitutes "property damage" as that term is defined in the CGL insurance policies issued to CCC. The OGDs also ask for an order establishing that the proper measure of damages under the insurance policies is the cost of investigation and cleanup incurred by the United States. (Suggs. in Support at 2). Although, as the OGDs concede, "a number of factual issues exist for trial with regard to coverage under these insurance policies", the OGDs nevertheless argue "that it is clear, as a matter of law, (1) that the escape of environmental contaminants from the [CCC] Site constitutes 'property damage' under the policies at issue here; (2) that the escape of contaminants constitutes 'property damage' which is not limited to property owned by CCC and/or Norman Hjersted; and (3) that the appropriate measure of 'property damage' is the cost of investigation and of the Remedial Action

approved by the Court." (Suggs. in Support at 2). The OGDs further argue that partial summary judgment can and should be entered in their favor on each of the three issues because "no factual development is necessary ..., and only issues of law are presented ..." (Suggs. in Support at 2).

To support their motion, the OGDs insist that the Court has already determined that contaminants from the CCC site have been and are escaping from the site into the surrounding ground water and surface water. *See, United States v. Conservation Chemical Co.*, 628 F.Supp 391, 395–399 (W.D.Mo.1985). The Court's Findings of Fact are supported by the voluminous technical record compiled to date in this case, and no testimony whatsoever was offered at the October 21, 1985 hearing to indicate that contaminants have not been and are not escaping from the CCC site into underlying ground water and surrounding surface water, including the Missouri River. (Suggs. in Support at 3–6). The OGDs maintain that the Court's determination conclusively establishes the first prerequisite needed for a determination that the escape of contaminants constitute property damage.

To support the second prerequisite, the OGDs point to decisions of several courts holding that environmental contamination of property which moves into surrounding ground water, surface water or soil constitutes "property damage" for the purposes of insurance coverage. In particular, the OGDs direct attention to *Lansco, Inc. v. Department of Environmental Protection*, 138 N.J.Super. 275, 350 A.2d 520, 88 A.L.R.3d 172 (Ch.Div.1975), *aff'd*, 145 N.J. Super. 433, 368 A.2d 363 (App.Div.1976), *cert. denied*, 73 N.J. 57, 372 A.2d 322 (1977).

On the two related issues, applicability of the "Owned Property" exclusion and the appropriate measure of the "property damage," the OGDs argue first that the "Owned Property" exclusion does not apply as a matter of law because surface and

sub-surface water on CCC's property is not property owned by CCC for purposes of determining coverage (Suggs. in Support at 9–16), and secondly, that the costs of investigation and Remedial Action approved by the Court is the appropriate measure of damage as a matter of law under *Lansco, Inc. v. Department of Environmental Protection, supra; Kutsher's Country Club Corp. v. Lincoln, Ins.*, 119 Misc.2d 889, 465 N.Y.S.2d 136 (1983); *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838 (1983); *Port of Portland v. Water Quality Ins. Syndicate*, 549 F.Supp. 233 (D.Ore.1982); and *Chemical Applications Co., Inc. v. The Home Indem. Co.*, 425 F.Supp. 777 (D.Mass.1977).

In opposition to the OGDs' motion, third-party defendant insurers ("insurers") argue that while "there is no doubt that hazardous wastes are escaping into the environment from the Kansas City site," the action brought by the United States is premised upon endangerment and seeks restitution of response costs incurred by the Government at the CCC site. "The United States did not demand damages for injury to, destruction of, or loss of natural resources pursuant to CERCLA, Section 107(a)(C), 42 U.S.C. § 9607(a)(C), however, choosing instead to pursue only reimbursement of economic loss." (Joint Memo. in Opp. at 2). Since the "injury" for which relief is sought is "purely economic," the insurers contend that "there is no demand for 'property damage' within the meaning of the policies at issue." (Joint Memo. in Opp. at 2). *See also*, Memo. in Support of Individual Insurers' Motions for Summary Judgment at 30–32. Thus, although not explicitly stated in the Joint Memorandum in Opposition, it is apparently the insurers' position that the escape of contaminants from the CCC Site cannot, as a matter of law, constitute "property damage" under CGL insurance policies because the Government did not seek compensation for damage caused by destruction or loss of natural resources under Section 107(a)(C).

In addition to the Insurers' Joint Memorandum, third-party defendant Home filed a separate memorandum in opposition to the OGDs' motion. Home opposes the motion because: (1) there is no "property damage" at issue in this action; and (2) even if there were, the costs of site investigation and cleanup would not be the proper measure of an insurer's liability to an insured. (Opp. of Home at 1). Home acknowledges that "property damage" as used in Home's insurance policy "took place at the CCC Kansas City site" and that "the presence of contaminants in off-site ground water and surface water in concentrations constituting damages" is not disputed by Home for purposes of the OGDs' motion. But Home argues that either "contention" is irrelevant to the question of insurance coverage for the non-property damage relief sought by the United States. (Opp. of Home at 1–2). Thus, reduced to its essentials, Home first contends that whether or not actual property damage (loss of or direct damage or destruction of tangible property) exists in the present situation is irrelevant to the question of coverage because the United States has sought injunctive relief and response costs under §§ 104 and 107(a)(A) and not damages for environmental injury under § 107(a)(C). (Opp. of Home at 2–3). It is the claim in the underlying action which determines questions of coverage and here the United States does not allege property damage, thus precluding coverage under Home's policy. (Opp. of Home at 3–6). Home next contends that damages recoverable under § 107(a)(A) claims are not, and clearly were not intended by Congress to be, the measure of damage to natural resources. In cost-recovery actions like the present one, Congress set the measure of recovery as the economic losses incurred in the cleanup and removal of hazardous substances or the amount necessary "to prevent or minimize the release of hazardous substances so they do not migrate or cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24). Thus, the costs of investigation and Remedial Action are not appropriate measures of damage in cost-recovery actions, but even

if they are, such are not "damages" as that term is used in the Home policies, and thus, no coverage exists. (Opp. of Home at 8–12).

In the Order approving the Special Master's Recommendation concerning disposition of the motions to dismiss or for summary judgment, *United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 182–184 (W.D.Mo.1985), and more fully in the Memorandum Order of December 12, 1985, *United States v. Conservation Chem. Co.*, 628 F.Supp. 391, 395–399 (W.D.Mo.1985), this Court determined that chemicals deposited in lagoons at the CCC site during the 20–year period (1960–1980) that the site was in operation have been and are migrating from the CCC Site into the Missouri River and have contaminated the aquifer beneath and adjacent to the CCC Site. Specifically, the Court found:

[T]he CCC site contains ... six basins (presently covered) that were used for storage, treatment, and disposal of a variety of chemicals, liquid waste, and sludges. The dimensions and exact locations of the lagoons migrated over the site during the 20–year (1960–1980) period that the site was in operation.

\* \* \* \* \* \*

The exact nature and quantities of chemicals and waste handled during the site's active operating period are unknown ... It is estimated that at least 28 million gallons of various types of waste were accepted between 1970 and 1980. The facility handled liquids, sludges, and solids.

\* \* \* \* \* \*

Hazardous substances have been and are being released from the site and migrating toward the east and toward the Missouri River. It is estimated that the annual rate of discharge of hazardous materials from the site into the ground water is in excess of 22,000 pounds, and that the likelihood of a significant rate of discharge continuing in the future is high. It is also opined that the likelihood of some or all of the hazardous substances being directly encountered by

aquatic organisms or other living creatures in the course of their migration was fairly high in that a number of substances are located at the surface and that a number of different mammals and birds and amphibious life frequent the area.

628 F.Supp. at 395, 396, 398.

The Special Master believes that the facts found by the Court regarding the release of contaminants and pollutants from the CCC site and the migration of such contaminants into ground water and the Missouri River clearly indicate harm to property. The deposit of hazardous substances into the CCC Site has caused injury to the site itself, and the release and migration of the contaminants has damaged and continues to damage surrounding ground water, surface water and soil. At this point, none of the parties disputes the obvious physical harm resulting from the movement of hazardous materials into water and soil from the CCC Site or the damage to CCC's property caused by the storage, treatment and disposal of a variety of chemicals, liquid waste and sludges. In any event, the facts established by the December 12, 1985 Order are the law of the case.

But the Court's determination of physical harm does not necessarily compel a finding that such harm is "property damage" as that term is defined and used in the various insurance policies issued to CCC. In order to resolve the question of whether the harm found by the Court is "property damage" for purposes of insurance coverage, it is necessary to review the definitions of "property damage" in the various policies. The typical policy issued to CCC reads as follows:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... *property damage* to which this insurance applies, caused by an occurrence ... [T]he company shall have the right and duty to defend any suit against the insured seeking damages on account of ... *property damage,*

even if the allegations of the suit are groundless, false or fraudulent. (Emphasis added).

The typical policy defines "property damage" as "injury to or destruction of tangible property." Another policy defines "property damage" as "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or loss of use of tangible property which has not been physically injured or destroyed, provided such loss of use is caused by an occurrence during the policy period." Yet another policy says that "Property Damage means loss of or direct damage to or destruction of tangible property (other than property owned by the Named Insured), which occurs during the policy period, including loss of use thereof at any time resulting therefrom." Thus, for the release and migration of contaminants and pollutants to constitute "property damage" as that term is used in the insurance policies, the harm must at a minimum be "physical injury or destruction of tangible property." The Special Master believes that it is.

In *Lansco, Inc. v. Department of Environmental Protection*, 138 N.J.Super, 275, 350 A.2d 520, 88 A.L.R.4th 172 (Ch.Div. 1975), *aff'd*, 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), *cert. denied*, 73 N.J. 57, 372 A.2d 322 (1977), the Court rejected the insurer's argument that the cost of statutorily imposed cleanup of a "sudden and accidental" oil spill was not cognizable under a comprehensive general liability insurance policy. Also rejected was the insurer's arguments that the "sudden and accidental" pollution was not "property damage."

Royal urges, however, that coverage under the policy does not include damages recoverable by the State from Lansco in the State's sovereign capacity or under the public trust doctrine; in other words, the term 'property damage' must be read as meaning measurable damage to identifiable physical property. This argument is without merit.

\*　　\*　　\*　　\*　　\*　　\*

The policy in suit provides for comprehensive general liability insurance. Numerous decisions of our courts have held that an insured should receive what he generally may be understood to have contracted for. As has so frequently been said, an insurance contract is essentially one of indemnification, and Lansco could have reasonably expected to be indemnified for any liability arising out of the operation of its business which was not specifically excluded. Lansco is engaged in a business which entails the storage of oil on property adjacent to the Hackensack River. The specific policy provision in question affords coverage for property damage arising out of a sudden and accidental discharge of oil into a body of water. This should have alerted the insurer to potential legal liability of its insured under state anti-pollution statutes which directly affected and regulated its business operations. 350 A.2d at 524–525. (Citations omitted.)

In *Kutsher's Country Club Corp. v. Lincoln Ins. Co.*, 119 Misc.2d 889, 465 N.Y. S.2d 136 (1983), Kutsher's filed an action seeking a declaration that Lincoln was responsible to indemnify it for any cleanup costs in connection with an oil spill resulting from a ruptured nipple on an oil storage tank located on the insured's property. Stipulated facts showed that on January 25, 1981, an oil spill occurred on Kutsher's premises. On April 27, 1981, an engineer from the New York State Department of Environmental Conservation (DEC) discovered fuel oil in a swamp located near plaintiff's premises but not owned by it. The DEC advised Kutsher's that the area in question constituted a declared fresh water wetland, and pursuant to New York law, plaintiff was strictly liable to clean up the oil spill and subject to fines up to $25,000 per day. Plaintiff immediately notified its insurance agent and the agent in turn notified Lincoln. On June 8, 1981, Lincoln's adjusters notified Kutsher's that it would

conduct an investigation of the claim, but reserved all rights concerning timeliness of notice of the claim. On September 4, 1981, Lincoln notified plaintiff that it was denying the claim on the ground that the cost of cleanup of the oil spill was not "property damage," and therefore not an item entitled to insurance coverage. Thereafter, the State of New York commenced an action seeking $289,945.44 in cleanup costs plus statutory penalties. Plaintiff then filed the declaratory judgment action. Plaintiff moved for summary judgment on the issue of coverage, and for purposes of the motion, defendant Lincoln stipulated that the oil spill was an "occurrence" within the meaning of the policy. Lincoln also withdrew all defenses except as to the timeliness of notice and whether or not the cost of cleanup of the oil spill constituted "property damage" within the meaning of the insurance policy.

In granting summary judgment in favor of Kutsher's and against Lincoln upon the disputed facts, the Court labeled as "preposterous" Lincoln's assertion that plaintiff had failed to establish that the petroleum discharge had resulted in injury to tangible property. In this regard, the Court said:

> The Court agrees with plaintiff's assertions that the New Jersey's Superior Court case of *Lansco, Inc. v. Department of Environmental Protection*, 138 N.J.Super. 275, 350 A.2d 520 (1975) should control in this matter. That case recognized the principle that 'the sovereign's interest and the preservation of public resources and environment enable it to maintain an action to prevent injury thereto.' [Cites omitted.] (*Lansco, supra*, 350 A.2d at p. 524).

\* \* \* \* \* \*

In view of the above, the Court agrees with plaintiff that Lincoln's assertions that plaintiff has not shown that the petroleum discharge resulted in injury to tangible property is preposterous. Further, Lincoln urges that *Lansco* should not be controlling as it is a case from a different jurisdiction. The Court disagrees ... Contrary to defendant Lincoln's assertions, the Court does not find that imposing the cost of cleanup by statute is punitive in nature but is clearly reflective of the state's power to establish damages with respect to legislation designed to preserve the sovereign state's interest in the preservation of public resources (*Lansco, supra.*).

465 N.Y.S.2d at 139.

So, too, in *Port of Portland v. Water Quality Ins. Syndicate*, 549 F.Supp. 233 (D.Ore.1982) (applying Oregon law), the Court held that a CGL policy covered the cleanup costs in connection with oil which had escaped from a barge into a river, and rejected the insurer's contention that the cost of cleanup did not constitute "property damage." The Court said:

> The insurer argues that the damage to the Willamett River was not 'injury to or destruction of tangible property' but this interpretation is untenable. The language of Exclusion K itself disallows coverage for certain 'property damage' resulting from discharge into navigable waters. Further, Oregon law establishes that the state's interest in its water resources is sufficient to support an action for damages caused by pollution, see, *Askew v. American Waterways Operators*, 411 U.S. 325, 331–32, 93 S.Ct. 1590, 1595, 36 L.Ed.2d 280 (1973); ORS 468.-805. The court in *Lansco, Inc. v. Environmental Protection*, 138 N.J.Super. 275, 350 A.2d 520 (1975), *aff'd per curiam*, 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), interpreting policy provisions identical to those in the St. Paul policy on closely analogous facts, rejected the insurer's arguments that the 'sudden and accidental' pollution was not 'property damage,' and I adopt this rationale as the 'reasonable, enlightened view' which the Oregon Supreme Court would adopt, see *Ins. Co. of North America v. Howard, supra*, [679 F.2d 147] at 149 [9th Cir.1982].

*Id.* at 235. Thus, it appears that at least three courts have explicitly concluded that, where property of third parties is involved, cleanup costs incurred by, or to be charged

against, an insured constitute "property damage" within the meaning of the term as used in a CGL insurance policy.

CGL policies have also been held to cover diminution in value of a third-party's property. *See, e.g., Aetna Cas. & Sur. Co. v. PPG Indus., Inc.,* 554 F.Supp. 290 (D.Ariz. 1983); *Hogan v. Midland Nat. Ins. Co.,* 3 Cal.3d 553, 91 Cal.Rptr. 153, 476 P.2d 825 (1970); *Geddes & Smith, Inc. v. St. Paul-Mercury Idem. Co.,* 51 Cal.2d 558, 334 P.2d 881 (1959); *Hauenstein v. St. Paul-Mercury Idem. Co.,* 242 Minn. 354, 65 N.W.2d 122 (1954); *Marine Midland Serv. Corp. v. Samuel Kosoff & Sons, Inc.,* 60 A.D.2d 767, 400 N.Y.S.2d 959 (1977). Other policies do not provide coverage for diminution in value. *See, e.g., Miller's Mut. Fire Ins. Co. of Tex. v. Ed Bailey, Inc.,* 103 Idaho 377, 647 P.2d 1249 (1982).

The insurers argue that the OGDs' reliance on *Lansco, Inc., Kutsher's Country Club Corp.,* and *Port of Portland* is misplaced because each is distinguishable and therefore unpersuasive as to whether cleanup costs constitute "property damage" under a standard form CGL insurance policy. According to the insurers, the distinguishing factor is that each dealt with a state's interest in preserving and protecting public resources and the environment. And, say the insurers, a state's proprietary interest in protecting its resources is "irrelevant insofar as establishing that an equitable action by the United States for restitution of costs expended constitutes 'property damage' as that term is defined in CCC's insurance policies." (Joint Memo. in Opp. at 3).

While it is true that *Lansco* and *Port of Portland* involve application of separate state laws which render persons responsible for the release of hazardous substances strictly liable for the cost of responding to those releases, such fact does not make the holding irrelevant to the present case. In both *Lansco* and *Port of Portland,* the state statute mandated response in the form of either direct government action to remedy the environmental hazard followed by a demand to recover

cleanup costs or an order to the liable party to conduct a cleanup at its own expense. In both cases, the cleanup was ordered by the state and undertaken by the owner of the property from which the pollutants came. In *Kutsher's Country Club Corp.,* remedial action was initially undertaken by the property owner, but later abandoned leaving the cleanup to the state. The Court found the state's claim for reimbursement to be "property damage" under the terms of the CGL insurance policy at issue. It appears that the "property damage" claim in *Kutsher's Country Club Corp.* is similar to the claim asserted by the United States in the present case. The Special Master finds the insurers' attempt to distinguish *Lansco, Kutsher's Country Club Corp.,* and *Port of Portland* on the basis of a state's proprietary interest to be unpersuasive in light of the obvious federal proprietary interest in the navigable waters of the United States. *United States v. Willow River Power Co.,* 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945); *Kaiser-Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *U.S. v. Bayview Riverside Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). It further appears that state statutes in *Lansco, Kutsher's Country Club* and *Port of Portland* appear to be analogous to the statutory scheme under RCRA and CERCLA.

As a second prong to their argument, the insurers contend that the holdings in *Lansco, Inc., Kutsher's Country Club Corp.,* and *Port of Portland* are inapplicable because those "property damage" claims involved states' proprietary interests in their natural resources as contrasted with the equitable cost-recovery action instituted by the United States pursuant to RCRA, § 7003 and CERCLA, § 107(a)(A). (Joint Memo. in Opp. at 4).

Cases arising under CERCLA and RCRA in other contexts have indicated that cleanup claims are not legal actions, but rather are equitable actions in the nature of restitution. *See,* Special Master's Recommendation Regarding General Dynamics Corporation's Demand for a Jury Trial (April 29, 1985), approved by Order, May 14, 1985;

*United States v. Price,* 688 F.2d 204, 210–14 (3rd Cir.1982); *United States v. Georgeoff,* No. C83–1656–A (N.D.Ohio, August 2, 1984); *United States v. Northeastern Pharm. & Chem. Co.,* 579 F.Supp. 823 (W.D.Mo.1983).

The great weight of authority equate "equitable" response or cleanup costs with property damage. *Reihl v. Travelers Ins. Co.,* No. 83–0085, 22 Envt.Rptr.Cas. 1544 (W.D.Pa. August 7, 1984), *rev'd on other grounds,* 772 F.2d 19 (3rd Cir.1985); *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich.App. 579, 336 N.W.2d 838 (1983); *Kutsher's Country Club Corp. v. Lincoln Ins. Co.,* 119 Misc.2d 889, 465 N.Y.S.2d 136 (1983); *Port of Portland v. Water Quality Ins. Syndicate,* 549 F.Supp. 233 (D.Ore. 1982); *Chemical Applications Co., Inc. v. The Home Idem. Co.,* 425 F.Supp. 777 (D.Mass.1977); *Lansco, Inc. v. Department of Environmental Protection,* 138 N.J.Super. 275, 350 A.2d 520, 88 A.L.R.3d 172 (Ch.Div.1975), *aff'd,* 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), *cert. denied,* 73 N.J. 57, 372 A.2d 322 (1977). Other courts have held or assumed, without extensive discussion, that cleanup costs constitute "property damage" for purposes of insurance coverage. *See, e.g., Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.,* Civ. No. 83–3347 (D.D.C. May 2, 1986) (sums denominated as "cleanup" costs constitute damages for purposes of liability insurance coverage); *Payne v. Fid. & Guar. Co.,* 625 F.Supp. 1189 (S.D.Fla.1985); *Buckeye Union Ins. Co. v. Liberty Solvents & Chems.,* 17 Ohio App.3rd 127, 477 N.E.2d 1227 (1984); *Evans v. Aetna Cas. & Sur. Co.,* 107 Misc.2d 710, 435 N.Y.S.2d 933 (1981). *See also, Mraz v. American Univ. Ins. Co.,* 616 F.Supp. 1173 (D.Md.1985) (holding after trial that cleanup costs constitute property damage). *But see, West Waterway Lumber Co. v. Aetna Ins. Co.,* 14 Wash.App. 833, 545 P.2d 564 (1976) (injury to navigable waters caused by an oil spill was not property damage within the meaning of CGL policy).

The Special Master believes, and the cited cases support the conclusion, that actions seeking recovery of cleanup costs, such as the present one, are equivalent to actions seeking recovery of damages to natural resources. *Lansco, Inc. v. Department of Environmental Protection, supra; Kutsher's Country Club Corp. v. Lincoln Ins. Co., supra; Port of Portland v. Water Quality Ins. Syndicate, supra.* The Special Master does not, however, read the above cases as broadly as the OGDs. In particular, it does not appear that the cases explicitly hold that *environmental harm or contamination* constitutes "property damage"; rather, the cases may only stand for the proposition that *cleanup costs* constitute "property damage." Thus, for example, in *Kutsher's Country Club Corp.,* the court framed the first question to be "whether or not the cost of the cleanup constitutes 'property damage' within the meaning of the insurance policy with the plaintiff." 465 N.Y.S.2d at 138. *See also, Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.,* Civ. No. 83–3347 (D.D.C. May 2, 1986) ("Courts have held that sums denominated as 'cleanup' costs constitute damages for purposes of liability insurance coverage" citing *Kutsher's Country Club Corp.* and *Lansco* ).

■ The Special Master, however, believes that the language of the CGL insurance policies establishes that the discharge, dispersal, release or escape of toxic chemicals, waste materials or other irritants, contaminates or pollutants into or upon land, the atmosphere or any water course or body of water is "property damage" for purposes of coverage. Each of the CGL policies at issue here attempts to limit coverage for pollution. The exclusion generally takes a form substantially similar to the following:

It is agreed that the insurance does not apply to bodily injury or *property damage arising out of* the discharge, dispersal, release or escape of ... toxic chemicals ... waste material or other irritants, contaminants or pollutants into or upon land, the atmosphere or an [sic] water course or body of water ...

Insurers' Joint Memo. at 57. The quoted exclusion explicitly recognizes and acknowledges that "property damage" can and does result from environmental pollution, i.e., "the insurance does not apply to ... property damage arising out of the discharge ... of ... toxic chemicals ..." Indeed, the insurers must and do concede that pollution resulting from a "sudden and accidental" discharge, dispersal, release or escape of toxic chemicals is covered by a standard form CGL policy. *See,* Insurers' Joint Memo. at 67–68; Suggs. of ACIC at 99; Suggs. of Foremost at 6; Brief of Home at 38; Brief of Central National, Point C. Because coverage under the CGL policies would exist for "sudden and accidental" pollution, it necessarily follows that the harm arising out of such release or escape of toxic chemicals would constitute "property damage" just as "property damage" results from "nonsudden and nonaccidental" releases of toxic chemicals or waste material. The fact that the so-called "pollution exclusion" seeks to limit coverage for property damage to "sudden and accidental" dispersals does not mean that damage or destruction to tangible property has not resulted from other escapes of contaminants.

■ The Special Master is persuaded that actions seeking recovery of cleanup costs and imposing a duty of cleanup, such as the present one, are equivalent to actions for recovery of damages to natural resources, and thus, constitute actions for injury to or destruction of tangible property. Furthermore, although the United States' claim is for injunctive relief and response costs, and thus is equitable in nature rather than one strictly for damages, the Special Master believes that the distinction does not prevent a holding that the claim in the present case is one for injury to or destruction of tangible property. This is so because a failure to undertake a remedy of the environmental contamination and damage would certainly have lead to a cleanup by the United States Government followed by an action seeking recovery of the cleanup costs.

The Special Master therefore recommends that partial summary judgment be *granted* in favor of the Original Generator Defendants on the specific issues that: (1) environmental harm associated with the CCC Site constitutes "property damage" as such term is used and defined in the CGL insurance policies issued and delivered to CCC; (2) cleanup costs arising out of the environmental harm caused by the discharge, dispersal, release or escape of toxic chemicals and waste material constitutes "damage" as that term is used in the CGL policies issued and delivered to CCC; and (3) alleged economic losses in the form of response and cleanup costs sought by the United States constitute damages caused by or arising out of the environmental harm for purposes the CGL insurance policies issued and delivered to CCC.

## H. OCCURRENCES

Each of the CGL policies at issue in the present case contains provisions substantially similar to this:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage to which this insurance applies caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury injury or property damage ...

Similarly, the typical policy at issue here defines occurrence as:

> "Occurrence" means an accident, including continuous or repeated exposure to conditions, injury or property damage neither expected nor intended from the standpoint of the Insured.

In one form or another, with the exception of the "claims made" policies discussed earlier in the report, the policies generally contain a clause which provides:

> This policy applies only to bodily injury or property damage which occurs during the policy period.

Thus, for coverage to exist under the typical CGL policy, it is necessary to establish

the existence of either bodily injury or property damage which is caused by an occurrence within the period of the policy.

It is fairly well settled in Missouri that the time of an "occurrence" within the meaning of an indemnity policy is the time the damage was sustained and not the time when the negligent or wrongful act was committed. *Hawkeye-Security Ins. Co. v. Iowa Nat'l Mut. Ins. Co.,* 567 S.W.2d 719, 720 (Mo.App.1978); *Kirchner v. Hartford Acc. & Indem. Co.,* 440 S.W.2d 751, 756 (Mo.App.1969). Consequently, it is necessary to analyze the facts to determine the time that damage was sustained and whether the facts indicate a single or a number of "occurrences". The Special Master finds that he is unable to determine at this point the applicability of the definition of an "occurrence" as applied to the facts of this case or the number of occurrences involved. In other words, when the event causing the property damage is not immediately discoverable and progresses through more than one policy period, different approaches must be utilized to fix coverage responsibility.

The Site Operator Defendants and OGDs argue that the initial acts and all damage occurred within the policies' periods beginning in 1960 and ending in 1984. On the other hand, the Insurers argue that in this case, coverage will only be triggered if the claimed injury or damage occurred during the specific time period of specific policies. The Insurers argue that the date of damage or injury is properly measured by determining the date the damage became manifest or ascertainable. As noted above, the general rule in Missouri, relative to bodily injury and property damage, is that the time of damage and not the time of the wrongful or negligent act or the manifestation of the injury determines the time in which the occurrence was occasioned. The Site Operator Defendants and the OGDs argue that the policies are vague and ambiguous as applied to toxic waste litigation, and that liability should attach from the time of the wrongful act (disposal) to the time of discovery or manifestation of the ultimate damage.

Numerous courts have analyzed these questions and the situation most analogous to the case at bar are those dealing with asbestos-related diseases. *See, e.g., Riehl v. Travelers Ins. Co.,* 772 F.2d 19 (3d Cir. 1985). The ultimate question in those cases concerned the time that an injury, sickness or disease occurs as defined by insurance policies. The holdings of these courts can be classified in three categories: (1) the "exposure" theory; (2) the "manifestation" theory; and (3) the "injury in fact" theory.

First, under the exposure theory, exposure to asbestos resulting in asbestosis is defined as a continuing tort, and all insurance companies which provided coverage from the time of the injured's initial exposure to the time of the manifestation of the disease are jointly and severally liable to defend and to indemnify the defendant, if liability is found. Several courts relying on the exposure theory have construed CGL policy terms to provide coverage for the progressive and long-term illness of asbestosis. The exposure theory has apparently been adopted by the Fifth, Sixth, and the District of Columbia Circuits. In doing so, the courts have found the term "bodily injury and occurrence" inherently ambiguous as applied to progressive diseases such as asbestosis. Those courts have theorized that the exposure theory tends to more closely approximate the reasonable expectations of the manufacturer and the insurer at the time the contract was entered into. *See, Ducre v. Executive Officers of Halter Marine, Inc.,* 752 F.2d 976 (5th Cir.1985); *Porter v. American Optical Corp.,* 641 F.2d 1128 (5th Cir.1981); *Insurance Co. of North America v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir.1980); *Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981), *cert. denied,* 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982); *Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.,* 597 F.Supp 1515 (D.D.C.1984).

The second approach, the manifestation theory, holds that only those insurance companies providing coverage at the time

the injuries manifest themselves or become reasonably ascertainable are liable for damages or bodily injury. These courts have rejected the exposure theory and have found that the CGL provisions actually support a manifestation theory. *Eagle-Picher Industries, Inc. v. Liberty Mut. Ins. Co.*, 523 F.Supp. 110 (D.Mass.1982), *modified*, 682 F.2d 12 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). The manifestation theory is also apparently followed by the Third Circuit in *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3rd Cir.1982) when dealing with sex discrimination, but the Court carefully distinguished that case from the various asbestos cases. *See also, United States Fid. & Guar. Co. v. American Ins. Co.*, 169 Ind.App. 1, 345 N.E.2d 267 (1976).

Third, the injury in fact theory rejects both the exposure and manifestation theories, instead, holding that the insured must prove injury in fact during the policy period in order to apply for coverage. The most thorough examination of the various theories is provided by the district court in *American Home Products v. Liberty Mut. Ins. Co.*, 565 F.Supp 1485 (S.D.N.Y.1983), *aff'd as modified*, 748 F.2d 760 (2nd Cir. 1984) (an "occurrence" of personal injury means "any point in time at which the finder of fact determines that the effects of exposure to a drug actually resulted in a diagnosable and compensable injury"). The appellate court agreed with the injury in fact theory, but felt that the lower court's requirement that the injury in fact be "diagnosable" or "compensable" during the policy period was unwarranted. In quoting the district court, the Second Circuit stated: "[A] real but undiscovered injury, proved in retrospect to have existed at the relevant time, would establish coverage, irrespective of the time the injury became diagnosable." 748 F.2d at 766, *quoting* the district court at 565 F.Supp. at 1497. Although this is an issue of first impression in the Eighth Circuit, it does appear that the Eighth Circuit has agreed in principle that the terms "bodily injury" and "property damage" contained within CGL policies are inherently ambiguous as applied to progressive diseases. This conclusion was reached in *Hon v. Director, Office of Workers Compensation Programs*, 699 F.2d 441 (3th Cir.1983). In making such a determination, the Eight Circuit noted a split among the various other circuits, adopting either the exposure or manifestation theories. This was particularly important when the case involved cumulative illnesses such as black lung disease considered in *Hon*.

Though not extensive, there is some Missouri case law discussion concerning the appropriate trigger of coverage for delayed-manifestation injuries. In *Standard Asbestos Mfg. & Insulating Co. v. Royal Indem. Ins. Co.*, CV80–14909 (Mo.Cir.Ct., Jackson County, April 3, 1986) (O'Leary, J.), the insured sought a declaratory judgment in favor of *Keene* insurance coverage for asbestos bodily injury claims. In construing the CGL policies, Judge O'Leary applied Missouri law and found that:

The policies require a showing of actual injury, sickness or disease occurring during the policy period based upon the facts proved in each particular case. This means that an occurrence of "personal injury, sickness, or disease" is determined to be any point in time at which the finder of fact determines that exposure to asbestos fibers resulted in a diagnosable and compensable injury ... An exposure that does not result in injury during coverage does not satisfy the policy's terms. On the other hand, a real but undiscovered injury proved in retrospect to have existed at a relevant time, would establish coverage, irrespective of the time the injury became manifest.

*Id.* at 17–19. This holding is in accord with the much earlier decision by the Missouri Supreme Court in *Tomnitz v. Employers' Liab. Assur. Corp.*, 343 Mo. 321, 121 S.W.2d 745 (1938). In that case, the court said if a jury concluded that silicosis injury actually happened during the policy period, then the insurance policy was triggered. Therefore, the Special Master does not interpret Missouri law as accepting the *Keene* doctrine. Indeed, Judge Clark recently declined to accept a multiple trigger

approach absent a more developed factual record. *Continental Ins. Cos. v. Northeastern Pharm. & Chem. Co.*, No. 84–5034–CV–S–4 (W.D.Mo. June 25, 1985) [Available on WESTLAW, DCTU database], *appeal pending sub nom, Continental Ins. Cos. v. State of Missouri*, No. 85–194OWM (8th Cir.). Missouri therefore appears to be in line with the legal position adopted by the Second Circuit in *American Home Products v. Liberty Mut. Ins. Co.*, 565 F.Supp. 1485 (S.D.N.Y.1983), *aff'd. as modified*, 748 F.2d 760 (2nd Cir.1984).

Consequently, the Special Master finds that the Third-Party Defendant Insurers' policies require the insurers to defend CCC, CCCI and/or Hjersted within the terms of their policies for "occurrences" of injury defined as follows. At any time a finder of fact determines that the effects of exposure to waste or hazardous materials released by the Site Operator Defendants actually resulted in damage to the off-site environment, if the Third-Party Defendant Insurers' insurance policies were in effect at such time, then those insurers and only those insurers' duty to indemnify the Site Operator Defendants for the underlying claim of the United States is triggered. Depending upon the facts of each case, the chemical involved, the period and intensity of exposure, and the property affected, an injury may occur in this sense upon exposure, at some point in time after exposure but before manifestation of the injury, or at manifestation. In addition, it is necessary to calculate whether multiple occurrences were occasioned due to the continuous deposit of additional waste material at the CCC Site until its closure in late 1979 or early 1980.

For the foregoing reasons, the Special Master finds that Missouri tends to follow the injury in fact analysis to actually determine or discover when an injury occurred. But there may be circumstances where the Missouri courts will look to the exposure and manifestation theories to determine when the injury occurred. For the foregoing reasons, the Special Master finds that he is unable to determine on the present record when disposal of waste materials first commenced, when leaching first occurred, or when damage to the environment was first discovered. As a matter of law, therefore, it cannot be decided whether this case presents only one "occurrence" which caused damage to the environment, groundwater and surface water, or whether there was a series of events constituting "occurrences" taking place beginning at various discrete and ascertainable times. Under any legal theory, one of these events during the policy period is necessary to trigger liability insurance coverage, yet, as noted, it cannot be determined when any of these events occurred.

Third-Party Defendant Insurers, both collectively and individually, have filed motions for summary judgment seeking to avoid any obligation to provide insurance coverage for property damage allegedly resulting from the handling of hazardous substances by CCC, CCCI and Hjersted. In support of their motions for summary judgment, various Third-Party Defendant Insurers contend that insurance coverage is non-existent because the harm was expected or intended by CCC, and therefore, was not caused by a "accident" or by an "occurrence" as required by the policy terms. (Suggs. of ACIC at 70–79; Memo. of Commercial Union at 8–13; Memo. of Continental Casualty at 7–9; Memo. of Foremost at 26–30; Memo. of Great American at 7–8; Memo. of Lincoln at 16–17; Memo. of Home at 15–37; Memo. of Central National; and Joint Memo. of Third-Party Defendant Insurers at 47–56).

The OGDs contend that under Missouri law, damages are "expected or intended" from the standpoint of the insured, if and only if such damages are intentionally caused by the insured. The OGDs say that it is well settled in Missouri that damages are "caused by accident" if the insured "did not intend that the damage resulting from his acts although the act itself was intentional." *Fidelity & Cas. Co. of New York v. Wrather*, 652 S.W.2d 245, 249 (Mo. App.1983); *White v. Smith*, 440 S.W.2d 497, 507 (Mo.App.1969). It is also well settled that injury or damage is intentional

"if the insured acts with specific intent to cause harm or if the insured's intent to harm is inferred as a matter of law from the nature or character of the act." *Travelers Ins. Co. v. Cole,* 631 S.W.2d 661, 664 (Mo.App.1982). Intent to harm is inferred as a matter of law only "if the natural and probable consequences of the act are to produce harm." *Id.; Subscribers at Automobile Club Inter-Insurance Exchange v. Kennison,* 549 S.W.2d 587 (Mo.App.1977). In summary, therefore, it is the OGDs' position that the Court cannot decide in a context of a summary judgment motion whether CCC "expected or intended" harm of the kind that resulted at the 8900 Front Street Site. Their argument is that such a determination under Missouri law turns on Hjersted's subjective intent, which can only be decided by the trier of fact.

In opposition to the OGDs' position, the insurers contend that the determination does not require proof of subjective intent. The insurers suggest that harm is expected and intended when the insured "knew or should have known" that there was a substantial probability that harm would result. *City of Carter Lake v. Aetna Cas. & Sur. Co.,* 604 F.2d 1052, 1058–59 (8th Cir.1979); *Auto-Owners Ins. Co. v. Jensen,* 667 F.2d 714, 719–20 (8th Cir.1981). Furthermore, the insurers allege that the cases cited by the OGDs indicate that intent to harm can be deduced from an insured's conduct, and thus the OGDs' own cases establish the falsity of their position.

The Special Master believes that the objective test is the operative rule under Missouri law. In other words, for purposes of determining whether an act falls within the definition of either "occurrence" or "accident," the harm is expected and intended if the insured knew or should have known that there was a substantial probability that harm would result. But finding that the objective test applies does not compel a holding as a matter of law that CCC, CCCI and/or Hjersted "expected and intended" environmental pollution and environmental harm to result from their actions at all times during the operation of the CCC Site.

The Special Master believes that the facts indicate that Hjersted may have intended certain materials to leach from the site into adjacent ground and surface water. This does not necessarily mean that Hjersted intended that harm should result from such leaching or that he knew that environmental harm would or could result from such activities. It is certainly not established as a matter of law that any of the Site Operator Defendants actually intended or expected harm to result from the operation of the CCC Site, or even that CCC, CCCI and/or Hjersted "knew or should have known" that environmental harm and damage could, would or might result from the storage and disposal of hazardous waste materials. But if the converse is true, it is not clear at what point CCC, CCCI or Hjersted knew or should have known that environmental harm would be occasioned.

In this regard, the testimony of CCC's President, Norman Hjersted, suggests that CCC did not actually intend to damage the environment, and that the natural and probable consequences of CCC's action was not to cause injury or property damage. Hjersted testified that CCC was formed to treat and neutralize industrial waste using a modified waste-plus-waste method originally developed by the United States Bureau of Mines. Hjersted considered his operation to be "state of the art" or ahead of the state of the art, and consulted with the Bureau of Mines in order to develop methods for the handling of waste materials. (Hjersted Depo. Vol. VIII, p. 65). Hjersted attended a number of seminars and conducted fairly extensive research at the Linda Hall Library of Science and Technology in developing his plans for setting up CCC. (Hjersted Depo. Vol. III, p. 40). According to Hjersted, the entire purpose of CCC was to avoid the release of *any* hazardous substances into the environment. (Hjersted Depo. Vol. VIII, p. 63). CCC did not dump materials directly into the Missouri River, nor did it place materials in sewer systems, streams or on any unapproved or unlicensed landfills. According to Hjersted's sworn testimony,

CCC never intended that toxic materials would be released into the environment. (*Id.* at pp. 66–67). Hjersted's plans for recycling, destroying or neutralizing waste materials presaged many methods that have become state of the art today. He incinerated flammable waste, using three incinerators during the history of the site. He built a stripper tower at the site in 1963 to strip hydrogen cyanide and constructed a device to strip hydrogen cyanide using natural gas, and to destroy it by flaring. He neutralized acid waste and alkaline waste by mixing them together in the "waste-plus-waste" process (Hjersted Depo. Vol. XIII, pp. 85–88; Hjersted Depo. Vol. XI, pp. 63–65) licensed from the Bureau of Mines. CCC chose its KC Site not to permit gradual release of waste into the Missouri River, but because it was close to Standard Oil and Sheffield Steel and was removed from commercial and residential areas. In fact, CCC did not even consider the hydrology of the site because Hjersted had no background in either geology or hydrology. (Hjersted Depo. Vol. III, pp. 6–64). The philosophy of handling waste materials changed in the first half of the 1970s. Nevertheless, CCC maintained a large research and development program to develop better ways of handling waste. (Hjersted Depo. Vol. VI, pp. 57–60). Furthermore, Hjersted testified that CCC maintained contact with state and federal officials and disclosed its entire operation to those officials except the specific sources of the waste being treated. Hjersted believed that the Government considered CCC to be an exemplary operation at the time; and indeed, Hjersted regularly received referrals from regulatory agencies and numerous Government agencies, including EPA, sent waste there. (Hjersted Depo. Vol. VI, pp. 47–49, 56).

Hjersted's sworn testimony, when viewed in the light most favorable to CCC, CCCI and Hjersted, and giving CCC, CCCI and Hjersted the benefit of all reasonable inferences, establishes that CCC at times intended to avoid rather than cause environmental damage by its treatment of industrial waste. The insurers themselves "do not contend that Hjersted ran CCC for the purpose of polluting." (Joint Memo. at p. 56). Consequently, the Special Master does not believe that the facts developed to date establish either an objective or subjective knowledge on the part of CCC that there was a substantial probability that environmental harm would result from its activities. In any event, if such knowledge can be proved, it has not been established at this point. The Special Master therefore recommends that the motions of the various insurers seeking summary judgment on the issue that CCC expected and intended harm to result from its operations be *denied.*

## I. OWNED PROPERTY EXCLUSION

A number of the insurers have declined insurance coverage to CCC, CCCI and Hjersted (and the OGDs) on the basis of standard-form liability insurance policy exclusions that purport to exclude coverage for damage to property owned by the insured or in the insured's care, custody or control. The OGDs have moved for partial summary judgment against the insurers seeking judgment that the insurers' defenses based on the "owned property exclusion" are inadequate as a matter of law to bar coverage for remedial measures being undertaken at the CCC site.

A typical provision of this type uses the following language:

This exclusion does not apply:

(k) To property damage to

(1) property owned or occupied by or rented to the insured,

(2) property used by the insured, or

(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;

Motion of Armco, AT & T–TI and FMC, Ex. 2.

The rationale behind the exclusion is to overcome the "moral hazard" problem where an insured has less incentive to take precautions owing to the existence of insurance. *See, e.g., American Economy Ins.*

Co. v. Commons, 26 Or.App. 153, 552 P.2d 612, 614–15 (1976).

Missouri courts have held that property damage occurring to property owned or occupied by an insured is excluded from coverage by CGL policies. *Estrin Const. Co. v. Aetna Cas. & Sur. Co.,* 612 S.W.2d 413 (Mo.App.1981), (distinguished liability coverage that relates to damage done by others and, for example, collision or builder's risk insurance which protects the insured against loss). The question then is whether the property damage is limited to CCC's property or whether other property is affected.

The holding in *Estrin, supra,* does not, however, close the inquiry into the application of the owned property exclusion. One issue argued by the parties is whether the groundwater under the CCC site is owned property, or is property in the care, custody or control of the insured. Relying primarily on *Higday v. Nickolaus,* 469 S.W.2d 859, 866 (Mo.App.1971), the insurers contend that the identified proprietary interest in the reasonable use of underground water is an ownership interest sufficient to support application of the owned property exclusion. Armco, AT & T–TI and FMC interpret the "reasonable use" holding in *Higday, supra,* in a contrary manner. Those generator defendants cite to *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich. App. 579, 336 N.W.2d 838, 843–44 (1983), which held that percolating water is not owned by the owner of the land under which it flows and so does not fit within the policy's owned property exclusion. The Michigan court reasoned that the "reasonable use" rule rejects the rule of absolute ownership over percolating groundwater in favor of an incorporeal interest or use prohibiting interference with a neighbor's reasonable use of water beneath the land. *Riehl v. Travelers Ins. Co.,* No. 83–0085, 22 Envt.Rptr.Cas. (BNA) 1544 (W.D.Pa. August 7, 1984) *rev'd on other grounds,* 772 F.2d 19 (3rd Cir.1985), aldo concluded that surface and sub-surface water were not property interests capable of being owned by the insured within the meaning of the policies' exclusions. *See also, E.C. Elec-*troplating, Inc. v. Federal Ins. Co.,* No. L–062919–85 (N.J.Super.Ct. February 18, 1986).

A second issue in determining the application of the owned property exclusion is whether the cost of the abatement remedies on land owned by CCC is covered under the policies. The contention that coverage is excluded for remedies to be performed on land in the control of the insureds has been rejected by the *Riehl* court, *supra.* That opinion recognizes that such remedies are performed to prevent damage to third parties, and that if the preventive work were not done, the pollution would continue. *See also, Bankers Trust Co. v. Hartford Accident & Indem. Co.,* 518 F.Supp. 371 (S.D.N.Y.1981), *vacated,* 621 F.Supp. 685 (S.D.N.Y.1981).

A related issue and one that is dispositive of this particular motion for partial summary judgment is the extent, if any, to which the remedy designed and agreed to is intended as a remedy for damage to the CCC site proper. As noted, an exclusion of coverage under CGL policies for property owned or controlled by the insured has been recognized under Missouri law. *Estrin, supra.* The Special Master is persuaded that the percolating groundwater under the CCC site is not owned or controlled by CCC, and that the owned property exclusion cannot apply. *United States Aviex, supra; Higday, supra; Riehl, supra.* The Special Master is similarly persuaded that coverage of the abatement remedy on the CCC site designed to prevent damage or further damage to third parties cannot be denied on the basis of the owned property exclusion. This does not, however, include elements of the claim which relate to a remedy for damage confined to the CCC site itself. To the extent that all or a portion of the remedy relates solely to damage to the CCC site itself and not to prevent off-site contamination, the "Owned Property Exclusion" clearly applies, and such damage is not within the coverage provided. The extent to which any remedial activities at the CCC site will

be in response to these categories of waste at the site, that are not now subject to migration, is not known, has not been briefed, argued or determined and remain issues to be determined at trial or on apportionment of damages. Because of this fact, the Special Master cannot find as a matter of law that the owned property defenses are inadequate, and recommends that the motion of Armco, AT & T–TI and FMC on this issue be *denied.*

## J. THE POLLUTION EXCLUSION

The insurers contend that the "Pollution Exclusion" clauses of the policies preclude coverage to CCC, and thus, to the Original Generator Defendants. This issue has been briefed in a number of the insurers' individual motions for summary judgment (*i.e.*, American Centennial, Centaur, Evanston, and Mutual Fire), in the Insurers' Memorandum in Support of the Individual Insurers' Motions, and in the Original Generator Defendants' Response to the Insurers' Motions, and in a reply to this response.

The pollution exclusion clause is a provision excluding liability for pollution that is not caused by a sudden and accidental release or discharge of contaminants. The language of the pollution exclusion clause typically states:

This insurance does not apply:

(f) to bodily injury or property damage arising out of discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply, if such discharge, dispersal, release or escape is sudden and accidental.

The insurers contend that it is uncontested that the hazardous waste materials stored and processed by CCC and Hjersted are acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants, and that the Government's actions to prevent or remedy the release of these substances at the Kansas City site bring its allegations within the pollution exclusion clause. It is contended that the only issue is whether the release was both "sudden" and "accidental." The insurers stress that the *discharge* is required to be sudden and accidental, and that the terms sudden and accidental does not refer to the harm. *Transamerica Ins. Co. v. Sunnes,* 77 Or.App. 136, 711 P.2d 212 (1985), *cert. denied,* 301 Or. 76, 717 P.2d 631 (1986).

The insurers cite *Missouri Terrazzo Co. v. Iowa Nat'l Mut. Ins. Co.,* 566 F.Supp. 546, 552 (E.D.Mo.1983), for the proposition that the usual meaning of "accident" is that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual or unforeseen. If the insured intends to discharge pollutants, the discharge is not accidental, and the sudden and accidental exception to the exclusion does not apply. According to the insurers, an intent to discharge is sufficient, an intent to pollute is not required. *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374 (1986); *Sunnes,* 711 P.2d at 214. *Barmet, Inc. v. Security Ins. Group,* 425 N.E.2d 201 (Ind.App.1981). The latter case involved a gas cloud escape as a result of equipment malfunction that led to a fatal car crash. The Court held that repeated equipment failure placed the insured in a position that he knew or should have known of the potential for another failure. As such, the release was foreseeable, not accidental, and not subject to the exception of the exclusion. In the case of CCC and Hjersted, the insurers would have the Court accept that it was the intent, design and expectation of Hjersted that the leaching of contaminants would occur.

"Sudden" as used in the exception emphasizes speed according to the insurers: a short, almost instantaneous time period. When construed along with the term "accidental," it is asserted that the exception to the pollution exclusion clause is limited to accidental discharges of limited duration. A long-continuing process of repeated dis-

charges cannot be considered sudden and accidental according to the cases cited by the insurers. *City of Milwaukee v. Allied Smelting Corp.,* 117 Wis.2d 377, 344 N.W.2d 523, 527 (Ct.App.1983); *National Standard Ins. Co. v. Continental Ins. Co.,* No. CA–3–81–1015–D (N.D.Tex.1983); *Techalloy Co. v. Reliance Ins. Co.,* 338 Pa. Super. 1, 487 A.2d 820, 827 (1984). Similarly, damage resulting from pollution that has taken place in the course of the insured's regular business activity has been held to fall within the pollution exclusion. *Great Lakes Container Corp. v. National Union Fire Ins. Co.,* 727 F.2d 30 (1st Cir. 1984); *Bentz v. Mutual Fire, Marine & Inland Ins. Co.,* No. 13,954, DKT. 22 (Md. Cir.Ct., Wash.Co., Oct. 14, 1985); *Barmet,* 425 N.E.2d at 203. With respect to the CCC Site, the insurers urge that the leaching of materials over more than 20 years can never be considered accidental.

The insurers argue that public policy supports their interpretation of the pollution exclusion clause. Presumably, an insured who knows he will be covered by his liability policy even if he is grossly negligent in preventing releases of pollutants will be tempted to diminish his precautions, *Waste Management,* 340 S.E.2d at 381, while enforcement of the exclusion will encourage and maintain vigilance and reduce the risk of environmental injury.

Finally the insurers anticipate and reject the argument of the generators that the pollution exclusion clause serves only to clarify or reaffirm the occurrence definition, or that the exclusion clause is ambiguous. To find that the exclusion clause is a restatement of the occurrence definition is said to render a provision of the contract superfluous in contravention of accepted contract interpretation rules. It is submitted that the perceived ambiguity is judicially created to provide coverage of otherwise excludable claims when in fact the language is clear. Assuming that the exclusion clause is not ambiguous, the Court is not free to look at other evidence of the parties' intent, but the insurers note that neither CCC nor Hjersted expected coverage for sustained pollution.

Notable among the individual insurers' motions that address the pollution exclusion clause are the motions of Centaur and Central National. Centaur asserts that the first of their three policies was issued with total pollution exclusion—*i.e.,* it lacked the sudden and accidental exception—and that therefore no claim can be stated under that policy. Central National, whose policy took effect in January of 1983, contends that any discharge of contaminants occurring subsequent to January 1, 1983, would not be sudden and accidental within the meaning of the pollution exclusion clause regardless of the construction placed on the phrase. Central National notes that the insured selected the coverage limited to sudden and accidental and declined coverage for non-sudden pollution occurrences. Thus, even if sudden is equated with unexpected, the company contends that the third-party plaintiffs were served with the Government's Complaint prior to January, 1983, alleging the release or threatened release, and the site operators cannot argue that any subsequent release was unexpected.

The Original Generator Defendants argue in response that the standard-form pollution exclusion clause does not unambiguously preclude coverage for the underlying CERCLA or RCRA claims. They first contend that recognized rules of insurance contract construction require an interpretation of the pollution exclusion clause that promotes coverage. "Under Missouri law, provisions designed to restrict coverage are to be construed most strongly against the insurer and to the favor of the insured; the insurer bears the burden of expressing its intention within such clauses by clear and unambiguous terms." *Missouri Terrazzo,* 566 F.Supp at 553, *citing Citizens Ins. Co. v. Kansas City Commercial Cartage, Inc.,* 611 S.W.2d 302, 307 (Mo.App.1980). When a policy provision is reasonably susceptible to more than one interpretation, the interpretation that maximizes coverage must be applied. *E.g., Bellamy v. Pacific Mut. Life Ins. Co.,* 651 S.W.2d 490, 495–96 (Mo. banc. 1983); *Nixon v. Life Investors Ins.*

*Co. of America,* 675 S.W.2d 676, 679 (Mo. App.1984). The Original Generator Defendants contend that these principles have "special vigor when applied to a policy ... which is by its own terms denominated a 'comprehensive general liability policy.'" *National Screen Service Corp. v. United States Fid. & Guar. Co.,* 364 F.2d 275, 279–80 (2nd Cir.), *cert. denied,* 385 U.S. 958, 87 S.Ct. 394, 17 L.Ed.2d 304 (1966).

The Original Generator Defendants conclude that application of these principles establishes that the pollution exclusion clause does not provide an appropriate basis for summary judgment under Rule 56 of the Federal Rules.

It is noted that contrary to the insurers' assertion that "sudden" connotes "almost instantaneous" the word "sudden" is not defined in the policy and that the primary definition in a dictionary emphasizes the element of unforeseeability, with a secondary meaning emphasizing speed. Under the rule urged upon the Court by the Original Generator Defendants, where a term in the pollution exclusion is susceptible to two reasonable interpretations, the one most favorable to the insured must be adopted.

The Original Generator Defendants cite a number of cases supporting their position that the pollution exclusion is ambiguous and must be construed strictly against the insurer. *E.g., Payne v. United States Fid. & Guar. Co.,* 625 F.Supp. 1189, 1193 (S.D. Fla.1985); *Shapiro v. Public Service Mut. Ins. Co.,* 19 Mass.App. 648, 477 N.E.2d 146, 149 (1985); *Buckeye Union Ins. Co. v. Libert Solvent & Chemicals Co.,* 17 Ohio App.3d 127, 477 N.E.2d 1227, 1233–35 (1984); *United Pacific Ins. Co. v. Van's Westlake Union, Inc.,* 34 Wash.App. 708, 664 P.2d 1262, 1265 (1983); *Allstate Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603, 604–05 (1980). A number of these cases have held that the pollution exclusion clause serves to clarify the occurrence definition—that coverage is not provided for pollution—related damage that is expected or intended from the standpoint of the insured. *E.g., Buckeye Union,* 477 N.E.2d at 1233–35; *Van's Westlake Union,*

664 P.2d at 1266; *Jackson Township Mun. Utils. Auth. v. Hartford Acc. & Idem. Co.,* 181 N.J.Super. 156, 451 A.2d 990, 993–94 (Law Div.1982); *Lansco v. Dep't of Environmental Protection,* 138 N.J.Super. 275, 350 A.2d 520, 524, 88 A.L.R.4th 172 (Ch. Div.1975), *aff'd,* 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), *cert. denied,* 73 N.J. 57, 372 A.2d 322 (1977).

The Original Generator Defendants contend that the cases relied upon by the insurers ignore the definition cited in the opinions, adopt a time-limited construction of "sudden" without analysis or support, or rely upon the non-accidental nature of the pollution discharge to deny coverage. *See, e.g., Techalloy Co.,* 487 A.2d at 823–25, 827; *Barmet,* 425 N.E.2d at 201; *Allied Smelting,* 344 N.W.2d at 523. They further argue that the *Waste Management* case, 340 S.E.2d, cited by the insurers relies on a temporarily limited definition of sudden that ignores the aforementioned rules of construction (and, in addition, turns the definition of duty to defend on its head by relieving the insurer of its duty to defend whenever the complaint suggests the possibility that an alleged escape of contaminants falls within the pollution exclusion).

The Original Generator Defendants argue that even if the restrictive interpretation of the pollution exclusion clause had any validity, there exists genuine issues of material fact that would preclude summary judgment. Contrary to the insurers' basically unsupported assertion that all releases of hazardous substances at the site were the result of a "gradual process," the OGDs point to evidence of overtopping of lagoons caused by floods or heavy rain, and the testimony of Hjersted as to fires and explosions, incidents that it would be difficult to characterize as gradual. Other testimony supporting this view describes the immediate penetration of the basin liners by the liquids deposited in the impoundments.

The Special Master is persuaded that summary judgment is not appropriate for a finding that the pollution exclusion

clause should be applied to exclude coverage as urged by the various insurance companies. The Special Master is convinced that there are triable issues of fact concerning ambiguity in the exclusion clause. As noted in *Van's Westlake*, 664 P.2d at 1265, liability insurance policies cover an occurrence, which by policy definition includes conditions continuing in nature, while the pollution exclusion clause excludes coverage unless the escape is sudden. Both propositions cannot be simultaneously true and the policy may be ambiguous. A second set of issues make the granting of summary judgment improper. These concern the allegations that releases may have been sudden and accidental even under the restrictive interpretation of the insurers. Questions remain as to the expectations of Hjersted relating to the intention to cause harm, whether such expectations included realization of gradual and continuous harm to the off-site environment.

▊ For these reasons, the Special Master recommends that summary judgment on the basis of the Pollution Exclusion clause be *denied*. For the Centaur policy that is alleged to contain a total pollution exclusion clause, the Special Master would agree that *if* it can be found that the policy contained this endorsement, it would be proper to exclude the coverage of that policy. However, the Special Master is aware that Hjersted and the Original Generator Defendants contest this issue, and that, therefore, summary judgment is not appropriate at this time. The Special Master is in agreement that damage occurring after the initiation of this action could not be considered unexpected, and that the contention by Central National that the Pollution Exclusion clause in its policy which was issued in January of 1983 should be held to preclude coverage. As to Central National's motion for summary judgment, then, the Special Master recommends that it be *granted*.

## K. DUTY TO DEFEND

### 1. *Original Generator Defendants.*

On May 9, 1986, Armco, AT & T–TI, FMC and IBM (collectively "OGDs") filed a motion for partial summary judgment seeking a declaration that: (1) certain third-party defendant insurance companies which issued primary liability policies to CCC between 1960 and 1984 are, as a matter of law, obligated under the terms of those policies to defend CCC, CCCI and Hjersted against all claims asserted by the United States and "other parties" in the underlying litigation, and to pay all attorneys' fees and costs incurred by CCC, CCCI and Hjersted; and (2) the third-party defendant insurance companies' liability to defend CCC, CCCI and Hjersted is joint and several. (Brief of OGDs in Support at 2).

In their supporting brief, the OGDs contend that the motion presents three legal questions: (1) Does the First Amended Complaint filed by the United States assert any claims which are potentially or arguably within the scope of coverage provided by the standard primary policies at issue; (2) Do any of the defenses asserted by the primary insurers unambiguously preclude the possibility that the allegations of the United States' Complaint might fall within the terms of coverage provided by the policies; and (3) What is the extent of each primary insurer's obligation to pay defense costs? (Brief of OGDs at 2).

The OGDs argue that "universally recognized principles of insurance contract" allow each of the three questions to be resolved as a matter of law in favor of CCC, CCCI and Hjersted pursuant to Rule 56(c), Fed.R.Civ.P., that material facts necessary for such resolution are not in dispute and Missouri law must be applied to resolve each of the three issues. (Brief of OGDs at 2–3).

The operative provisions typically appear in the standardized, preprinted "Insuring Agreements" and "Definitions" sections of the twenty-six policies at issue. The language of one of the CGL policies issued by Centaur is illustrative. The "Coverage" provision of the Centaur policy provides that the insurer will:

[P]ay on behalf of the insured all sums which the insured shall become legally

obligated to pay as damages because of A. bodily injury or B. property damage to which this insurance applies, caused by an occurrence, and *the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent* ...

Centaur Policy No. PL–04726, Insuring Agreement. (Emphasis added).

The term "occurrence" is defined as: An accident, including continuous or repeated exposure to conditions, which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The term "property damage" is defined as: (1) Physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The Insuring Agreement of the representative Centaur policy defines "Persons Insured" to include the following:

(c) If the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such ...

*Id.* Insuring Agreement.

These terms and definitions appear in identical or nearly identical form in virtually all of the primary policies at issue here. Indeed, the only notable exception to the virtual uniformity is the relevant policy language found in the six policies issued by Commercial Union and its predecessor in interest, Central Surety.

The "Insuring Agreements" section of the six Commercial Union policies requires Commercial Union to:

[P]ay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... injury to or destruction of property, including the loss or use thereof, caused by an accident.

The use of the term "accident" rather than "occurrence" in the Commercial Union policies merely denotes the fact that those policies were issued prior to the promulgation of the 1966 Revisions to the standard CGL Form by the National Bureau of Casualty Underwriters, an insurance industry trade association. As the Special Master previously recognized, the industry-wide shift from "accident" to "occurrence" CGL policies in 1966 did not substantially alter the scope of an insurer's duty to defend under standard CGL policies. *See,* Special Master's Report and Recommendation Regarding Rule 12 Motions on Insurance Issues at 38–39. For purposes of assessing the duty to defend CCC, CCCI and Hjersted, there appears to be no material difference between the "accident" terminology of the pre–1966 Commercial Union policies and the "occurrence" language utilized in the post–1966 policies.

The scope of the primary insurers' defense duties is clearly set forth in the language of the policies. The language states that each of the insurers shall have:

[T]he right and duty to defend any suit against the insured seeking damages on account of such ... property damage, even if any of the allegations of the suit are groundless, false or fraudulent.

Centaur Policy No. PL–04726, Insuring Agreement.

These provisions create a contractual duty to defend that is independent of the duty to pay settlements or judgments on behalf of the insured. It is well established in Missouri that an insurer's duty to defend is considerably broader than its duty to indemnify the insured for an adverse judgment. *See, e.g., Howard v. Russell Stover Candies, Inc.,* 649 F.2d 620, 625 (8th Cir.1981); *United States Fid. & Guar. Co. v. Lewis A. Roser Co.,* 585 F.2d 932, 936 (8th Cir.1978); *Missouri Terrazzo v.*

*Iowa Nat'l Mut. Ins. Co.,* 566 F.Supp. 546 (E.D.Mo.1983). The duty to defend arises if any claim made by the plaintiff in the underlying liability case is "potentially or arguably within the policy's coverage." *Howard v. Russell Stover Candies, Inc.,* 649 F.2d at 624, *citing Hartford Acc. & Idem. Co. v. Krekler,* 491 F.2d 884, 886–887 (8th Cir.1974). In other words, if the allegations of the underlying complaint assert facts which raise the possibility of recovery, however remote, the insurer has an obligation to defend. *Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.,* 654 F.Supp. 1334 (D.D.C.1986), *citing Klein v. Salama,* 545 F.Supp. 175, 177 (E.D.N.Y.1982).

An insurer's duty to defend is initially determined by comparing the policy language with the allegations of the underlying complaint. *See, e.g., Scherschligt v. Empire Fire & Marine Ins. Co.,* 662 F.2d 470, 472 (8th Cir.1981); *Howard v. Russell Stover Candies, Inc.,* 649 F.2d at 624; *Lane v. Hartford Fire Ins. Co.,* 343 F.Supp. 79, 84–85 (E.D.Mo.1972). Since the insurer has obligated itself to defend even if the allegations are "groundless, false or fraudulent," the insurer generally may not look to facts beyond the complaint which might tend to negative coverage. *See, e.g., Ritter v. United States Fid. & Guar. Co.,* 573 F.2d 539, 542 (8th Cir.1978). *See also, Travelers Idem. Co. v. Dingwell,* 414 A.2d 220, 227 (Me.1980); *Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.,* 654 F.Supp. 1334 (D.D.C.1986). It is therefore irrelevant to the existence of a duty to defend whether or not the insurer will eventually be able to establish that it has no duty to indemnify the insured as long as the allegations of the underlying complaint assert facts which could conceivably fall within the policy's coverage. *Howard v. Russell Stover Candies, Inc.,* 649 F.2d at 625. Thus, if the allegations of the complaint assert facts "potentially or arguably" within the coverages afforded by the policy, the insurer is obliged to defend the insured unless some condition or exclusion is clearly applicable.

In opposition to the OGDs' motion for partial summary judgment, the insurers argue: (1) the Government's Complaint alleges neither compensable "property damage" nor an "occurrence"; (2) the pollution exclusion forecloses coverage; and (3) CCC is not entitled to declaratory relief concerning the obligation to provide a defense because CCC has not suffered an injury.

Elsewhere in this Report, the Special Master has recommended that the Court find that the release of hazardous materials into soil, groundwater and surface water constitutes "property damage" within the meaning of standard-form CGL insurance policies. (Section G, *supra*). Likewise, in Section H above, the Special Master has recommended to the Court that it hold that the release or escape of hazardous substances into soil, ground water and surface water are "occurrences" for purposes of coverage under a "CGL" insurance policy. (Because "accident" under the pre–1966 policies issued by Commercial Union has been interpreted to be similar to the term "occurrence" found in the post–1966 policies, the Special Master likewise believes that the release or escape of hazardous substances into the environment is also an "accident" for purposes of the pre–1966 policies).

Application of these principles to the allegations in the Government's Complaint indicates to the Special Master that the claims asserted by the United States are at least conceivably or possibly within the scope of coverage provided by the primary policies at issue here. In other words, the OGDs have established that a prima facie duty to defend exists with respect to those primary CGL insurance policies actually issued and delivered to CCC and for which CCC paid the applicable premium; and conversely, the insurers have failed to establish that the claims of the United States are not at least potentially or arguably within the scope of coverage provided by the CGL policies. But the inquiry does not stop with such a determination as it is necessary

to review each of the defenses asserted by the primary insurers.

Although individual insurers have raised several policy defenses to coverage, the insurers principally argue the applicability of the pollution exclusion clause. (Insurers' Opp. to Motion of CCC and ODGs on the Duty to Defend at 11–15).

In Section J of this Recommendation, the Special Master examined the applicability of the "Pollution Exclusion" clause and determined that because of numerous issues and material questions of fact that it was inappropriate to recommend summary disposition of the instant action on the basis of the "Pollution Exclusion" clause. In the same section, the Special Master recognized the operation of the "Pollution Exclusion" clause and the possibility of coverage being voided or barred if the insurers are able to establish various material facts. (Section J)>. For the reasons stated in Section J, the Special Master finds that the "Pollution Exclusion" does not unambiguously relieve the insurers of the duty to defend.

Lastly, in their joint brief, the insurers contend that the Court lacks jurisdiction to entertain the claims related to the duty to defend because CCC has not suffered an injury since a defense is being provided by three insurers. (Insurers' Opp. to Motion of CCC and ODGs on the Duty to Defend at 15–17).

On this point, the OGDs argue that CCC and Hjersted have a contractual right to a defense from *each* of the primary insurers because none of those insurers can demonstrate that there is no possibility, however remote, that the claims asserted by the United States fall within the scope of the policies' coverage provisions. Moreover, say the OGDs, CCC's real and immediate interest in obtaining a judicial declaration of its contractual right to an unreserved defense is in no sense altered by the fact that three primary carriers are temporarily paying defense costs subject to a full reservation of rights. The OGDs further argue that under these unsettled circumstances, CCC plainly has a real and substantial interest in obtaining a judicial declaration of its contractual rights.

The Special Master agrees. A similar argument was recently rejected in *Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 654 F.Supp. 1334 (D.D.C. 1986). In rejecting the insurers' argument that the assumption of defense by some carriers pursuant to a reservation of rights deprived the insured of a right to declaratory relief on the duty to defend issue, the Court said:

> This argument is unacceptable. Additional facts are not necessary to determine this issue. The simple fact that the underlying claims may be found outside the insurance coverage does not change the obligation to defend absent a showing that there is no possibility of recovery under the policies. Defendants have not met this burden. Further, as pointed out by plaintiffs, there are temporal limitations on the agreement. It may be terminated by the defendants effective August 1, 1986. The Court finds that since all of the underlying claims potentially trigger defendants' obligation to pay for those claims, they must be defended by the primary carrier defendants.

654 F.Supp. at 1346. The Special Master therefore rejects the insurers' argument that there is no justiciable case or controversy on the duty to defend issue.

With respect to the OGDs' motion, the Special Master finds that the claims asserted by the United States against CCC conceivably or arguably fall within the coverages cognizable under standard-form CGL insurance policies because such conceivably relate to "property damage" caused by an "occurrence" and such "occurrence" may have taken place during one or more of the policy periods, and that no issue as to any material fact exists with respect to the duty to defend CCC against the claims asserted by the United States. Therefore, the Special Master believes that entry of summary judgment is appropriate against those primary insurance carriers who issued and delivered standard-form

CGL policies ("accident" or "occurrence") prior to September 29, 1980, to CCC and for which CCC paid the applicable premium (*see*, Section F above on the issue of a duty to defend CCC). The Special Master finds and recommends that summary judgment be denied as to any duty to defend CCCI, Hjersted and "other insureds" as no proof was offered with respect thereto, and the OGDs have totally failed to meet the burden for summary judgment on such issue. Likewise, the Special Master recommends that summary judgment be denied as to any "excess" insurer on the issue of duty to defend.

### 2. *Site Operator Defendants*

CCC, CCCI and Hjersted seek partial summary judgment against six (6) insurance companies (American Fidelity, Centaur, Evanston, Lincoln, Maryland Casualty, and Mutual Fire) declaring that they have a "joint and several" obligation to defend CCC, CCCI and Hjersted against all claims asserted by the United States and "other parties" and to pay all costs, attorney's fees and expenses incurred in such defense. To support the motion, CCC, CCCI and Hjersted refer the Court to the arguments and authorities cited by the OGDs in support of their Motion on the issue of duty to defend. (Motion of CCC, CCCI and Hjersted at 1–2).

With respect to the Site Operator Defendants' motion, the Special Master finds that the claims asserted by the United States against CCC conceivably or arguably fall within the coverages cognizable under standard-form CGL policies, and that no issue of material fact exists with respect to the duty to defend CCC against the claims asserted by the United States. Therefore, the Special Master believes that entry of summary judgment is appropriate against those primary carriers who issued and delivered standard-form CGL policies ("accident" or "occurrence") prior to September 29, 1980 to CCC, and for which CCC paid the applicable premium (*see*, Section F above on the issue of a duty to defend CCC). The Special Master finds and recommends that summary judgment be denied

as to any duty to defend CCCI, Hjersted and "other insureds" as no proof was offered with respect thereto, and the Site Operator Defendants have failed to meet the burden for summary judgment on such issue. The Special Master further finds and recommends that summary judgment be *denied* as to any "excess" insurer on the duty to defend.

### L. THIRD–PARTY BENEFICIARIES

The Original Generator Defendants have asserted claims against each of the sixteen insurance companies which contend, in part, that they are third-party beneficiaries of the insurance contracts, and therefore each is entitled to assert rights under the policies.

Third-Party Defendant Insurers Maryland Casualty, Commercial Union, Foremost and ACIC contend that they are each entitled to summary judgment on the OGDs' claim for the reason that none of the Original Generator Defendants is a third-party beneficiary as a matter of law. (Maryland Casualty's Separate Memo. in Support at 14–21; Memo. in Support at 6–8; Suggs. in Support of Foremost at 68–69; Suggs. of ACIC in Support at 128–138).

A third-party beneficiary is one who is not in privity to a contract, but who is benefited by it and who may maintain a cause of action for its breach. *Stephens v. Great So. Sav. & Loan Ass'n*, 421 S.W.2d 332, 335 (Mo.App.1967); 2 Williston on Contracts, § 347 (3 ed. 1959); Restatement (First) of Contracts § 133 (1932). The doctrine does not permit all those who benefit from a contract to sue, however. The contract must be made for the beneficiary's benefit as its object, and the beneficiary must be the party intended to be benefited. The intent necessary to establish the status of a third-party beneficiary is "not so much a desire to confer a benefit on the third person, or to advance the interest or promote the third person's welfare, but rather an intent that the promissor assume a direct obligation." *Stephens v. Great So. Sav. & Loan Ass'n*, 421 S.W.2d at 335.

Intention is to be gleaned from the contract itself, and if it is uncertain or ambiguous, from surrounding circumstances, *Laclede Investment Corp. v. Kaiser*, 596 S.W.2d 36, 41 (Mo.App.1980), including the apparent purpose the parties intended to accomplish. *J. Louis Crum Corp. v. Alfred Lindgren, Inc.*, 564 S.W.2d 544, 547 (1978); *Black & White Cabs of St. Louis, Inc. v. Smith*, 370 S.W.2d 669 (Mo.App.1963). If the contract clearly and unambiguously expresses the intent of the parties, it is the duty of the court to state the intended meaning as a matter of law, *Wilson v. General Mortgage Co.*, 638 S.W.2d 821, 823 (Mo.App.1982), recognizing the strong presumption that in the absence of express declaration, parties contract for themselves and not for the benefit of others. *Laclede Investment Corp. v. Kaiser*, 596 S.W.2d at 42. Where the agreement is ambiguous as to intent, the Court is required to receive extrinsic evidence regarding the intent of the parties. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc. 1973). If the contract is ambiguous on the issue of intent, it becomes an issue of fact. *See, e.g., Volume Services, Inc. v. C.F. Murphy & Assoc.*, 656 S.W.2d 785, 795 (Mo.App.1983); *Wilson v. General Mortgage Co.*, 638 S.W.2d at 823.

Missouri has adopted the Restatement (First) of Contracts classification and definition of third-party beneficiaries. *Mertens v. MGR, Inc.*, 507 S.W.2d 433, 435–436 (Mo. App.1974). Under § 133 of the First Restatement, beneficiaries to contracts are divided into three classes: donee beneficiary, creditor beneficiary and incidental beneficiary. *Hardware Center, Inc. v. Parkedge Corp.*, 618 S.W.2d 689, 693 (Mo.App.1981). Restatement (Second) of Contracts § 302 has dropped the terms "donee" and "creditor" as being obsolete and has replaced them with the single term "intended."

Under Missouri law, both donee and creditor beneficiaries have enforceable rights against the promisor; an incidental beneficiary does not. *Wilson v. General Mortgage Co.*, 638 S.W.2d at 823; *Hardware Center, Inc. v. Parkedge Corp.*, 618 S.W.2d at 693; *Bennett Const. Co., Inc. v. Allen*

*Gardens,* 433 F.Supp. 825 (W.D.Mo.1977). Thus, for the Original Generator Defendants to have enforceable rights against any of the sixteen Third-Party Defendant Insurers, they must be either donee or creditor beneficiaries.

A person is a "creditor" beneficiary if performance of the promise will satisfy an actual, supposed or asserted duty of the promisee to the beneficiary. Restatement (First) of Contracts § 133. A person is a "donee" beneficiary of a promise if the purpose of the promisee in obtaining the promise is to confer upon the beneficiary the right against the promissor to some performance neither due, asserted nor supposed to be due from the promisee to the beneficiary. Restatement (First) of Contracts § 133. An "intended" beneficiary encompasses both classifications. Restatement (Second) of Contracts § 302.

Four factors are considered by Missouri courts in determining whether the contracting parties intended to confer a benefit on an outside party.

First, were the third parties unequivocally named in the contract as parties to whom a benefit is conferred? *See, e.g., Slate v. Boone County Abstract Co.*, 432 S.W.2d 305, 307 (Mo.1968); *Black & White Cabs of St. Louis, Inc. v. Smith*, 370 S.W.2d 669, 671 (Mo.App.1963); *Farris v. Pitts*, 221 Mo.App. 1204, 300 S.W. 840 (1927).

Second, does the contract expressly require that performance be made directly to the third party? While it is true that a third-party beneficiary contract need not necessarily call for performance to a third party, a contract "for the benefit of a third person usually provides that performance shall be rendered directly to the beneficiary." Restatement (First) of Contracts § 133, comment d.

Third, does the relationship between a third-party beneficiary and the contracting party suggest a motive or intent to confer a benefit on the third party? *J. Louis Crum Corp. v. Alfred Lindgren, Inc.*, 564 S.W.2d 544, 548–49 (Mo.App.1978); *Black*

*& White Cabs of St. Louis, Inc. v. Smith,* 370 S.W.2d 669 (Mo.App.1963).

Finally, is there language in the contract authorizing a direct suit by an aggrieved third party against a contracting party? *Binswinger v. Employers Liab. Ins. Corp.,* 224 Mo.App. 1025, 28 S.W.2d 448, 454 (1930).

Maryland Casualty argues that nothing in the record even remotely suggests that conferring a benefit on the Original Generator Defendants was in any sense the "cause or the creation of the contract" between Maryland Casualty and CCC. Maryland Casualty points to the fact that three insurance policies at issue name only CCC as an insured, and the endorsements attached to the policies, which designate the contracts covered by the contractual liability portion, do not refer at all to FMC, IBM or Armco. Likewise, under the heading "persons insured", the term "insured" is defined under Maryland Casualty's policies to mean CCC itself and "any executive, officer, director, or stockholder thereof while acting within the scope of his duties thereof." None of the Original Generator Defendants is listed under the heading "persons insured." Maryland Casualty further argues that the policies are devoid of any indication that performance is to be made directly to the Original Generator Defendants, and on the contrary, the policies clearly state that any performance is to be made to the insured, CCC. As further indication that the policies issued by Maryland Casualty were not intended to be for the benefit of any or all of the Original Generator Defendants, Maryland Casualty says there is no indication of any relationship between CCC and the OGDs from which one could reasonably infer that CCC wished to make the agreement for the OGDs' benefit, rather than its own. Finally, Maryland argues that the insurance policy is devoid of any authorization indicating that the Original Generator Defendants could proceed directly against Maryland Casualty in the event of a covered occurrence. In this regard, the benefits run directly to the parties—to Maryland Casualty in the form of consideration paid as premiums on the policy, and to CCC in the form of protection and indemnity for covered liability that might occur. In the final analysis, says Maryland Casualty, the assertion of the Original Generator Defendants that they are third-party beneficiaries of the insurance policies between Maryland Casualty and CCC flies in the face of the plain language of the policies at issue. "Absent any indication of an intent by Maryland and CCC in contracting for policies Nos. 31–313977, 31–458447 and 31–528115 to confer on the generators the requisite benefits, let alone evidence sufficient to overcome the presumption that Maryland and CCC intended to contract solely for their own benefit, the generators' frivolous third-party beneficiary claims must be rejected." (Maryland Casualty's Separate Memo. in Support at 21).

In support of its separate motion for summary judgment on the issue of third-party beneficiary status, Commercial Union argues that the OGDs are neither "insureds" nor "beneficiaries" of any insurance policy issued by Commercial Union to CCC, and the Contractual Liability Coverage Endorsement specifically provides that the definition of "insured" is the applicable definition and refers to CCC and only CCC. Comercial Union says that it is clear that the OGDs are not insureds and are not entitled to assert claims directly against Commercial Union since the policy is one providing for indemnification of CCC and then only after the insured has become legally obligated to pay damages under the terms and provisions of the policy. (Suggs. of Commercial Union at 6–7).

Foremost argues that it issued its policies to CCC and CCCI as named insureds, and the only "intended beneficiaries of the insurance policies were the insureds, to-wit: CCC, CCCI and in certain instances Norman Hjersted." (Suggs. of Foremost at 68). Foremost says that it has obligations to its insured with respect to contractual liability insurance, however, the "insured" in the five policies "do not include third-party plaintiffs AT & T–TI, Armco, Inc., FMC and IBM, or cross-claimants Sperry

Corporation or Murray Ohio Manufacturing Co." (Suggs. of Foremost at 69). Foremost's brief does not explicitly argue the questions of intent to be gleaned from facts and circumstances surrounding the formation of the contract.

In support of its separate motion for summary judgment, ACIC argues that there is no coverage for any of the Third-Party Generator Plaintiffs for the claims made in this lawsuit by the United States Government, or in any other lawsuit that might be brought against CCC, CCCI and Norman Hjersted for the reason that: (a) no claim for contractual indemnity has been made for coverage in the Third Amended Third-Party Complaint of Armco, FMC, IBM and AT & T–TI; (b) the ACIC policy unambiguously exludes contractual liability coverage; (c) there is no evidence of an intent to procure contractual liability coverage under either the Centaur or ACIC policies; (d) certificates of insurance issued by Marsh-McLennan on CCC's behalf to Armco, FMC or any other Third-Party Generator Plaintiff do not alter, reform or amend coverage for the ACIC and Centaur policies; and (e) the Third-Party Generator Plaintiffs cannot be third-party beneficiaries of the policy under Missouri law until a judgment is obtained against the insureds, CCC, CCCI and Norman Hjersted. (Suggs. of ACIC at 128–129). It is also argued that the underlying Centaur policy unambiguously excludes contractual liability and therefore, the ACIC policy similarly fails to provide any coverage for liability under contracts.

With respect to the issue of intent to procure a contractual liability coverage under either the Centaur or ACIC policy, ACIC argues that there is no indication from any of the policies or applications that CCC intended to procure a contractual liability coverage; and, on the contrary, all of the evidence indicates that CCC was fully aware that the ACIC policy specifically excluded contractual liability coverage. (Suggs. of ACIC at 133–137).

Arguments similar to those of ACIC are advanced by Centaur. Centaur contends that the Original Generator Defendants are not insureds or third-party beneficiaries under Centaur's policies. In support of this statement, Centaur states that "none of the Centaur policies provided contractual coverage for any of the original or third-party generators. In fact, they expressly exclude it. The first Centaur policy, PL 01191, expressly excludes contractual liability of CCC and its customers while the other two Centaur policies, PL 04726 and GL 10 02 500, expressly exclude liability for all but contracts designated in the written policy." (Suggs. of Centaur at 19–20). Centaur contends that no contracts are designated in either of the latter two policies, and this fact was acknowledged by CCC's Rule 30(b)(6) insurance witness, Lloyd Kaiser. Further, the applications for insurance submitted to Centaur state that there were no such contracts.

At Pages 21 through 24 of its brief, Centaur argues that the Original Generator Defendants are neither donee or creditor beneficiaries under any of the policies issued by Centaur to CCC, because Centaur's policies clearly show that Centaur did not intend to insure the generator defendants as they are not named as additional insureds, and the policies afford no coverage for their alleged contracts with CCC. Centaur correctly argues that the allegation that CCC and/or the Original Generator Defendants had such an intent, even if true, is not as a matter of law sufficient to establish a third-party beneficiary relationship. The law requires intent on the part of the promissor, in this case Centaur, which Centaur says is clearly lacking and cannot be established as a matter of law. Furthermore, Centaur correctly acknowledges that the status of the parties, i.e., promissor, promissee and/or third-party beneficiary is determined at the time the contract is formed, *Chmielski v. City Products Corp.*, 660 S.W.2d 275, 286 (Mo. App.1983) and here the evidence conclusively establishes that CCC was not doing business with any of the Original Generator Defendants at the time Centaur's policy was issued.

In opposition to the separate motions of Maryland Casualty, Commercial Union, Foremost, ACIC and Centaur, on the issue of a third-party beneficiary relationship, the OGDs claim that the insurers have failed to comply with Rule 56, Fed.R.Civ.P., by failing to support their motions with affidavits, deposition transcripts, answers to interrogatories or admissions on file, and thus the insurers have not sufficiently raised any factual issue for the OGDs to respond to. The OGDs nevertheless contend that they will demonstrate that they are as a matter of law third-party beneficiaries of each insurance policy in this case, and therefore entitled to the benefits of the insurance contracts.

The OGDs argue that under § 133 of the Restatement (First) of Contracts, the question to be determined is whether the promise between the promissor and promissee satisfies an actual, supposed or asserted duty of the promissee to a beneficiary. In other words, the OGDs are third-party beneficiaries of CCC's insurance contract if payment of the proceeds under the insurance contracts (the promise) will satisfy an actual, supposed or asserted duty of CCC (promissee) to the Original Generator Defendants (the beneficiaries). (OGDs' Response at 125–126).

To further support their position, the OGDs contend that CCC entered into various contracts with each of the Original Generator Defendants, and pursuant to these contracts, CCC, among other things, assumed the duty to indemnify and hold harmless each Original Generator Defendant.

With respect to the argument advanced by Maryland, Centaur and ACIC that the OGDs are not entitled to the benefits of their policies because the OGDs' contracts are not specifically covered by the contractual liability portions of the policies, the OGDs stated that the existence of this particular coverage does not determine whether the Original Generator Defendants are entitled to the benefits of the policies. Third-party beneficiary concepts, they contend, operate totally independent of contractual liability coverage parts under policies.

With regard to the issue of intent, the OGDs argue that they are creditor beneficiaries of CCC's insurance policies under Restatement (First) § 133 analysis. This intent is demonstrated by the contracts between the OGDs and CCC and the fact that to discharge the duty assumed under these contracts, CCC was obligated to purchase insurance. To show the insurers' intent to benefit the OGDs, they argue that a third-party beneficiary need not specifically be named in a contract, rather it is sufficient that there be an attempt to benefit "an identifiable class of which the party asserting rights as a third-party beneficiary is a member." *Laclede Investment Corp. v. Kaiser*, 586 S.W.2d at 42; *see also Volume Services, Inc. v. C.F. Murphy & Assoc.*, 656 S.W.2d 785 (Mo.App.1983). To further support the proposition that the OGDs need only establish that they are within a "identifiable class" of which the party asserting the rights as a third-party beneficiary is a member, the OGDs cite *Union Electric Co. v. Siteman Organization, Inc.*, 616 S.W.2d 851 (Mo.App.1981); *St. Joseph Light & Power Co. v. KAW Valley Tunneling, Inc.*, 589 S.W.2d 260 (Mo.1979); and *Brugioni v. Maryland Casualty Co.*, 382 S.W.2d 707 (Mo.1964).

Armco argues extensively that factual issues support its status as an additional insured or third-party beneficiary of the policies of insurance. Armco argues that its status under either category cannot be resolved as a matter of law on the motions filed by Commercial Union, Foremost, Maryland, ACIC and Centaur.

Based upon the arguments and facts contained in the briefs and suggestions of the parties, the Special Master believes that certain facts have been conclusively established. For example, it is clear that the OGDs are not listed as "insureds" and are not "insureds" under any of the policies issued by Maryland Casualty, Commercial Union, Foremost, ACIC or Centaur. This being so, the OGDs' right to proceed against the Third-Party Defendant Insur-

ers rests upon their ability to establish themselves within the status of third-party beneficiaries to the insurance policies existing between CCC and the various companies.

Upon the present motions for summary judgment, the Special Master is persuaded that material issues of fact exist with respect to the intention and motive of the parties to confer a benefit on a third party. Indeed, the record is less than clear on the question of whether conferring a benefit on the OGDs was in any sense the cause of the creation of the contract between CCC and any of the insurers. Likewise, the Special Master is not convinced that the fact that certain of the policies exclude contractual liability requires a holding that a third-party beneficiary relationship could not exist, as a matter of law, although such is certainly a strong indication that such is the fact. The presence of a total contractual liability exclusion may overcome the question of intent, and upon the development of further facts and the resolution of disputed facts, may entitle such insurers to judgment.

The Special Master further believes that each of the insurers has failed to establish its right to judgment as a matter of law with such clarity as to leave no room for controversy or doubt because of the facts surrounding the intention of the parties to form the various insurance contracts. It cannot be said, for example, that in arranging for various coverages, CCC did not intend to honor the commitments made by contract to the Original Generator Defendants to indemnify and to procure insurance. The fact that the insurers provided the OGDs with certificates of insurance at least creates a question as to the intent of CCC and the insurers with respect to the insurance so provided. The furnishing of a certificate of insurance at least creates an inference that the insurers were aware of a contractual relationship between CCC and the third party.

The Special Master finds and recommends that the motions for summary judgment on the issue of third-party benefi-

ciaries filed by Maryland Casualty, Commercial Union, Foremost, ACIC and Centaur be *denied* on the basis of unresolved factual disputes.

## M. INDIVIDUAL INSURER'S MOTIONS FOR SUMMARY JUDGMENT

### 1. *Maryland Casualty.*

Pending is the separate motion of The Maryland Casualty Company for summary judgment. Maryland contends that it has no obligation under its policies for any claims asserted against it in this case and identifies as the basis for this assertion nine independent grounds. In support of those grounds, they rely on the Third-Party Defendant Insurers' Memorandum In Support of Individual Motions for Summary Judgment, or on their separate memorandum in support of its motion, or in one instance, on both. Maryland seeks summary judgment on the following grounds: (1) the underlying complaints do not allege "property damage" within the policy definition; (2) the injury for which relief is sought was sustained long after the expiration of Maryland's policies; (3) the underlying complaints seek purely equitable relief for which the policies, which obligate Maryland to defend or indemnify only claims for "damages," do not provide coverage; (4) even if the contamination can be deemed to be the relevant "property damage" within the meaning of the policies, it was discovered long after the expiration of the policies and, accordingly, coverage could not have been triggered under traditional property damage trigger rules; (5) the claimants "expected" or "intended" the contamination and, accordingly, cannot establish that an "occurrence" took place which is an essential prerequisite of coverage; (6) CCC's noncompliance with the notice provision of the insurance contracts forecloses coverage; (7) the major generators and Third-Party Generator Defendants are neither third-party beneficiaries of the CCC–Maryland insurance contracts nor named or additional insureds and, accordingly, cannot claim coverage under the policies; (8) Maryland's contractual liability coverage

under the policies at issue is limited to designated CCC contracts with Western Electric and Amoco; accordingly, coverage of claims arising under non-designated contracts is foreclosed; and (9) the Atchison, Topeka & Santa Fe Railway Company, Ford Motor Company, the Trane Company, Parmalee Pharmaceutical Company, Kustom Electronics, Inc., and U.S. Industries, Inc., had no relationship with the CCC Site prior to the expiration of Maryland's policy periods and, accordingly, Maryland has no obligation to them or to CCC for claims asserted against it by them.

(1) *The Underlying Complaints Do Not Allege "Property Damage" Within the Policy Definition.*

In Section G of this Recommendation, the Special Master has recommended that the Court hold, as a matter of law, that "cleanup" costs fall within the definition of "property damage" as used in the CGL policies at issue here. Because of this recommendation, the Special Master recommends that Point (1) of Maryland's motion for summary judgment be *denied.*

(2) & (4) *Even If The Contamination Can Be Deemed Property Damage Under The Policies, It Was Discovered Long After The Expiration Of The Policies, And Cannot Have Triggered Coverage Under Property Damage Trigger Rules.*

Maryland argues for the date of discovery as being the date when property damage occurs, and while declining to pinpoint the date of discovery, states that it was after Maryland's last policy expired in February, 1971.

In Section H of this Recommendation, the Special Master has rejected the manifestation approach for one which recognizes that the injury in fact is the test which Missouri law prefers. There is no inevitable correlation between the time that environmental damage occurs and its manifestation or discovery, unless the facts conclusively determine that no other time

for determination of damage other than discovery or manifestation exists.

Based on this reasoning, the Special Master recommends that Points (2) and (4) of Maryland's motion for summary judgment be *denied.*

(3) *The Underlying Complaints Seek Purely Equitable Relief For Which The Policies, Which Obligate Maryland To Defend Or Indemnify Only Claims For "Damages," Do Not Provide Coverage.*

Based on language of the insurance agreement, Maryland argues that equitable claims are not property damage caused by an occurrence. Under insurance principles, property damage is injury to, destruction of, or the loss of use of tangible property. Recovery costs and injunctive relief, it is asserted, do not qualify as damages.

To the extent that Maryland's argument once again raises the question of whether "cleanup costs" constitute "property damage" for purposes of liability insurance coverage, the Special Master rejects Maryland's argument. To the extent that Maryland's argument interprets "damages" as compensation for injury or loss and excludes the cost of complying with equitable or injunctive orders, the Special Master believes the argument interprets "damages" too narrowly. The Special Master interprets "damages" to be sums which the insured is obligated to pay by reason of liability imposed by law, and adopts the reasoning of the Court in *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich. App. 579, 336 N.W.2d 838 (1983). For this reason, the Special Master recommends that Point (3) of Maryland's argument be *denied.*

(5) *The Claimants "Expected" Or "Intended" The Contamination And, Accordingly, Cannot Establish An "Occurrence," A Prerequisite Of Coverage.*

Maryland here argues by way of the insurers' joint memorandum, that Hjersted expected the eventual consequences, that

he knew or should have known, or intended the results, and continued in the pursuit of a deliberate, consciously known wrong. It is Maryland's position that the contamination inevitably and predictably resulted from the siting of the facility and designed leaching.

As the Special Master found in Section H of this Recommendation, the existing record is insufficient to establish as a matter of law what Hjersted intended, and at what point in time he knew or should have known of the eventual consequences. In addition, as noted in Section B, subjective intent is particularly inappropriate as a basis for summary judgment.

For these reasons, the Special Master recommends that Point (5) of Maryland's argument be *denied.*

(6) *CCC's Non-Compliance With The Notice Provision Of The Insurance Contracts Forecloses Coverage.*

Maryland argues, by way of the insurers' joint memorandum, that notice is required as a condition precedent to liability, and that CCC failed to notify the insurance carriers of "occurrences," and that that failure should foreclose coverage without a showing of prejudice, even though they assert that they have been prejudiced. As noted in Section M In Great American's separate motion of this Recommendation, Missouri courts enforce timely notice claims, but will construe the language to be "within a reasonable period of time." Whether the notice was given within a reasonable period of time depends on the facts and circumstances of each case, with the singular factor to be considered being whether the insurer was actually prejudiced by the delay.

Although the Special Master can envision several areas where insurance companies, including Maryland, could claim prejudice because of CCC's alleged delay, Maryland has not, through the insurers' joint memorandum, produced evidence to support its claim of prejudice. This failure precludes summary judgment on the issue of lack of timely notice.

The Special Master, therefore, recommends that Maryland's argument on the issue of lack of timely notice be *denied.*

(7) *The Major Generators And Third-Party Generator Defendants Are Neither Third-Party Beneficiaries Of The CCC–Maryland Insurance Contracts Nor Named Or Additional Insureds, And, Accordingly, Cannot Claim Coverage Under The Policies.*

In this argument, Maryland asserts that none of the major generators qualify as a named insured under the policy, and that the insuring agreements explicitly limit Maryland's obligation under its policy exclusively to its insureds. Maryland states that the third-party beneficiary doctrine does not permit all those who may benefit from a contract to assert rights thereunder, and that courts apply a presumption that contracting parties intend to benefit only themselves, rather than to confer benefits on third parties. Four factors are identified as being considered in determining whether the contracting parties intended to confer a benefit on an outside party: (1) were the third parties unequivocally named in the contract as parties to whom a benefit is conferred; (2) does the contract expressly require that performance be made directly to the third party; (3) does the relationship between a third-party beneficiary and the contracting party suggest a motive or intent to confer a benefit on the third party; and (4) is there language in the contract authorizing a direct suit by an aggrieved third party against a contracting party? Maryland asserts that tested by these principles, the conclusion is inescapable that the generators are not third-party beneficiaries of the Maryland-CCC insurance contracts. CCC was the only named insured; there is no indication that performance is to be made to the Third-Party Generator Defendants; there is no indication of a relationship from which one can confer CCC's intent to make the agreement for the generators, and there is no authorization for the generators to act directly

against Maryland. Certificates of insurance provided to IBM, Western Electric, and Armco are averred to be informational in nature.

In Section L of this Recommendation, the Special Master has found that he is unable, as a matter of law, to find that the Third-Party Generator Defendants are not third-party beneficiaries under the insurance contracts at issue, specifically in this case, the Maryland contract. The Special Master finds that facts as to the intent of the parties are unclear and in dispute. Specifically, there is a question of intent as to whether the insurers knew of the relationship of generator defendants to the site operator and intended to provide coverage to them. The certificates of insurance could arguably show such an intent. For this reason, the Special Master recommends that Maryland's motion for summary judgment on the basis of the inapplicability of the doctrine of third-party beneficiaries be *denied*.

(8) *Maryland's Contractual Liability Coverage Under The Policies At Issue Is Limited To Designated CCC Contracts With Western Electric And Amoco; Accordingly, Coverage Of Claims Arising Under Non-Designated Contracts Is Foreclosed.*

In this argument, Maryland acknowledges the existence of contractual liability coverage, but only for designated contracts on an attached schedule. The schedule includes references to contracts between CCC and only two generators—American Oil Company and Western Electric Company (the predecessor of AT & T-TI). Based on the plain language of the policies and the unambiguous listing of designated contracts, Maryland asserts that it is entitled to summary judgment on the grounds that it has no obligation to CCC for contractual liability assumed by it under any contract not listed, and that it has no obligation to any generator as a result of any contract with CCC not listed.

The Special Master is persuaded that Maryland's contracts of insurance and the attached schedule of designated contracts establishes that contractual liability coverage was available only to generators Western Electric (predecessor to AT & T-TI) and American Oil Company. The Special Master notes that the OGDs have not contested this argument.

The Special Master recommends that Maryland's motion for summary judgment on the issue of limited contractual indemnification be *granted.*

(9) *The Atchison, Topeka & Santa Fe Railway Company, Ford Motor Company, The Trane Company, Parmalee Pharmaceutical Company, Kustom Electronics, Inc., And U.S. Industries, Inc. Had No Relationship With The CCC Site Prior To The Expiration Of Maryland's Policy Periods And, Accordingly, Maryland Has No Obligation To Them Or To CCC For Claims Asserted Against It By Them.*

This argument is moot. The listed parties were dismissed pursuant to an order of the Court and are no longer parties to this action.

2. *Commercial Union.*

Pending are two motions for summary judgment: one against third-party plaintiffs CCC and Hjersted, and one against third-party plaintiffs FMC, IBM, Armco and AT & T-TI. The motion against CCC and Hjersted is addressed first and includes the following points:

(2) & (5) *No Coverage Is Provided Under Policies Issued By Commercial Union To CCC For CERCLA Cost-Recovery Actions.*

In this now familiar argument, Commercial Union states that their policies provided coverage for property damage liability and that there is no allegation of a claim based on property damage given that the Complaint seeks only the recovery of response costs, which do not constitute injury to or destruction of property under insurance principles.

To the extent that Commercial Union's argument once again raises the question of whether "cleanup costs" constitute "property damage" for purposes of liability insurance coverage, the Special Master rejects Commercial Union's argument. To the extent that Commercial Union's argument interprets "damages" as compensation for injury or loss and excludes the cost of complying with equitable or injunctive orders, the Special Master believes the argument interprets "damages" too narrowly. The Special Master interprets "damages" to be sums which the insured is obligated to pay by reason of liability imposed by law, and adopts the reasoning of the Court in *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838 (1983). For this reason, the Special Master recommends that Points (2) and (5) of Commercial Union's motion for summary judgment based on the issue of no coverage for CERCLA cost recovery be denied.

(3) *There Is No Coverage Afforded CCC Since There Was No "Accident" Within The Meaning And Intent Of The Policies Issued By Commercial Union To CCC.*

This argument raises the issue of whether a covered event has occurred based on the assertion that the harm was expected or intended by Hjersted and CCC. The term "accident" was used in pre–1966 insurance policies, with the term "occurrence" being substituted for it after that date. As the Special Master previously recognized, the shift from "accident" to "occurrence" CGL policies did not substantially alter the scope of an insurers' duty to defend under standard CGL policies. *See,* Special Master's Report and Recommendation Regarding Rule 12 Motions on the Insurance Issues at 38–39.

Commercial Union would exclude coverage for harm that is expected or intended, and relies on the previously noted definitions of "expected" where the insured knew or should have known, and "intended" as deliberately and consciously intending. Commercial Union asserts that the

exact degree and specific nature of the harm need not be predicted, that no coverage exists where an insured knowingly continues harmful operations without adequate attempts to prevent foreseeable damage, and that expected/intended does not hinge solely on the insured's subjective state of mind.

As the Special Master found in Section H of this Recommendation, the existing record is insufficient to establish as a matter of law what Hjersted intended and at what point in time he knew or should have known of the eventual consequences. In addition, as noted in Section B, subjective intent is particularly inappropriate as a basis for summary judgment. For those reasons, the Special Master recommends that Point (3) of Commercial Union's argument be *denied.*

(4) *Policies Issued By Commercial Union To CCC Provide Coverage For Property Damage Occurring Only During The Policy Period.*

Commercial Union asserts that there is no evidence of an "accident" or of property damage, citing the lack of evidence as to any waste being deposited until late 1961, the lack of evidence that any waste deposited in the initial lagoon or basin has in any way been removed from its original location, the lack of evidence that any hazardous wastes other than those neutralized and/or subject to incineration were placed in any lagoon or basin at the site, and the total absence of any evidence, including expert opinion, indicating that there was removal, seepage, leaching or movement of any waste at the CCC Site during the period from September 7, 1960 to September 7, 1966. Commercial Union argues that its policies are indemnity policies and not liability policies. An assessment of damages may be imposed only at a time when CCC can establish that injury to or destruction of property has occurred, and that CCC has become legally obligated to pay damages. It is submitted that no such assessment and obligation have occurred and that there has been no showing and that there are no

facts to establish destruction of property which would trigger coverage during Commercial Union's policy periods.

In Section H of this Recommendation, the Special Master has found that depending on the facts of each case, the chemical involved, the period and intensity of exposure, and the property affected, an injury may occur in this sense upon exposure, at some point in time after exposure, but before manifestation of the injury, or at manifestation. In addition, it must be calculated whether multiple occurrences were occasioned due to continuous deposit of additional waste materials at the site.

Based on this reasoning, The Special Master recommends that Point (4) of Commercial Union's argument be *denied.*

(6) *Conservation Chemical Cannot Otherwise Establish Coverage Of The Government's Claims Under The Commercial Union Policies.*

Relying on the insurers' joint memorandum in support of individual insurers' motions, Commercial Union states that CCC cannot otherwise establish coverage under Commercial Union's policies. In the joint memorandum, the heading relied upon includes the arguments that equitable claims asserted are not claims for damages, to which the Special Master has responded in this section on Commercial Union's motion under Points (2) and (5), and the argument that the harm was expected or intended, to which the Special Master has responded in this section on Commercial Union's motion under Point (3).

(7) *CCC's Non-Compliance With The Notice Provisions Of The Insurance Policies Issued By Commercial Union Forecloses Coverage.*

Relying on the insurers' joint memorandum in support, Commercial Union argues that notice to the insurer is a condition precedent to coverage, and that because it was not provided, coverage is precluded even without a showing of prejudice (although they argue they have been prejudiced).

As noted in Section M of this Recommendation, Missouri courts enforce timely notice clauses, but will construe the language to be "within a reasonable period of time." Whether the notice was given within a reasonable period of time depends on the facts and circumstances of each case, with the singular factor to be considered being whether the insurer was actually prejudiced by the delay.

Although the Special Master can envision several areas where insurance companies, including Commercial Union, could claim prejudice because of CCC's alleged delay, Commercial Union has not, through the insurers' joint memorandum, produced evidence to support its claim of prejudice. This failure precludes summary judgment on the issue of lack of timely notice.

The Special Master, therefore, recommends that Commercial Union's argument on the issue of lack of timely notice be *denied.*

(8) *Maintenance Of This Action By CCC Against Commercial Union Is In Direct Violation Of The Terms And Conditions Of The Policies Of Insurance Issued By Commercial Union.*

Commercial Union contends that a policy provision forecloses the possibility of an action against the company unless all terms of the policy have been complied with (i.e. notice), and the amount of the insured's obligation has been finally determined by judgment or by written agreement.

The Special Master is not persuaded that the no action clause of the policy can be found as a matter of law to preclude this action. Clearly it would be against public policy to foreclose a declaratory judgment action by CCC, CCCI or Hjersted to determine an insurer's obligation to defend. The Special Master, therefore, recommends that the argument under Point (8) of Commercial Union's motion for summary judgment be *denied.*

The motion against third-party plaintiffs FMC, IBM, Armco, and AT & T–TI includes the following points:

That no third-party plaintiff constitutes an additional insured under any of Commercial Union's policies; that because the policies at issue are indemnity policies, and no insured has become legally obligated to pay damages pursuant to the policies, no obligation of Commercial Union has arisen; that no third-party plaintiff is an intended or creditor beneficiary of any Commercial Union insurance contract; that no third-party plaintiff has standing to assert any claim under any policy of Commercial Union to CCC; and that no individual OGD can support a claim under the contractual liability provisions of any policy issued by Commercial Union to CCC.

The Special Master is not persuaded that Commercial Union's unsupported assertions establish their policies as being indemnity policies. The motion for summary judgment on this basis is *denied.*

The Special Master has found in Section L of this Recommendation that he is unable as a matter of law to find that the Third-Party Generator Defendants are not third-party beneficiaries under the insurance contracts at issue. The motion for summary judgment on this basis is *denied.*

As to the assertion that none of the individual OGDs can avail themselves of contractual liability coverage, the Special Master notes that the policies are not attached, and that the claims that any one generator did not contribute waste to the CCC Site is subject to a factual dispute. The Special Master recommends that the motion for summary judgment on these bases be *denied.*

### 3. *Evanston.*

Pending is the separate motion of Evanston Insurance Company for summary judgment against CCC, CCCI, Hjersted, AT & T–TI, Armco, FMC and IBM on their third-party claims against Evanston. Evanston makes the following points:

(1) *Claims-Made Policies.*

Evanston asserts that no claims were made within the policy period of their claims-made policies. Under a claims-made policy, coverage is triggered only when there is a claim made against the insured during the policy period. Evanston contends that the filing of the November 22, 1982 suit falls outside the period of their coverage, December, 1980 through December, 1981.

As recognized by the Special Master in Section E, however, the policies at issue incorporated a December, 1977, retroactive date. This may open the coverage to include the September 29, 1980 action by the United States. It is unclear from the evidence whether any particular conditions attach to the retroactive date, or whether the two policies at issue have different conditions attached to the retroactive date. As such, the Special Master recommends that Evanston's motion for summary judgment on the basis of their claims-made policy provision be *denied.*

(2) *Pollution Exclusion.*

■■■ Evanston asserts that their policies incorporate a pollution exclusion clause which precludes coverage. Evanston contends that the exclusion is clear and unambiguous, and that there is no dispute regarding Hjersted's and CCC's knowledge of the release of toxic chemicals.

The Special Master has found, in Section J of this Recommendation, that summary judgment is not appropriate for a finding that the pollution exclusion clause excludes coverage. The Special Master has found the exclusion to be ambiguous, that there are factual questions as to allegations of releases that may have been sudden and accidental, and that there are questions as to what was expected by Hjersted and when he expected it. For these reasons, the Special Master recommends that Evanston's motion for summary judgment on the basis of the pollution exclusion be *denied.*

Evanston also relies on the insurers' joint memorandum in support, which are ad-

dressed in other sections of this Recommendation.

#### 4. *Mutual Fire.*

Pending is the separate motion of Mutual Fire for summary judgment against CCC, CCCI, Hjersted, AT & T–TI, Armco, FMC and IBM on their third-party claims against Mutual Fire.

##### (1) *Claims-Made Policies.*

Mutual Fire asserts that no claims were made within the policy periods of their claims-made policies. Under a claims-made policy, coverage is triggered only when there is a claim made against the insured during the policy period. Mutual Fire contends that the November 22, 1982 suit filing falls outside the period of their coverage, December, 1979 to December, 1980. As recognized by the Special Master in Section E of this Recommendation, Mutual Fire has ignored the action by the United States filed in September, 1980. This action clearly falls within the claims-made policy period. The Special Master, therefore, recommends that the Mutual Fire motion for summary judgment on the basis of the claims-made policy be *denied.*

##### (2) *Pollution Exclusion.*

Mutual Fire asserts that their policies incorporate the pollution exclusion clause which precludes coverage. Mutual Fire contends that the exclusion is clear and unambiguous, and that there is no dispute regarding Hjersted's and CCC's knowledge of the release of toxic chemicals.

The Special Master has found, in Section J of this Recommendation that summary judgment is not appropriate for a finding that the pollution exclusion clause excludes coverage. The Special Master has found the exclusion to be ambiguous, that there are factual questions as to allegations of releases that may have been sudden and accidental, and that there are questions as to what was expected by Hjersted and when he expected it.

For these reasons, the Special Master recommends that Mutual Fire's motion for summary judgment on the basis of the pollution exclusion be *denied.*

Mutual Fire also relies on the reasons addressed in the insurers' joint memorandum in support, which are addressed in other sections of this Recommendation.

#### 5. *Lincoln.*

Pending is the separate motion of Lincoln Insurance Company for dismissal of Count III of the Third Amended Third-Party Complaint. The reasons asserted why Lincoln's policies provide no coverage include:

##### (1) *Claims-Made Policies.*

Lincoln asserts that no claims were made by the United States or any of the entities asserting third-party claims during the Lincoln policy periods, December, 1977 to December, 1979.

The Special Master has found in Section E of this Recommendation that the claims-made policy of Lincoln cannot be asserted to deny coverage in the instant case, reasoning that a triable issue exists as to whether a claim as defined in the policy was received by the insured.

The Special Master, therefore, recommends that Lincoln's motion for summary judgment on the basis of the claims-made policy provision be *denied.*

##### (2) *No Compensable Property Damage Alleged and No "Injury" During Policy Periods.*

Relying on the insurers' joint memorandum in support, Lincoln argues that there is no compensable property damage alleged and no injury during the policy period. The Special Master's analysis and recommendation on this argument are contained in Section G.

##### (3) *Pollution Exclusion.*

Relying on the Insurers' joint memorandum in support, Lincoln argues that the pollution exclusion in their policy precludes coverage.

The Special Master's analysis and recommendation on this argument are contained in Section J.

### (4) *No Occurrence.*

Relying on the Insurers' joint memorandum in support, Lincoln argues that there was no occurrence under their policy; that the damage was expected or intended.

The Special Master's analysis and recommendation on this argument are contained in Section H.

### (5) *Mishandling Material.*

■ Lincoln asserts that a policy exclusion for mishandling of materials is applicable given that CCC's handling of waste chemicals was in violation of federal, state and municipal laws, statutes, ordinances and regulations as established in the insurers' joint memorandum in support. The insurers point to CCC's ignoring Corps of Engineers, directives, to notification to CCC that its operation of a solid waste disposal facility without a permit violated Missouri law, and to an abatement order against continued illegal discharge.

The Special Master is not persuaded that this exclusion or the evidence given in support is sufficient to sustain a motion for summary judgment. Neither Lincoln nor the insurers cite the specific laws being violated nor establish them as being in force at any relevant period of time.

The Special Master, therefore, recommends that Lincoln's motion for summary judgment based on the mishandled materials exclusion be *denied.*

### (6) *Design Deficiency.*

■ Lincoln also alleges an exclusion precludes coverage for property damage resulting from the failure of work completed by the insured to perform the function intended by the named insured if such failure is due to a mistake or deficiency in any design.

The Special Master is not persuaded that this exclusion or the evidence given in support is sufficient to sustain a motion for summary judgment. At a minimum, Lincoln should provide more information as to the specific design deficiency alleged. Moreover, questions of intent are particularly inappropriate as a basis for sustaining a motion for summary judgment. The question of what was intended by CCC and Hjersted at the CCC Site is clearly a disputed issue.

The Special Master, therefore, recommends that Lincoln's motion for summary judgment based on the design deficiency exclusion by *denied.*

### (7) *Failure to Notify.*

Lincoln makes the familiar argument that the lack of timely notice to the insurer precludes coverage.

As noted in Section M in Great American's separate motion, although the Special Master can envision several areas where insurance companies could claim prejudice because of CCC's alleged delay, the claim is not supported by the evidence. This failure precludes summary judgment on the issue of notice.

The Special Master recommends that Lincoln's motion for summary judgment on the issue of lack of timely notice be *denied.*

### (8) *Misrepresentation.*

■ Lincoln argues that CCC's material misrepresentations in procuring coverage preclude the applicability of coverage. They direct their assertions to information given to an insurance company representative who inspected and audited the insured and the insured's site. The Special Master, in Section M, in the discussion of the separate motion of Centaur, has found that the question of misrepresentation cannot be decided on summary judgment. Given CCC's alleged policy of truthfulness in procuring insurance (Hjersted Depos. Vol. XIX, p. 92; Vol IX, p. 85), the opportunity to inspect the site, and the asserted misrepresentations, the question that remains is the extent to which Hjersted or the other representatives intended to misrepresent CCC's business activities. As noted, intent is a

particularly inappropriate basis for summary determination.

The Special Master recommends that Lincoln's motion for summary judgment on the basis of material misrepresentation be *denied.*

6. *Centaur.*

The separate motion of Centaur seeks summary judgment in its favor on all claims now pending against it by CCC, CCCI, Hjersted, IBM, AT & T–TI, FMC, Armco, Sperry and Murray Ohio. Centaur joins in the insurers' joint memorandum in support of summary judgment and covers the following separate issues:

(1) *As A Matter Of Law, No Insurance Coverage Is Provided For Pre-Existing Claims Known To The Insured.*

The argument notes that all three Centaur policies were issued after the commencement of this litigation (September 29, 1980), after CCC was sued for environmental pollution by the State of Missouri (July 18, 1979) and after the filing of various Missouri and E.P.A. administrative actions against CCC involving environmental pollution (September, 1976 and April, 1979).

In Section H of this Recommendation, the Special Master found that an injury relates to a repeated or continuous exposure to conditions. In the instant case, the injury changed until the site was closed in late 1979 or early 1980. After that point, the conditions and events harm were static. As a matter of law, the Special Master has found that no new occurrence can be identified after the initiation of original action by the United States on September 29, 1980. An insurer coming on to the risk after that date could not have its coverage applied given no new occurrence.

Centaur's first policy was issued in December, 1981. As a matter of law, their policy cannot be found applicable. The Special Master recommends that Centaur's motion for summary judgment on the basis of no coverage for pre-existing claims be *granted.*

(2) *The Original And Third-Party Generators Are Not Insureds Or Third-Party Beneficiaries Under Centaur's Policies Nor May They Proceed Against Another's Insurer Unless And Until They Are A Judgment Creditor And They Can Never Pursue Another's Insurer For Its Failure To Settle.*

Centaur argues that none of the original or third-party generators are parties or named insureds under Centaur's policies.

Centaur also argues that no contractual coverage exists under their policies; that such coverage is expressly excluded under its first policy; that it is excluded except for designated contracts under the other two policies; and that none were so designated. The Special Master discusses and makes recommendations on this issue in Section O.

Centaur asserts that the OGDs are not third-party beneficiaries under Centaur's contracts of insurance with CCC. Centaur argues that the OGDs were neither donee beneficiaries, as no claim of gifts has been made, nor were they creditor beneficiaries, with the "performance of the promise satisfying an actual or supposed or asserted duty of the promissee to the beneficiary . . . ." Restatement of Contracts § 133(1)(b). Centaur says that its policies are clear as to its intent to insure the generator defendants, pointing out that the generators are not named insureds, and that the policies did not afford contractual coverage (a proposition which is in dispute and on which the Special Master makes recommendations in Section O).

Centaur admits that the question of intent is paramount in any analysis of alleged third-party beneficiary status. It contends that the intent of CCC is insufficient, that Centaur's intent as the promissor is also required by law.

The Special Master is not persuaded that Centaur's intent is so clear as to find in their favor as a matter of law that the OGDs are not third-party beneficiaries under the insurance contracts. As has been

alluded to repeatedly in this Recommendation, intent, including corporate intent, is particularly unsuited to motions for summary judgment. The information as to intent conflicts as to whether the insurers were aware of the OGDs and as to what their intent was toward the OGDs. While the fact that the OGDs may not be named insureds or be afforded contractual liability is evidence, it is not dispositive. There is additional discussion of this issue in Section L.

The Special Master therefore recommends that Centaur's motion for summary judgment on the basis of third-party beneficiary status being inapplicable be *denied*.

Centaur's raising of RSMo 379.200 is a puzzle to the Special Master. There is no disagreement that the statute precludes a direct action against another party's insurer until recovery of a final judgment is made. But, as discussed in the Special Master's Report and Recommendation Regarding Rule 12 Motions on Insurance Issues at Page 36, the claim of the OGDs contains no allegation that a judgment *in their favor* has been rendered against CCC, CCCI and/or Hjersted, or that they are presently judgment creditors of CCC, CCCI and/or Hjersted, or any allegation from which either or both can be reasonably inferred. On the contrary, the OGDs assert that they are creditor beneficiaries as that relates to third-party beneficiary status, not that they are judgment creditors under RSMo 379.200.

(3) *Centaur's Policy Was Issued With A Total Pollution Exclusion, To Which There Is No Exception.*

■ One of Centaur's three policies was issued with an on condition of what is identified as a total pollution exclusion. This exclusion does not include the "sudden and accidental" language that is common to most Pollution Exclusions.

As noted in Section J of this Recommendation, the Special Master agrees that *if* the policy contains this endorsement, it would be proper to exclude the coverage of that policy. But there is a factual dispute as to whether the endorsement was part of the policy which precludes summary judgment.

The Special Master therefore recommends that Centaur's motion for summary judgment on the basis of the total pollution exclusion be *denied*.

(4) *The Policies Issued By Centaur Are Void Ab Initio Because of False Warranties and Material Misrepresentations Made To Centaur In The Applications For The Policies.*

■ Centaur alleges false statements and omissions in CCC's applications to Centaur for insurance. These include the failure to disclose the existence of this litigation, the failure to disclose previous investigation and sanctions, and the previous suit by the State of Missouri. CCC allegedly failed to disclose that it had been declined coverage by numerous other insurers, and misrepresented the true nature of its operations.

Centaur claims that each false or omitted statement made constitutes, independently and/or together with other statements made, (1) a false warranty which voids a policy, and/or (2) a material misrepresentation that voids the policy.

Centaur asserts that the insurance applications it received from CCC included provisions that the applicant, agent or broker represented the statements and facts to be true and without material facts suppressed or misstated. Under such circumstance, it is contended the answers must be deemed warranties rather than representations, *see, Ettman v. Federal Life Ins. Co.*, 48 F.Supp. 578, 580 (E.D.Mo.1942); *Houston v. Metro Life Ins. Co.*, 97 S.W.2d 856, 860 (Mo.App.1936); *Pacific Mut. Life Ins. Co. v. Glaser*, 245 Mo. 377, 150 S.W. 549, 551 (1912), and that as warranties the statements "must be absolutely true whether material or not, and even though innocently made." *Miller v. Plains Ins. Co.*, 409 S.W.2d 770, 774 (Mo.App.1966); *Houston*, 97 S.W.2d 856.

Centaur cites *Getz v. Shelter General Ins. Co.*, 679 S.W.2d 439, 442 (Mo.App. 1984), for the proposition that the statements constitute warranties even though the application or policy does not expressly state such to be warranties. Arguing that the statements of the insured were expressly made warranties, and that they were false in several respects, Centaur contends that the policy should be declared void.

Centaur further asserts that even if the statements are not considered warranties, the policies may be declared void as a matter of law due to representations made that were false and material. Materiality is an objective test according to the authority cited by Centaur, and focuses on whether the fact, as stated truthfully, might reasonably influence an insurance company to accept or reject the risk or to charge a different premium. *Getz*, 679 S.W.2d 439; *DeLisle v. Cape Mut. Ins. Co.*, 675 S.W.2d 97, 101 (Mo.App.1984); *Haynes v. Missouri Property Ins. Placement Facility*, 641 S.W.2d 497, 499 (Mo.App.1982); *Miller*, 409 S.W.2d at 774. Whether a misstatement is material depends not upon what the applicant may think about the materiality or the importance of the false information given or true information withheld, but upon what those in the insurance business, acting reasonably and in accord with the usual practice would have done had they known the truth. *Chambers v. Metro Life Ins. Co.*, 235 Mo.App. 884, 138 S.W.2d 29, 39 (1940).

Centaur argues that CCC's statements that it had no previous claims history were false and materially so, and should be found so as a matter of law. *See, Taylor v. Black*, 258 F.Supp. 82, 86 (E.D.Mo.1966); *Miller*, 409 S.W.2d at 776. *Lumbermen's Mut. Ins. Co. v. Edwards*, 293 F.Supp. 687, 689 (E.D.Mo.1968), is cited for the proposition that attempts to secure coverage for events that have already occurred have been found material. Misrepresentations as to prior rejections and cancellations have also been held as a matter of law to be material. *Taylor*, 258 F.Supp. at 86; *Preferred Risk Mut. Ins. Co. v. Main*, 295 F.Supp. 207, 216 (W.D.Mo.1968); *Miller*, 409 S.W.2d at 776; *Bearden v. Countryside Cas. Co.*, 352 S.W.2d 701, 707–08 (Mo. App.1961).

Centaur asserts that representatives of an insurance broker have acknowledged that the insured failed to disclose its involvement in the waste disposal industry as distinct from being a manufacturer of industrial waste control chemicals and that such non-disclosure would be material from an underwriting standpoint, as would an undisclosed pending claim or suit. CCC is averred not to have disclosed that an extensive part of its business continued to be the storage of hazardous waste. *Miele v. Boston Ins. Co.*, 288 F.2d 178 (8th Cir.1961) is cited as an example of material misrepresentations as to the nature of an insured's operations that rendered the insurance unenforceable.

The OGDs dispute the contentions of Centaur (as well as ACIC and Lincoln). They argue that no warranties, let alone false warranties, were made, and that Centaur is bound by its policies.

The OGDs argue, and refer to Centaur's exhibits for support, that false warranties were not made. They state that a truthful answer was given to the question of loss history, although CCC's involvement with administrative proceedings were not included because CCC did not consider lawsuits with unproven allegations to be material. The question of prior insurance declinations of coverage is said to have been answered, again pointing to a Centaur exhibit. The nature of CCC's business is also asserted to be known, relying on a Centaur exhibit.

The OGDs contest the assumption that certain statements relating to the standard language of applications make all statements appearing on the application warranties. The OGDs argue that this contention is raised despite the fact that the applications were unsigned, that they were submitted by Centaur's agent, and that the applications were not made part of the policies.

The OGDs contend that a warranty is a statement or description on the part of the insured which appears in the policy or in an instrument incorporated relating contractually to the risk insured against. *Getz.* 679 S.W.2d at 442. They distinguish representations as being collateral or preliminary, *Grand Lodge, U.B. of F. v. Massachusetts Bonding & . Ins. Co.*, 324 Mo. 938, 25 S.W.2d 783, 787 (1930), and as only needing to be substantially true. *Scheutzel v. Grand Aerie Fraternal Order of Eagles*, 164 S.W.2d 135, 139 (Mo.App.1942).

In the same vein, the OGDs assert that no material misrepresentations were made by CCC and that materiality is a question of fact to be determined by the fact finder, rendering summary judgment inappropriate.

The OGDs rely on the general rule of law that a misrepresentation will render a policy voidable only if it was material to the issuance itself, *DeLisle*, 675 S.W.2d at 100; *Haynes*, 641 S.W.2d at 499, and whether, if stated truthfully, it might have influenced the accepting or rejecting of the risk.

The OGDs assert the insurers' argument is conclusory, without specific underwriter guidelines to show materiality. They assert that the prior litigation was regulatory in nature, not claims of insurance loss as requested in the application.

The final contention of the OGDs is that insurance broker Marsh & McLennan, Inc. was an agent of the insurers, and that their knowledge of this litigation was imputable to the insurers.

The Special Master is persuaded that the conflicting evidence regarding warranty and material misrepresentation should be resolved at trial. It is not clear to the Special Master that the answers were not responsive to the questions asked, leaving a question of CCC's intent. The Special Master is persuaded that the question of materiality remains contested, as well as the question of agency. Summary judgment is not appropriate where material factual issues remain.

For these reasons, the Special Master recommends that the Centaur motion for summary judgment on the basis of false warranties and material misrepresentations be *denied.*

### 7. *Foremost.*

Foremost submits that it has no liability for claims asserting liability for any CERCLA or RCRA based injunction or order. This position is based on the pollution exclusion, the policy definitions of occurrence and property damage, the "care, custody and control exclusion," failure to mitigate damages, failure to provide notice, and the public policy behind CERCLA and RCRA.

#### (1) *Pollution Exclusion.*

The Special Master has found, in Section J of this Recommendation, that summary judgment is not appropriate for a finding that the Pollution Exclusion bars coverage. The Special Master concluded that the exclusion was ambiguous, and that factual questions exist as to the nature and speed of release as well as what was expected by Hjersted and when he may have expected it.

For these reasons, the Special Master recommends that Foremost's motion for summary judgment on the basis of the pollution exclusion be *denied.*

#### (2) *"Occurrence" As Defined By The Foremost Policies Has Not Taken Place.*

Foremost argues that no occurrence as defined has taken place within the policy period.

In Section H of this Recommendation, the Special Master has rejected the manifestation approach for one which recognizes that there is no inevitable correlation between the time that environmental damage occurs and the time that such damage becomes manifest.

Foremost also argues that there was no occurrence because the leaching of contaminants was by design, and not "unex-

pected" or "unintended" as required by the policy.

As the Special Master found in Section H of the Recommendation, the existing record to be insufficient to establish as a matter of law what Hjersted intended, and at what point in time he knew or should have known of the eventual consequences. In addition, as noted in Section B, subjective intent is particularly inappropriate as a basis for summary judgment.

For the above reasons, the Special Master recommends that Foremost's motion for summary judgment on the basis of the occurrence definition be *denied.*

(3) *The U.S.–E.P.A. Claim Does Not Fall Within The Definition Of "Property Damage" As Defined In The Foremost Policies.*

In Section G of this Recommendation, the Special Master recommended that the Court hold as a matter of law that "cleanup costs" fall within the definition of "property damage" as used in the CGL policies at issue here. The Special Master therefore recommends that Foremost's motion for summary judgment based on the property damage definition be *denied.*

(4) *Foremost Is Not Responsible For "Damage To The Insured's Property".*

Foremost submits that remedial cost recovery is barred by the "damage to the insured's property" exclusion based on the waste and the CCC Site being owned by CCC.

In Section I of this Recommendation, it was determined that an abatement remedy on the CCC Site designed to prevent damage or further damage to third parties cannot be denied on the basis of the owned property exclusion. This does not include elements of the claim which may relate to a remedy for damage to the CCC Site itself. For the above reasons, the Special Master recommends Foremost's motion for summary judgment based on the owned property exclusion be *denied.*

(5) *The Insured's Failure To Mitigate Damages Precludes Payment By Foremost For Their Liability.*

 Foremost contends that their liability is precluded by CCC's failure to mitigate damages or minimize avoidable consequences in that they continued to accept waste materials when the site was at capacity, and after they had been warned about substances leaching from the site.

The Special Master is persuaded that fact questions remain that make summary judgment inappropriate. Among these are when the CCC Site reached its capacity, the nature of the changes in processes at the CCC Site over the years as concerns arose, what Hjersted's intent was in continuing to accept waste, and to what extent uninvestigated warnings of *possible* leaching could be understood to require mitigation.

(6) *The Insured's Breached The Insurance Contract By Failing To Provide Prompt Notice.*

As noted in Section M of this Recommendation, in the section discussing Great American's separate motion, the Special Master can envision possible prejudice to the insurance company by reason of delayed notice, but has found that the claim of prejudice is unsupported. For this reason, the Special Master recommends that Foremost's motion for summary judgment on the basis of prompt notice be *denied.*

(7) *AT & T–TI, Armco, FMC, And IBM Are Not Insureds, Persons Insured, Or Third-Party Beneficiaries Under The Foremost Policies.*

As noted in Section L of this Recommendation, the Special Master cannot find as a matter of law that the OGDs are not third-party beneficiaries.

For this reason, the Special Master recommends that Foremost's motion for summary judgment on the basis of third-party beneficiary issues be *denied.*

8. *Continental Casualty.*

Pending is the motion for summary judgment of Continental Casualty for the rea-

son that no coverage is provided under their policies for the allegations of the United States.

All the issues they have raised have been addressed and ruled upon in various sections of this Recommendation, including that timely notice was not given, that there is no recovery for CERCLA cost recovery, that the claim does not allege property damage, that the actions for which CCC and Hjersted were sued were expected and intended, and that coverage is precluded by the owned property exception.

For reasons expressed in numerous sections of this Recommendation, the summary judgment motion of Continental Casualty is *denied.*

### 9. *Home.*

Pending is the motion for summary judgment by Home. The bases for this motion are that there is no coverage for liability for harm that was expected or intended, that coverage is barred by the pollution exclusion, that the relief sought is not property damage, and that the injury was not sustained during the policy period.

All these issues have been addressed and ruled on in various sections of this Recommendation.

For reasons expressed in numerous sections of this Recommendation, Home's motion for summary judgment is *denied.*

### 10. *Central National.*

Pending is the summary judgment motion of Central National. They raised the issues that their coverage was nonexistent when the suit was filed, that the relief sought is for harm occurring before the policy was purchased and effective. They also raise the issues that there has been no occurrence under the policy definition, that the pollution exclusion would limit coverage except to sudden and accidental occurrences, and that any release after their policy became effective was not sudden or unexpected, and that there were omissions or material misrepresentations in the applications for insurance. All of these issues

have been raised and ruled on in various portions of this Recommendation. The Special Master has *affirmed* in part Central National's motion for summary judgment and *denied* in part Central National's motion for summary judgment.

### 11. *American Centennial.*

Pending is the separate motion of American Centennial Insurance Company ("ACIC") seeking entry of summary judgment against CCC, CCCI, Hjersted, IBM, Armco, FMC, AT & T-TI, American Oil Company, General Dynamics Corporation, Kustom Electronics, United States Industries, Parmelee Pharmaceutical Company, Ford Motor Company, Trane Company, the Atchison, Topeka & Santa Fe Railroad, Airtex Products, Inc., Sperry Corporation, Maryland Casualty Company, Murray Manufacturing Company of Ohio, as well as "any other third-party generator which has not waived its 'deemed filed' cross-claim against third-party defendant insurance companies."

In support of its motion, ACIC raises ten separate arguments. With the possible exception of the argument set forth at Section VIIIB alleging a violation of the doctrine of *ubberimae fidei,* all other arguments advanced by ACIC have been dealt with in this Report and Recommendation.

The Special Master therefore adopts the recommendations regarding each of the points raised in ACIC's brief, including those concerning application of Missouri law, cleanup costs constituting property damages, the nature of the relief sought by the United States, the fact of an occurrence, the application of the pollution exclusion, misrepresentation and concealment, third-party beneficiary, untimely notice, and failure to state a claim for bad faith. In accordance with the recommendations on each of these subjects, the Special Master *approves* in part and *denies* in part ACIC's separate motion for summary judgment.

Furthermore, the Special Master recommends *denial* of ACIC's motion for summary judgment as such applies to

American Oil Company, General Dynamics Corporation, Kustom Electronics, United States Industries, Parmelee Pharmaceutical Company, Ford Motor Company, Trane Company, the Atchison, Topeka & Santa Fe Railroad, Airtex Products, Inc., Sperry Corporation, Maryland Casualty, Murray Manufacturing of Ohio, as well as all other third-party generators who have not waived their "deemed filed" cross-claims against ACIC. The Special Master believes that the motion regarding such parties is moot in light of the Court's Orders of October 21, 1985 and February 18, 1986 dismissing all claims by or against settling Third-Party Defendant Generators.

## 12. *Great American.*

Pending is the separate motion of Great American Insurance Company ("Great American") for summary judgment. Great American contends that is entitled to judgment as a matter of law denying coverage under its policies for any claims raised in the action (Memo. in Support at 1–2). Great American alleges lack of coverage for six (6) reasons: (1) lack of timely notice; (2) Great American's policies do not cover exposure for paying CERCLA recovery costs; (3) the Complaint filed by the United States does not claim relief for "bodily injury" or "property damage" as defined in Great American's policies; (4) the equitable claims asserted against CCC are not claims for "damages" within the meaning of Great American's policies; (5) the claim alleged by the Government against CCC is not based on an "occurrence" as defined in Great American's policies; and (6) the "owned property" exclusion is applicable. The basis for Great American's alleged lack of coverage will be discussed *in seriatim.*

### (1) *Lack of Timely Notice.*

Great American argues (without support of affidavit, deposition, interrogatory answers or admissions on file as required by Rule 56, Fed.R.Civ.P.) that because of CCC's failure to provide timely notice of the Government's claim, it has been "unnecessarily and unfairly prejudiced" which

should bar a recovery for claims under the policies (Memo. in Support at 4).

CGL insurance policies include a timely notice clause requiring the insured to notify the insurer of an occurrence "immediately" or "as soon as practicable." Timely notice clauses are enforceable, *Greer v. Zarick Ins. Co.,* 441 S.W.2d 15, 30 (Mo. 1969), but Missouri courts have uniformly held that such language will be construed to mean "within a reasonable period of time." *Scott v. Club Exchange Corp.,* 560 S.W.2d 289 (Mo.App.1977); *Greer v. Zarick Ins. Co., supra* at 31.

Whether notice was given within a reasonable period of time depends upon the facts and circumstances of each case. *Greer v. Zarick Ins. Co., supra* at 31; *Cockrell v. Farmers Mut. Auto. Ins. Co.,* 427 S.W.2d 303 (Mo.App.1968). The single factor to be considered by the fact finder in determining if notice of the occurrence was given within a reasonable time is whether the insurer has been prejudiced because of the delay. Actual prejudice will not be presumed from mere delay in giving notice. The prejudice must be actual and must be shown to be actual. *Katz Drug Co. v. Commercial Standard Ins. Co.,* 647 S.W.2d 831 (Mo.App.1983); *St. Paul & K.C. Short Line Ry. Co. v. United States Fid. & Guar. Co.,* 231 Mo.App. 613, 105 S.W.2d 14 (1937). *See also, Miller v. Lindgate Developers, Inc.,* 274 F.Supp. 980 (E.D.Mo.1967) (an insurer will not be relieved of liability because of delay in the giving of notice unless the insurer proves that the failure to give timely notice resulted in prejudice).

Missouri courts have found undue prejudice by lack of timely notice in cases where the insurers were not notified of the claim until after judgment against the insured had been rendered. *See, e.g., Anderson v. Slayton,* 662 S.W.2d 575 (Mo.App.1983); *Greer v. Zarick Ins. Co.,* 441 S.W.2d 15, (Mo.1969).

Although the Special Master can envision several areas where insurance companies, including Great American, could claim

some prejudice because of CCC's alleged delay, Great American has not produced any evidence or proof to support its claim of prejudice. The Special Master, therefore, recommends that Great American's motion for summary judgment on the issue of lack of timely notice be *denied.*

### (2) *No Coverage for CERCLA Recovery of Costs.*

Under this section, Great American repeats in abbreviated form the twin arguments set forth at length in the "Insurers' Joint Memorandum in Support of Individual Insurers' Motions for Summary Judgment" in Section IV as points A and B.

The first argument is premised upon the holding in *Continental Ins. Cos. v. Northeastern Pharm. & Chem. Co.,* No. 84–5034–CV–S–4 (W.D.Mo. June 25, 1985), [Available on WESTLAW, DCTU database], *appeal pending sub nom, Continental Ins. Cos. v. State of Missouri,* No. 85–1940 (W.M. 8th Cir.), ("NEPACCO") which the insurers contend holds that cleanup costs do not constitute "property damage" as such term is used in CGL insurance policies.

For the reasons stated in Section G of this Recommendation, the Special Master has recommended that the Court hold that cleanup costs are "property damage" as a matter of law, and therefore, the Special Master recommends that the first part of Great American's motion be *denied.*

In the second part of its argument, Great American seeks judgment on the theory that CCC's CGL insurance policies provide no coverage because the present action seeks no recovery for injury sustained during the policy terms, September 7, 1966 to September 7, 1968. Again, relying upon NEPACCO, Great American argues that the "action by the Government to recover response costs are not covered under the Great American policies because they [the response costs] were not incurred during the policy periods of the Great American policies." (Memo. in Support at 5).

In Section H above, the Special Master has rejected the insurers' argument that

"injury or loss" and hence "occurrence" is limited to the point in time where the Government first expended funds to remedy the environmental injury at the CCC site. For the reasons set forth in Section H above, the Special Master recommends that the second part of Great American's second motion be *denied.*

### (3) *The Complaint Does Not Allege "Property Damage."*

This argument is a restatement of the dual contentions advanced under Point (2) above.

The Special Master has previously found that recent decisional law establishes that equitable claims by governmental entities to enjoin cleanup or for the recovery of the remedial costs of cleaning up environmental contamination constitute "property damage" within the meaning of CGL insurance policies as a matter of law. *See* Section G above.

Because of the foregoing recommendation, the Special Master recommends that Point (3) of Great American's motion for summary judgment be *denied.*

### (4) *"Equitable Claims" Are Not Claims for "Damages."*

In this section, Great American argues that "equitable claims" are not "damages" within the meaning of the two policies of insurance which it issued to CCC. To support this argument, Great American says that its policies provide property damage liability coverage based upon the following insuring agreement:

Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and subject to the limited liability, exclusions, conditions, and other terms of this policy: ... Coverage—Property Damage Liability—Except Automobile. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as *damages* because of *property damage* caused by an *occurrence.* (Emphasis added).

"Damages" as defined in the policy means "damages for death and for care and loss of services resulting from bodily injury and damages for loss of use of property resulting from property damage."

Based upon the insuring agreement and the definition of "damages", Great American argues that "there is no basis for interpreting Great American policies to cover the claims of equitable relief for 'recovery costs' and 'injunctive relief' as being covered under the Great American policies because they do not qualify as 'damages' under the Great American policies." (Memo. in Support at 7).

To the extent that Great American's argument once again raises the question of whether "cleanup costs" constitute "property damage" for the purposes of liability insurance coverage, the Special Master rejects Great American's argument. To the extent that Great American's argument interprets "damages" as compensation for injury or loss and excludes the cost of complying with equitable or injunctive orders, the Special Master believes the argument interprets "damages" too narrowly. The Special Master interprets "damages" to be sums which the insured is obligated to pay by reason of liability imposed by law, and adopts the reasoning of the court in *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838 (1983). For this reason, the Special Master recommends that Point (4) of Great American's argument be *denied*.

(5) *The Claim Alleged by the Government Against CCC Is Not Based on an "Occurrence" as Defined in Great American's Policies.*

In the two policies issued by Great American to CCC for the policy terms September 7, 1966 to September 7, 1968, the policies define "Occurrence" to mean:

An accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured. For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

Great American contends that coverage under one or both of the policies of insurance issued to CCC does not exist for the reason that there was no "occurrence" because "Hjersted's actions for which he has been sued were intended and the damage was expected."

In other sections of this Recommendation, the Special Master has determined that sustantial questions of material fact exist as to whether CCC expected or intended the harm at issue in this case, *i.e.*, release of dangerous, toxic chemicals into the groundwater and environment surrounding the CCC site. The existence of these substantial and material issues of fact preclude a finding as a matter of law that CCC expected or intended the harm at issue in this case.

For the reasons stated in Section H above, the Special Master recommends that Point (5) of Great American's motion for summary judgment be *denied*.

(6) *The "Owned Property" Exclusion Is Applicable.*

As its last ground for the entry of summary judgment in is favor, Great American alleges that there can be no coverage to CCC under the two Great American policies because coverage to property and premises of CCC is specifically excluded.

In Section I of this report, the Special Master found that the "Owned Property Exclusion" applied, if at all, only to that part of the "cleanup" designed to improve CCC's property and not to prevent the escape of contaminants from the CCC site. For the reasons set forth in Section I above, the Special Master recommends that Point (6) of Great American's motion for summary judgment be *granted in part and denied in part.*

## N. MOTIONS OF MURRAY OHIO AND SPERRY CORPORATION

Pending are the identical motions of the Murray Ohio Manufacturing Company ("Murray Ohio") and the Sperry Corporation ("Sperry") for judgments on their cross-claims against CCC and two of CCC's insurers, Foremost and Home, on the issue of: (1) their right to indemnification by CCC for all obligations imposed upon them as a result of the present litigation and, further; (2) their right to reimbursement by CCC's insurers. Murray Ohio and Sperry assert that the granting of both parts of their motions is proper because there are no genuine issues as to any material fact, and Murray Ohio and Sperry are entitled to judgments as a matter of law.

### 1. *Sperry Corporation.*

Beginning on or about October 11, 1972, CCCI quoted the "Univac Corporation" for pickup and disposal of waste chrome material. (Document 2540000053). In September of 1973, Hjersted, as "President" of CCCI, wrote to Rodger Martin regarding the essential nature of assuring that "State and Federal E.P.A." regulations regarding waste disposal are met, and indicating that CCCI looked "forward to being of service to your firm." (Document 2540000046). Subsequently, on December 4, 1973, R.F. LaPoint of "Sperry Univac" wrote to N.B. Hjersted regarding Hjersted's September 13, 1973 letter to Rodger Martin at CCCI's address in Gary, Indiana. The letter indicates a "wish" to enter into a contract for removal of used chromic sulfuric acid etchant for reclamation or disposal per pertinent government regulations. The letter further discloses Univac policy requiring maintenance of certain minimum types and amounts of insurance coverages and requests CCCI have Certificates of Insurance issued for such coverages. (Document 3610004310). A subsequent letter on CCCI stationery signed by Roni Dingee on behalf of CCCI confirms CCCI's quotation for disposal of waste and states that "our Kansas City plant will handle this account." (Document 0090025974). On the same date, December 10, 1973, Miss Dingee wrote to R.A. Earp at Mann-Kline Insurance requesting that a Certificate of Insurance be sent to "Sperry Univac Defense Systems." (Document 3610004307). On 2–22–74, "Sperry Univac Computer Systems" issued a Purchase Order No. 497580S to CCCI with CCCI listed as the "Seller" and Univac shown as the "Buyer." (Document 2540000002). Attached to P.O. No. 497580S was Attachment "A" which indicates that the contract was between "Sperry Univac, Division of Sperry Rand Corporation" as "Buyer" and Conservation Chemical Company of Illinois at Box 6066, Gary, Indiana 46406 as "Seller." Subparagraph b to Section 3 provides:

Seller agrees to hold harmless, indemnify, and defend Buyer, its agents, servants and employees against all judgments, claims, losses, damages and expenses (including attorney fees and interest) and other costs and also all consequential and incidental losses arising in any way out of the performance of this contract after title to and possession of the Etchant passes to Seller and regardless of the negligence or non-negligence of Buyer, its agents, servants or employees.

Subparagraph c to the same Section states:

At all times during the life of this contract Seller shall provide and maintain in force, with an insurance company acceptable to Buyer and in a form approved by Buyer, insurance coverages as follows:

\* \* \* \* \* \*

(3) Manufacturers and Contractors Liability Insurance with limits for personal injury (including death) of not less than $100,000 for any one individual and not less than $300,000 for any one occurrence and limits for property damage of not less than $100,000 for any one occurrence. Such policy shall contain a "Contractual Liability Insurance endorsement" that specifically references this contract and that provides for insurance coverage against all risks contractual assumed by Seller under this contract.

\* \* \* \* \* \*

(5) Umbrella Liability Insurance that provides $3,000,000 combined single limit of liability excess above those limits indicated in (2) through (4) above.

(Document 2540000012). A subsequent Purchase Order No. 497580S dated 03-11-74 indicates changes in the following sections of Attachment "A": Section 2.a— SECOND SENTENCE SHOULD NOW READ: "SELLER'S VEHICLE SHALL TRAVEL ONLY WITHIN THE STATES OF MINNESOTA, IOWA, WISCONSIN, ILLINOIS, MISSOURI, AND INDIANA AND DISPOSAL OF ETCHANT SHALL BE MADE ONLY AT SELLER'S DISPOSAL SITES IN MISSOURI AND INDIANA." The same P.O. changes Section 3.c.1 to read "OF MINNESOTA, IOWA, MISSOURI, WISCONSIN, ILLINOIS AND INDIANA; OR IN LIEU THEREOF AND ALL STATES ENDORSEMENT." (Document 2540000005). In a letter dated March 26, 1974, Roni Dingee proposed various changes in Purchase Order No. 497580S and Attachment "A". The changes continue to indicate that Conservation Chemical Company of Illinois is the contracting party and is the party proposing the indemnification agreement with certain modifications proposed by Miss Dingee. (Document 0090025951). On 3-26-74, the Purchase Order was changed in certain respects in response to the proposals advanced by Miss Dingee in her letter of March 26. (Documents 00540000006, 7, 8 and 9). A subsequent Purchase Order, 530056S, dated 10-07-74, indicates that the Seller is CCC with an address of 215 West Pershing Road, Kansas City, Missouri 64108. The Purchase Order indicates that it supersedes P.O. 497580S and Attachment "A" dated 9-25-74 is part of the order and incorporated therein by reference. Attachment "A" indicates that the contracting parties are Sperry Univac, Division of Sperry Rand Corporation ("Buyer") and Conservation Chemical Company of Illinois, 215 West Pershing Road, Kansas City, Missouri 64108, ("Seller"). Section 3.c.(3) provides that:

Coverage afforded by Policy No. GAL6727181658 covers all liability which Conservation Chemical Company of Illinois, the Insured, has assumed under a certain contract between the Insured and Sperry Univac, a Division of Sperry Rand Corporation, described as Purchase Order No. 530056S with Attachment "A" as revised 9/25/74.

Furthermore, Attachment "A" provides that written notification under this contract shall be addressed to CCCI at 215 West Pershing Road, Suite 703, Kansas City, Missouri 64108. (Documents 0090025911–0090025918). Finally, a subsequent Purchase Order dated 02-13-75 indicates that Conservation Chemical Co. is seller. (Document 0090025902). Documents 0090025932 and 0090025930 are Certificates of Insurance issued by Foremost Insurance Company and Home Insurance Company, respectively. Each shows the named insured to be Conservation Chemical Company and Conservation Chemical Company of Illinois. The Foremost Certificate of Insurance lists the address of CCC and CCCI as P.O. Box 6404, Sheffield Station, Kansas City, Missouri 64125, while the Home Insurance Company Certificate of Insurance indicates the address of CCC and CCCI as being P.O. Box 6066, Gary, Indiana. The Foremost Certificate was issued to Sperry Univac, Division of Sperry Rand Corporation while the Home Certificate was issued to Sperry Univac Defense Systems. The Foremost Certificate contains an attachment with the following language:

Insofar as coverage is available under Policy No. GAL6727181658, Insurance is provided for the liability assumed by Conservation Chemical Company of Illinois, the Insured, under that certain contract between the Insured and Sperry Univac, a Division of Sperry Rand Corporation, described as Purchase Order No. 497580S with Attachment "A" as revised 3-26-74.

A subsequent Certificate of Insurance (Document 0090025920) was issued by Foremost on September 24, 1974, to Sperry Univac, Division of Sperry Rand Corpora-

tion, certifying that CCC and CCCI were named insureds at P.O. Box 6404, Sheffield Station, Kansas City, Missouri 64125. The Certificate contains an attachment (Document 0090025921) which is substantially similar to the attachment to the first Certificate issued by Foremost and indicates that CCCI is the insured and that coverage, insofar as such is available under a certain policy, is provided for liability assumed by CCCI under a certain contract between CCCI and Sperry Univac in Purchase Order No. 487580S. Other Certificates of Insurance were issued by Foremost on October 7, 1974 and March 20, 1975. Each indicates that the insured is CCC and CCCI, with the post office box address in Kansas City, Missouri. Each contains the same statement regarding the assumption of contractual liabilities under the Purchase Order. (Documents 0090025904, 0090025905, 361005587 and 361005588). An additional Certificate of Insurance was issued by Home Insurance Company on April 30, 1975. The Certificate indicates that CCC and CCCI are the named insureds with a post office box address of P.O. Box 6066, Gary, Indiana, and references Purchase Order No. 530056S.

Based upon the foregoing "uncontroverted" facts, Sperry argues that under the express terms of the indemnity agreement, CCC is responsible for Sperry's damages, costs and expenses in this litigation. The Special Master disagrees.

■ It is not clear at all from the foregoing facts whether the indemnifying party was CCC or CCCI. Most of the documents attached to Foremost's motion would seem to establish that the contracting party and therefore the putative indemnitor was CCCI and not CCC. Furthermore, it is in no way clear from the documents attached to Foremost's motion whether some, most or nearly all of Sperry's waste materials went to the CCC–KC Site or to CCCI–Gary. Thus, it is impossible to say as a matter of law that under the express terms of the indemnifying agreement that CCC is responsible for Sperry's

damages, costs and expenses in this litigation.

But even if it were possible to establish beyond any doubt that CCC was the contracting party, it is unclear whether CCC contracted for liability under RCRA and/or CERCLA. Inasmuch as both RCRA and CERCLA were adopted subsequent to the contracting periods, it is doubtful that CCC and/or CCCI could have expected or intended to assume liability which was unknown. CERCLA claims differ radically from common law claims in that liability can be imposed without establishing fault. *United States v. Conservation Chem. Co.*, 589 F.Supp. 59 (W.D.Mo.1984). There is nothing about the indemnity provision which indicates clearly that CCCI (or CCC) intended it to apply to strict liability situations. Certainly Sperry has not presented evidence in support of its contention that CCCI (or CCC) intended to indemnify Sperry for CERCLA claims. For this reason alone, the Special Master finds that the entry of summary judgment in favor of Sperry is inappropriate.

Sperry contends that even in the absence of a contract, CCC would be liable to Sperry for indemnification. This argument once again assumes that CCC was the party with whom Sperry dealt and the party which created a condition causing injury for which Sperry became exposed. A more accurate statement would be that Sperry's liability arises out of its status as a generator under CERCLA and not because CCC created a condition which caused injury.

In support of its argument for noncontrctual indemnification from CCC, Sperry devotes one paragraph citing *Listerman v. Day & Night Plumbing & Heating Serv.*, 384 S.W.2d 111, 117 (Mo.App.1964), overruled, *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc. 1983) and *Hales v. Monroe*, 544 F.2d 331 (8th Cir.1976). Both cases cited by Sperry involved actions by those who had neither knowledge of nor responsibility for the condition giving rise to liability. Each sought indemnification from the culpable party. Here, Sperry has not established either its own innocence or even that

CCC was more culpable. Furthermore, concepts such as fault and culpability find no place in the statutory scheme of RCRA and CERCLA. It certainly cannot be said as a matter of law that Sperry is entitled to any non-contractual indemnity from CCC. Finally, the Special Master finds that Sperry has failed to establish as a matter of law that it is a third-party beneficiary of either the primary or excess policies issued by Foremost or Home. It is not clear from the record and facts presented to support the motion that it was the intent of the insurance companies to confer a benefit on Sperry. Likewise, it cannot be said as a matter of law that CCC intended or expected the insurance companies to provide indemnification.

■ Finally, the Special Master believes that despite Sperry's contrary argument regarding RSMo § 379.200, Sperry is not at the present time a judgment creditor of CCC, and therefore, such statute is unavailing.

For all of the foregoing reasons, the Special Master recommends *denial* of each and every motion and submotion filed by Sperry Corporation against CCC seeking entry of summary judgment on the issue of indemnification.

### 2. *Murray Ohio Manufacturing Co.*

To support its claim to judgment as a matter of law on the issue of contractual indemnity, Murray Ohio alleges that it obtained from CCC an "explicit, unambiguous agreement that CCC would indemnify Murray Ohio for any expenses or liabilities arising from CCC's disposition of Murray Ohio's waste." (Memo. in Support at 6). According to Murray Ohio, this "explicit, unambiguous agreement" is embodied in a letter from Terry L. Robbins of CCC to Roy Ezell of Murray Ohio dated December 22, 1972. The subject letter is attached as Exhibit B–1. In pertinent part it states:

> This letter sets forth the terms of our liability in regards to disposal of your waste material.

> The following materials, *waste Cyanide solution,* will be disposed of in full com-

pliance with applicable laws and governmental regulations during the term of this agreement, as they relate to our handling and disposal. We further agree to hold you harmless from all loss, cost, expense or liability, which may be occasioned by such disposition.

> These materials (*waste Cyanide solution*), become our property F.O.B. our dock or truck.

The letter is signed on behalf of CCC by Terry L. Robbins whose position with the company is noted as "Sales & Marketing."

■ Several questions immediately rise in connection with Exhibit B–1. The letter is written on CCCI stationery showing an address of Box 6066, Gary, Indiana 46406, while Terry L. Robbins purports to sign the letter on behalf of CCC. It is certainly unclear from this apparent conflict whether the indemnifying party was intended to be CCCI or CCC. Although Murray Ohio contends that the document is dated December 22, 1972, the letter itself is dated "December 22, 197." Thus, it is unclear when the letter was drafted or sent to Murray Ohio. The second paragraph of the letter is likewise far from "explicit and unambiguous" as alleged by Murray Ohio. For example, the agreement does not more than agree to hold Murray Ohio harmless for expenses or liabilities occasioned by "such disposition." It is unclear whether "such disposition" refers to CCC's "handling" or its "disposal" or both or perhaps neither. Finally, and perhaps most critical to the present motion, the subject letter does not clearly and unambiguously indicate that Terry L. Robbins had authority to speak for or on behalf of CCCI and/or CCC, and certainly nothing in the letter indicates that either CCCI or CCC agreed to the terms and conditions set forth by Mr. Robbins. The Special Master believes that each of these presents a triable issue of fact making the entry of summary judgment inappropriate.

As a secondary basis for finding that CCC expressly agreed to indemnify Murray Ohio, it is argued that Murray Ohio's Blanket Purchase Orders for CCC's services contained a requirement imposing contrac-

tual indemnification. The Purchase Orders contained the following requirement:

> If any work is done on our premises or other premises where we or our affiliated corporations may be responsible, you shall indemnify and hold us and our affiliated corporations harmless from and against any liability, loss, cost or expense (including reasonable attorneys' fees).

Murray Ohio contends that CCC agreed to this provision by accepting the Purchase Orders for the years 1975 through 1979.

As with the letter discussed above, the Special Master believes that the clause contained in the Purchase Orders does not unambiguously contain an expression whereby CCC agreed to indemnify Murray Ohio for liability under RCRA and/or CERCLA. In Missouri, indemnity provisions are narrowly construed. If a party wishes to indemnify for his own culpable conduct, language that is broad and all inclusive generally will not suffice. The indemnity provision must give clear notice that it applies to damage resulting from culpable acts of the party claiming indemnification. *Kansas City Power & Light Co. v. Federal Construction Corp.*, 351 S.W.2d 741, 745 (Mo.1961); *New York Central Ry. v. Chicago & E.I.R. Co.*, 360 Mo. 885, 231 S.W.2d 174 (1950); *Southwestern Bell Telephone Co. v. J.A. Tobin Const. Co.*, 536 S.W.2d 881, 885 (Mo.App.1976). The indemnity provision must also be placed in the contract so that the indemnitor has fair notice of its existence, *Safway Scaffold Co. of Houston, Inc. v. Safway Steel Products, Inc.*, 570 S.W.2d 225, Tex.App.1978), and where provisions appear on the back of a printed form surrounded by unrelated terms, it is not conspicuous and may not be enforced. The Purchase Orders do not conclusively establish whether these Purchase Orders covered all waste that Murray Ohio shipped or entrusted to CCC. Murray Ohio is silent on this point. Murray Ohio does acknowledge, however, that only some of the Purchase Orders contain the alleged indemnification agreement. Indemnity provisions were not put on the back of Purchase Order forms until 1975 (Murray Ohio

Memo. at 3, 6). A question exists, therefore, about the portion of Murray Ohio's waste stream covered by the alleged Purchase Order "contract." Furthermore, nothing in the record before the Court establishes conclusively that CCC ever knew of the existence of the indemnification clause on the reverse side of the Purchase Order forms, or, of greater importance, that CCC agreed to such provision.

For the foregoing reasons, the Special Master recommends that the motion of Murray Ohio seeking indemnification from CCC for Murray Ohio's damages, costs and expenses in this litigation be *denied*. With respect to Points B, C, D, E and F as well as those points raised under Section III and subparts A, B and C thereof, the Special Master recommends that each be denied.

Also pending is the motion of Sperry Corporation and Murray Ohio seeking summary judgment against Illinois Employers Insurance of Wausau. At the hearing on Thursday, May 29, 1986, counsel for Illinois Employers Insurance of Wausau and Sperry Corporation and Murray Ohio indicated that in light of the settlement reached between Illinois Employers Insurance of Wausau and its insureds (CCC and CCCI) as well as the OGDs, that neither Sperry nor Murray Ohio intended to pursue their crossclaims against Illinois Employers Insurance of Wausau. Because of the agreement expressed at the hearing and because the settlement has not been approved by the Court, the Special Master finds the present motion to be premature and recommends no action on it at this time.

O. CONTRACTUAL IDEMNITY.

The OGDs have moved for summary judgment against CCC declaring that each is entitled to indemnification for all damage, costs and fees incurred, or to be incurred, by each in this action or as a result of this action, including without limitation (1) the amount of response costs, including the cost of the Remedial Investigation and Feasibility Study; (2) the amount of attorney's fees, legal expenses, court costs and all other expenses lawfully incurred in de-

fending the claims of the United States; and (3) the amount of sums expended and to be expended pursuant to the Preliminary Agreement.

The OGDs argue that because CCC has been held liable to the United States as a matter law upon the claims asserted, and because each is contractually entitled to indemnification for all claims arising out of the services supplied by CCC, that entry of summary judgment is appropriate.

(A) *The Motions.*

1. *Armco.*

Sometime in 1964, an Agreement was executed between Armco and CCC whereby Armco agreed to furnish to CCC, without charge to CCC, a quantity of pickle liquor not to exceed 20,000 gallons per week for a period of one year. The Agreement recites that the pickle liquor will be used by CCC for experimenting in the manufacture of ferric chloride and/or ferric sulfate for use in the treatment of sanitary sewage in sewage treatment plants and for use in water treatment plants. The Agreement further provides that CCC shall provide the means for removal of the pickle liquor from Armco's tanks at such time as Armco deems necessary or convenient. Pertinent to the present motions, the Agreement provided:

Conservation agrees to indemnify and hold harmless Armco against any and all claims, liability and causes of action for personal injury to or death of persons and damage to property in any way arising out of or in connection with the removal of pickle liquor from the premises of Armco's plant in Kansas City, Missouri, the transportation of such pickle liquor to any other point or the use thereof for any purpose or in the manufacture of any product.

The Agreement provided that it shall remain in force and effect for a period of one year, although as mentioned above, the Agreement is undated. The Agreement was apparently signed by N.B. Hjersted on behalf of Conservation Chemical Company. (Exhibit "A").

On some date in December of 1970, Armco and CCC entered into a "Standard Performance Contract" whereby CCC agreed to sell to Armco and Armco agreed to purchase from CCC certain unspecified "equipment, material, work and services at prices and subject to terms and conditions all set forth in any purchase order or orders issued hereunder referencing this contract." Paragraph 2 of Standard Performance Contract No. 856 provided:

2. INDEMNITY

Contractor shall protect, indemnify and save harmless Armco of and from any loss, cost, damage or expense arising from:

(a) any and all claims which may be made against Armco by reason of injury or death to person or damage to property suffered or claimed to have been suffered by any person, firm, corporation, or other entity caused by or alleged to have been caused by any act or omission, negligent or otherwise, of Contractor or any subcontractor of Contractor or of any of their employees, workmen, servants or agents;

\* \* \* \* \* \*

(c) any and all claims which may be made against Armco by reason of injury or death to person or damage to property, however caused or alleged to have been caused, and even though claimed to be due to Armco's negligence, suffered or claimed to have been suffered by Contractor or any subcontractor of Contractor or by any of their employees, workmen, servants or agents; ...

The Agreement further provides that CCC shall carry at its sole expense liability and property damage insurance covering all operations and work in amounts of not less than $100,000 for all liability arising out of injury to or death of one person and $300,000 for all liability arising out of injuries to or death of two or more persons in any one occurrence, and not less than $100,000 for all liability arising out of injury to or destruction of property in any one occurrence, and $100,000 in the aggregate aris-

ing out of injury to or destruction of property. The Contract is executed on behalf of Conservation Chemical Co. by Larry E. Barbee. Mr. Barbee's title or position at CCC is not disclosed. (Exhibit "B").

Finally, Armco attaches a series of Purchase Orders dated June 14, 1978, March 27, 1979, and October 16, 1979. Each Purchase Order incorporates terms and conditions on the reverse side, including Section 14, relating to insurance and indemnity. The pertinent paragraph reads:

INSURANCE AND INDEMNITY.

If this purchase order requires the performance of work or services on Buyer's property—

A. Indemnity—Seller shall protect, indemnity and hold harmless the Buyer and any of its subsidiaries thereof, of and from any loss, cost, damage or expense arising from

(1) any and all claims which may be made against Buyer or any subsidiaries thereof, by reason of injury or death to person or damage to property, suffered or claimed to have been suffered by any person, firm, corporation or other entity caused by or alleged to have been caused by any act or omission, negligent or otherwise of Seller or any of Seller's employees, workmen, servants or agents;

(2) * * *

(3) any and all claims which may be made against Buyer or any subsidiaries thereof by reason of injury or death to person or damage to property, however caused or alleged to have been caused, and even though claimed to be due to the negligence of Buyer or any subsidiaries thereof, suffered or claimed to have been suffered by Seller or any of Seller's employees, workmen, servants or agents.

(Exhibits "C" and "D").

Armco alleges that taken together these provisions establish CCC's obligation to hold Armco harmless should it be found liable to the United States for any claims asserted in the First Amended Complaint.

2. *AT & T Technologies.*

The contracts executed by CCC and AT & T-TI contain provisions concerning liability and indemnification. Attachments 1 and Exhibits A through J are attached to AT & T-TI's motion. For example, in Exhibit "C", the following language is found under the heading "LIABILITY" in the section entitled "Terms and Conditions":

You agree to indemnify and save us and our customers harmless from and claims or demands (including the costs, expenses and reasonable attorney's fees on account thereof) that may be made: (1) by anyone for injuries to persons or damage to property resulting from your acts or omissions or those of persons furnished by you; or (2) by persons furnished by you or your subcontractors under Workman's Compensation or similar acts. You agree to defend us and our customers, at our request, against any such claim or demand.

In a document entitled "CONTRACT FOR MISCELLANEOUS WORK" dated June 23 (?), 1962, relating to the pickup and removal of waste cyanide from Western Electric Company's premises, the following provision is set forth:

In view of the hazardous nature of the waste material here involved, the Contractor [Conservation Chemical Co.] agrees, in addition to what is required by Articles V and VII of the "General Conditions", to exercise every reasonable safety precaution, whether or not required by law, in the performance of this contract, and to indemnify Western against claims of any nature arising out of its failure to do so, and to assume full responsibility for the waste material upon the vesting of title, and to indemnify Western against claims of any nature with respect thereto.

Finally, it is alleged that CCC agreed that it would comply with all applicable federal, state, county and municipal laws, ordinances and regulations in the performance of the contracts and would indemnify AT & T-TI for any loss or damage which AT & T-TI might sustain by reason of CCC's

failure to do so. "The Contractor agrees that it will and all subcontractors engaged by it with the written consent of Western shall comply with all applicable federal, state, county and municipal laws, ordinances and regulations including procurement of permits where needed in connection with work done hereunder; and the Contractor agrees to indemnify Western for any loss or damage which Western may sustain by reason of its or its approved subcontractors' failure so to do." (Exhibit A, General Conditions, Document W000217).

Although not disclosed by AT & T–TI in its Suggestions, a review of the documents reveals that several were never executed by CCC while others were apparently signed by Larry Barbee in his purported capacity as "Office Manager" for CCC. Several of the exhibits advanced to support the motion are illegible.

### 3. *FMC Corporation.*

The agreements executed by CCC and FMC contain some provision concerning liability and indemnification. *See*, Exhibits 1–9 of Exhibit A attached to FMC's motion. Pertinent to the present motion, CCC agreed as follows:

> Conservation Chemical shall indemnify and hold harmless FMC, its officers, directors, and employees from and any all claims, liabilities, obligations, and causes of action and shall defend any suit against FMC, its officers, directors, employees, and shall pay all damages, costs and expenses in connection with such action for injury to or death of any person or for damage to or destruction of any property occurring, growing out of, incidental to, or resulting from the performance or lack of performance of Conservation Chemical and any subcontractor and their respective employees in connection with the services required to be performed by Conservation Chemical under this agreement, incuding, but not by limitation, injury, death, loss, damage, or destruction caused by the industrial waste material at any time after owner-

ship thereof passes to Conservation Chemical.

The above-quoted language taken from a "Service Agreement" dated June 2, 1972 between Conservation Chemical Company and FMC Corporation, and was apparently executed by N.B. Hjersted as "President" of Conservation Chemical Company. The Service Agreement relates to waste materials containing arsenic sulfide.

A Service Agreement identical to the preceding one above was executed between CCC and FMC on December 7, 1973, and again was executed by N.B. Hjersted as "President" of CCC.

Also in support of its motion on the issue of indemnification, FMC contends that CCC warranted that all services performed under the agreements would be done in compliance with all federal, state and local laws and regulations. Further that CCC agreed to obtain and keep in force at all times appropriate permits and licenses. And further, CCC agreed to assume ownership of FMC's wastes as soon as CCC took possession of them and in that regard, "FMC shall have no responsibility therefor [and] Conservation Chemical shall be solely responsible for any and all ... damage to and destruction of property arising out of, caused by, or resulting from the removal, transportation, and disposal of the industrial waste material." Finally, it is contended that CCC agreed to procure and did procure liability insurance to meet claims arising under the agreements.

### 4. *IBM.*

By letter agreement dated October 7, 1969 and May 1, 1971, IBM entered into contracts with CCCI and CCC respectively for the "removal and disposal of chemicals, liquid wastes, and certain toxic and inflammable materials" and the "transporting and disposing of chemicals, liquid wastes, and certain toxic and inflammable materials."

Although the October 7, 1969 agreement recites that it is between Conservation Chemical Company of Illinois, it was apparently "accepted and agreed to" by CCC

under the signature of N.B. Hjersted as "President" on December 30, 1969. (Exhibit "A"). The May 1, 1971 service agreement recites that it is between IBM and "Conservation Chemical Company, a corporation of the State of Illinois." It was apparently "accepted and agreed to for" CCC by Harold W. Eagan on May 13, 1981. Mr. Eagan's title or position with CCC does not appear. Subject to the rights of termination specified in the agreement, the agreement was for the period May 1, 1971 through April 30, 1972.

On December 21, 1971, IBM's facility in Lexington, Kentucky, issued a "Request for Quotation" or "Inquiry" under Inquiry No. 53932–3PE to CCC at 6500 Industrial Highway, Box 6066, Gary, Indiana 46406. The "Request for Quotation" clearly states that "THIS IS NOT AN ORDER" and goes on to describe the "requested services" as "blanket order to cover the hauling and disposing of bulk chemicals for the period 1-1-72 through 12-31-72." It states that quotations for the described services must be in IBM–Lexington's possession by 1-3-72. Under the heading "Description," the following language is set forth:

> Distruction [sic] must be by incineration. Vendor will furnish hoses & fittings. Shall meet all state & local requirements of waste disposal & agree to hold IBM harmless from any claim or suits by any firm, corp., individual, municipality or government agency concerning the treatment & or disposal of any waste material hauled by ____ for IBM under this purchase order. IBM General Conditions apply to all work performed on IBM property.

On the reverse side of Exhibit "C," IBM provides instructions for the completion and submission of the request. Exhibit "C" is neither signed nor acknowledged by CCC and/or CCCI.

Exhibit "D" attached to IBM's motion and suggestions is a copy of a letter from M.M. Collings, Jr. of IBM's Purchasing Department in Austin, Texas. The letter is written to Mr. Larry E. Barbee at CCC in Kansas City, Missouri, and is a request for execution of four copies of a "Hold Harmless" certificate. The letter is dated November 20, 1970. Attached to the letter are four copies of a document purporting to be a "Hold Harmless" attachment to blanket Purchase Order No. 53442AF755 between CCC and IBM–Austin, Texas. The documents are signed by Larry E. Barbee and dated 12–31–70. Neither Mr. Barbee's authority for executing the documents nor his title with CCC is disclosed, however.

IBM claims that the purpose and plain meaning of the documents was to ensure that CCC and not IBM would be financially responsible for any claims arising in connection with waste disposal services furnished by CCC.

(B) *Discussion.*

██ 42 U.S.C. § 9607(a), in addition to identifying different classes of potentially responsible parties, acknowledges the ability of contractual agreements to modify the allocation of liability between parties. Section 107(e) provides:

> (1) No indemnification, hold harmless or similar agreement or conveyance shall be effective to transfer from ... any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless or indemnify a party to such agreement for any liability under this section.
> (2) Noting in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that ... any other person subject to liability under this section ... has, or would have, by reason of subrogation or otherwise against any person.

The quoted subsections do no more than indicate that the subsection cannot act as a bar to any agreement to hold harmless or indemnify a party for liability established under § 9607. Section 107(e)(1) certainly does not encourage or even authorize indemnity agreements, it simply states that such are not prohibited. Section 107(e)(2)

provides that causes of action which a liable party has or may have by reason of subrogation or otherwise is not barred by the provisions of the subchapter, including the provisions of paragraph (1) of § 9607(e). Like the first paragraph, the second is not so much an affirmative statement approving the use and effect of indemnity agreements as it is an acquiescence in the use of agreements for indemnity.

Nothing in § 9607(e) indicates a clear intent to permit existing or pre-existing indemnity agreements to shift current liability among parties found liable under CERCLA. On the other hand, since liability under CERCLA is retroactive, *United States v. Conservation Chem Co.*, 619 F.Supp. 162, 217–222 (W.D.Mo.1985), it appears at least reasonable to assume that Congress may have taken into account the possibility of pre-existing indemnity agreements being called into play or liability imposed under CERCLA. This position is perhaps bolstered by the use of the phrases "liability imposed under this section" and "any liability under this section" used in paragraph (1), and in paragraph (2) the phrase "any other person subject to liability under this section." It is therefore the retroactive liability under CERCLA which are subject to agreements which cannot be barred and for which causes of action may be asserted.

The Special Master therefore believes that CERCLA does not prevent actions for indemnification based upon agreements to insure, hold harmless or indemnify a party for liability under 42. U.S.C. § 9607.

■ Armco, AT & T–TI, FMC and IBM have cited and apparently believe that the law of Missouri must be applied to the various purchase orders and agreements for purposes of the motions for summary judgment. In other context and for other purposes, the Special Master agreed that Missouri law must be applied (*see,* Section D above) to determine matters regarding insurance contracts and torts. It is upon the present record whether Missouri law must be applied to the indemnity agree-

ments or whether the law of some other state must be applied to determine whether such are effective. In this regard, neither the OGDs nor the parties opposing the present motions have disclosed any of the factors necessary to determine which state might have the most significant relationship to the indemnity agreements. That is, it is not apparent (and certainly not disclosed by the parties) where the agreements were negotiated, the location of execution, or the precise location understood to be the principal place of the acts leading to indemnity. Similarly, it is not even clear who the parties to the agreements may have been for some of the agreements indicate CCCI, while still others refer to CCC but state an address in Gary, Indiana.

Because the Special Master is unable, upon the present record, to make a determination as to the applicable state law, the motions must be denied pending development of those factors which would enable a determination of the state possessing the most significant relationship to the parties and indemnity.

But even if Missouri law were found to apply as a matter of law, the Special Master nevertheless believes that summary judgment would be inappropriate based upon the numerous material issues of fact remaining. In order to provide the parties with guidance in preparing for trial, the Special Master believes that the parties should be prepared to present evidence concerning each of the factors set forth in § 188 of the Restatement (Second) of Conflict of Laws as well as the specific issues enumerated below.

*1. Armco.*

■ A number of factual disputes arise in the examination of the exhibits attached as evidence of alleged indemnification agreements.

Exhibit A headed "AGREEMENT" is between Armco and CCC, and represents the agreement for Armco to *furnish* pickle liquor to CCC without charge. One factual issue is that the agreement purports to stay in effect for one year, but is only

dated 1964, leaving the period of the agreement unclear. Another factual issue is that the asserted indemnification agreement refers to liabilities arising out of "removal, transportation, or use for any purpose or in the manufacture of any product." The agreement does not explicitly refer to "disposal," the act for which liability was ultimately found. There is no indication that the indemnity provision was designed to survive the end of the contract period.

Exhibit B, headed "Standard Performance Contract No. 856," is between Armco and CCC. The contract is dated December 7, 1970. The contract by its terms applies to Purchase Orders which reference to it. The contract is signed by Larry E. Barbee for CCC. The title of Barbee is not noted and there is no indication of his status or whether he has authority to bind CCC to the agreement. The date of the contract, December 7, 1970, raises a fact question as to the period of approximately five years between when the preceding agreement ran and the institution of the contract period. Included within this period is the year 1969, when Armco has acknowledge disposal of 950,000 gallons of waste; a period in which no contract of indemnity is alleged to have been in effect. The act or omission clause does not explicitly apply to strict liability. Exhibits C and D are three Armco Purchase Orders to CCC. Included are two copies of boiler plate "Terms and Conditions" which apparently come from the reverse side of the Purchase Orders. The legible dates on the Purchase Orders are 3/27/79 and 10/16/79; the other is apparently June, 1978. The indemnity provision which is legible calls for CCC to hold harmless Armco for claims based on acts or omissions, negligent or otherwise, of CCC and its employees, and claims based on Armco's alleged negligence suffered by CCC and its employees. Factual issues that arise include the fact that the Purchase Orders do not reference the contract discussed above. The Purchase Orders are not signed by any representative of CCC, raising the question of whether the terms were agreed to and accepted by CCC. The

Purchase Orders only cover a period in the late–1970s; whether waste received prior to these Purchase Orders were subject to similar orders is subject to dispute. A factual issue applying to all of these exhibits is the lack of any indication as to where the waste materials were. It is undisputed that Hjersted and his affiliated companies operated three sites; none of the exhibits cited as the basis of the indemnity reveal any reference to the CCC–KC Site. As noted by the Special Master, the OGDs

> have adroitly disputed material facts concerning the shipment of their waste to the CCC site. For example, while admitting that invoices and shipping records reflect that their wastes were intended to be disposed of at the CCC site, they rely on Norman Hjersted's deposition testimony that some or all of such wastes may not have been disposed of at the CCC site and thereby put those facts in issue.

*United States v. Conservation Chem. Co.,* 619 F.Supp. 162, 191 (W.D.Mo.1985).

### 2. *AT & T–TI.*

Factual disputes arise in the exhibits attached as evidence of alleged indemnification agreements.

Exhibits A and B are headed "Contract for Miscellaneous Work." The contracts are between Western Electric (AT & T–TI's predecessor) and CCC. Exhibit B, dated December 21, 1962, is for the pickup and removal of waste acid. Exhibit A is dated June 23, 1962, and by amendment is to continue through December 31, 1970. It is signed by Norman Hjersted; the amendment is signed by "Office Manager" Larry Barbee. The Exhibit A contract is for the pick up and removal of waste cyanide. The indemnification provisions of both contracts purport to have CCC indemnify Western for claims arising from acts or omissions of CCC or from CCC's failure to comply with applicable laws. Both contracts' indemnity provisions are modified by amendments acknowledging the hazardous nature of the waste and requiring indemnity for CCC's failure to exercise every reasonable safety precausion. The contracts are not specific

as to the waste involved, raising a question if other wastes were removed. The nature, type and quantity of waste is unclear. It is unclear where the wastes were to be disposed, and where they were ultimately disposed. Another factual issue is that the first date is June of 1962. It is asserted that Western's first consignment was in early 1961. It is also an issue whether Barbee can sign an amendment and bind CCC to the longer time period when his authority is nowhere established. The acts or omissions clause of the indemnity agreements do not explicitly apply to strict liability.

Exhibit C is a contract between Western and CCC for the removal of waste flammable liquids, miscellaneous waste chemicals and waste acids. It is purportedly accepted on November 20, 1968 by Larry Barbee for CCC and is not to extend beyond December 31, 1971 or beyond an expenditure (as amended) of $41,000. The contract is not dated, but is referred to in the amendment as the contract of January 1, 1969. The indemnity provision is similar, but less detailed, and there is no amendment specifically recognizing the hazardous nature of the waste material. Similar fact questions arise: the authority of Barbee to bind CCC; and strict liability is not specifically recognized. The inclusion of other classes of waste raise further questions regarding the contracts noted earlier and their coverage. There is no indication of where the wastes removed were taken, the earlier quoted statement from the Special Master's recommendation should be noted here.

Exhibit D is a seven-page service order between Western and CCC for the removal, transport and destruction of waste materials. It is dated 12/22/71 and applies to January 1, 1972 through January 31, 1972. Removal of bulk mixed solvents, miscellaneous waste chemicals, bulk acids and waste cyanides is contemplated by the service order. Apparently no indemnification provision other than the one recognizing the hazardous nature of the waste materials and requiring indemnity for a failure to exercise every reasonable safety precaution that results in a claim. There is no

signature by any representative of CCC, raising a question of agreement and acceptance. Again, there is no indication where wastes picked up were deposited.

Exhibits E, F, G, I and J are Purchase Orders from Western Electric to CCC. They cover periods from January 1, 1973 through December 31, 1975. The Purchase Orders are not signed by any representative of CCC. They include indemnity agreements essentially the same as those previously noted, including the amendments. Similar factual questions apply.

Exhibit H is a letter agreement from CCC to Western Electric to confirm a quote. It seems to include a proposed hold harmless provision. The letter is not signed, but is over the name of Joan Miller, a market analyst for CCC. There is no indication that it is more than a negotiation or that it was accepted by Western. The letter refers to a "special job," and refers only to spent cyanide. This letter as application to other waste is unclear.

Whether the affidavits in support of the motions are sufficient to meet the requirements for Rule 56 Summary Judgment is unclear. Deficiencies have been alleged in that there is no statement of the affiant's personal knowledge or the affiant's competence or qualification to establish proper foundation under the Federal Rules of Evidence.

### 3. FMC.

FMC Exhibit 1 is a Purchase Order dated September 20, 1963. It contains one sentence which could conceivably be read as an indemnification agreement. The sentence reads: "Conservation Chemical to assume all responsibility and liability for the collection and disposal of this material." With respect to Exhibit 1, it is not established as to the type of material or the quantity which Conservation Chemical Company agreed to collect and dispose. Likewise, it is not clear where the materials were disposed, and certainly the document does not establish that the materials were sent to the CCC–KC Site.

FMC Exhibit 2 is similar to the preceding exhibit, and also refers to terms and conditions in a letter and telephone conversation which are neither included nor attached to the motion. Exhibit 2 contains no express indemnity agreement, a description of the materials, the quantity of the materials, or the location where the materials were to be shipped. Exhibits 3, 4, and 5 contain no indemnity provisions and no references to CCC's purchase of insurance to cover FMC. Exhibit 5 incorporates a sheet of "insurance requirements" which does not appear. These exhibits are Purchase Orders for separate jobs, each of which involve CCC's receipt of an unspecified amount of toxic wastes. Again, as with the previous exhibits, it is unclear where the wastes were to be disposed, where the wastes were actually disposed, the nature and type of wastes, and the quantity of the waste material.

Exhibits 6, 7, and 8 are "Service Agreements" dated June 2, 1972 and December 7, 1973. Each purports to be an agreement between CCC and FMC relating to the evacuation and removal of industrial waste materials to CCC's facility. It is unclear from the documents the exact nature and quantity of waste materials picked up by CCC during the life of the agreements.

FMC Exhibit 9 is another, later Purchase Order which is expressly subject to "the conditions described in a letter to Mr. G.M. Gilmore from Ms. Joan Miller dated February 14, 1977 (copy attached) ...", but no February 14, letter appears in the motion. And, as with other exhibits, it is unclear as to where the waste materials were disposed of, the type and nature of the waste materials, and the quantity of the waste materials.

### 4. *IBM.*

Exhibit "A" attached to IBM's motion for summary judgment is a letter dated October 7, 1969 from IBM–Bolder, Colorado to Conservation Chemical Company, P.O. Box 6304, Kansas City, Missouri 64126. The letter indicates that it is an agreement between CCCI and IBM to remove and dispose of chemicals, liquid wastes and certain toxic and inflammable materials. The letter is signed by N.B. Hjersted as "President" of CCC. This inconsistency as to the entities creates a question as to whether the contract was with CCC or CCCI. The contract is silent as to the exact type and quantity of waste materials as well as the location where the materials were to be disposed of.

Exhibit "B" is a letter dated May 1, 1971 from IBM–Bolder, Colorado to CCC, P.O. Box 6304, Kansas City, Missouri 64126, and references Agreement No. 0054D. The exhibit goes on to state that it is a "service agreement" between IBM and CCC, a corporation of the *State of Illinois* with offices at 8900 Front Street, Kansas City, Missouri. The agreement allegedly provides for transportation and disposing of chemicals, liquid waste and certain toxic and inflammable materials. It was apparently accepted and agreed to for CCC by Harold W. Eagan on May 13, 1971. As with the previous document, there is a question as to the entity intended to be referenced as CCC is an was not an Illinois corporation. There is also a question as to the authority of Harold W. Eagan to sign the document on behalf of Conservation Chemical Company. Mr. Eagan's title is not shown and no document produced on this motion indicates that Mr. Eagan was authorized by board resolution or otherwise to bind CCC.

Exhibit "C" is a Request for Quotation, and according to the document itself, is not an order. Despite the language contained under the heading "DESCRIPTION," there is a material question as to whether Exhibit "C" is in fact an order or simply a request by IBM for a quotation of work to be performed, together with a list of various conditions which would be imposed if a contractual relationship were established. Because it is unclear as to whether Exhibit "C" is or is not a contractual agreement, it is impossible to say whether CCC is bound by any of the provisions. If Exhibit "C" is a Purchase Order in direct contradiction to what is printed thereon, questions exist as to the exact quantity, quality and nature of

the waste materials as well as the ultimate disposal site for such.

Finally, IBM relies upon Exhibit "D" which is a letter from M.M. Collings, Jr. to Larry E. Barbee of Conservation Chemical Company. The letter is a request to execute four "Hold Harmless" certificates. Attached to the letter are the four copies of the hold harmless agreement. Inasmuch as the "Hold Harmless" agreements are not attached to any Purchase Orders, a question exists as to whether they are applicable to any particular transaction between IBM and CCC or were simply executed in contemplation of some future course of conduct which never materialized.

Exhibit "A" to IBM's motion purports to be a contract between IBM and CCC for the period October 13, 1969 through January 31, 1970. IBM Exhibit "A", Paragraph 14, p. 5. The chronologically subsequent contract, IBM Exhibit "B," covers the period May 1, 1971 through April 30, 1972. The "blanket hold harmless certificates" are dated December 31, 1970. IBM Exhibits "C" and "D". In addition to questions relating to the authority of Mr. Barbee to execute the "blanket hold harmless certificates," no express contract exists between CCC and IBM for the period January 31, 1970 to December 31, 1970 or May 1, 1971. Yet during that time, IBM admits that IBM–Austin consigned over 1,700 gallons of spent cyanide to CCC at Kansas City, pursuant to various invoices. Furthermore, IBM introduces no contracts dated earlier than October 13, 1969. (IBM Exhibit "A"), but IBM admits that CCC billed IBM–Rochester for the disposal of drums of waste cyanide in 1967 and 1968, and that IBM consigned most, if not all, of those drums to CCC for shipment to Kansas City. Finally, IBM admits that CCC billed IBM on April 30, 1971 for the pickup and disposal of drums of spent chemicals and fourteen other containers from IBM–Boulder. IBM does not deny that the material may have been shipped to the Kansas City Site. No contract was in effect at the time, and IBM makes no showing that one of the

blanket hold harmless agreements applied to that shipment.

Given the issues set forth above, material issue exists as to the quantity of waste which was actually deposited at the CCC–KC Site and the extent of shipments clearly not covered by the indemnity agreements even if such are effective.

For the above reasons, the Special Master finds that summary judgment is not proper on the Motions of Armco, AT & T–TI, FMC and IMB against CCC for contractual indemnification. Therefore, the Special Master recommends that the separate motions of the OGDs be *denied.*

## CONCLUSION

For the reasons stated in each of the above sections, the Special Master recommends to the Court that the motions be ruled upon in accordance with this Report.